**PUBLIC VERSION**
**CONFIDENTIAL**
**MATERIAL REDACTED**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

JOHN WILEY & SONS, INC.,                              :    Case No. 1:11-cv-05454 (GBD)(KNF)

      Plaintiff, Counterclaim Defendant,        :

                                       :

          -against-                                    :    **ECF Case**

DRK PHOTO,                                                :

      Defendant, Counterclaimant.               :

                                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

## JOHN WILEY & SONS, INC.'S MEMORANDUM OF LAW
## <u>IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>

Robert Penchina
Christopher P. Beall
LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
321 W. 44th Street, Suite 1000
New York, NY 10036
(212) 850-6100

Joseph J. Barker
JOHN WILEY & SONS, INC.
111 River Street
Hoboken, NJ 07030
(201) 748-7862

*Attorneys for Plaintiff John Wiley & Sons, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION .........................................................................................................................1

FACTS ..........................................................................................................................................2

ARGUMENT.................................................................................................................................6

I.      DRK LACKS STANDING TO ASSERT COPYRIGHT INFRINGEMENT
        CLAIMS ..............................................................................................................................6

II.     DRK HAS NO VIABLE CLAIMS RELATING TO STEPHEN
        KRASEMANN'S PREVIOUSLY REGISTERED PHOTOS...........................................12

        A.      DRK Has No Rights in the Previously Registered Photos of Stephen
                Krasemann .............................................................................................................13

        B.      Stephen Krasemann's Copyright Registration Nos. VAu 175-200 and
                VAu 516-002 Are Invalid ......................................................................................13

III.    A DECLARATION OF NON-INFRINGEMENT SHOULD BE ISSUED......................18

CONCLUSION............................................................................................................................19

# TABLE OF AUTHORITIES

**CASES**                                                                                              **PAGE(S)**

*Bouchat v. Bon–Ton Department Stores, Inc.*,
   506 F.3d 315 (4th Cir. 2007) .......................................................................................... 13-14

*Determined Productions, Inc. v. Koster*,
   1993 WL 120463 (N.D. Cal. Apr. 13, 1993) ....................................................................14, 15

*DRK Photo v. Houghton Mifflin Harcourt*,
   09-cv-08225-NVW (D. Az. Dec. 14. 2009)................................................................................4

*DRK Photo v. John Wiley & Sons, Inc.*,
   11-cv-08133-FJM (D. Az. Aug. 25, 2011) ...............................................................................4

*DRK Photo v. John Wiley & Sons, Inc.*,
   AAA # No. 76 143 00193 11 (Feb. 1, 2013) .............................................................................6

*DRK Photo v. McGraw Hill Cos.*,
   11-cv-08059-FJM (D. Az. Apr. 15, 2011)................................................................................4

*DRK Photo v. Pearson Education, Inc.*,
   11-cv-08097-PGR (D. Az. Jun. 27, 2011) ................................................................................4

*Eden Toys, Inc. v. Florelee Undergarment Co.*,
   697 F.2d 27 (2d Cir. 1982)........................................................................................................6

*Family Dollar Stores, Inc. v. United Fabrics International, Inc.*,
   896 F. Supp. 2d 223 (S.D.N.Y. 2012)........................................................................14, 15, 17

*Granse v. Brown Photo Co.*,
   1985 WL 26033 (D. Minn. July 1, 1985) ...............................................................................15

*HyperQuest, Inc. v. N'Site Solutions, Inc.*,
   632 F.3d 377 (7th Cir. 2011), *pet. for reh'g and reh'g en banc denied*, 2011 U.S.
   App. LEXIS 4512 (7th Cir. Feb. 23, 2011) .............................................................................7

*Kay Berry, Inc. v. Taylor Gifts, Inc.*,
   421 F.3d 199 (3d Cir. 2005)............................................................................................... 17-18

*L.A. Printex Industries, Inc. v. Le Chateau, Inc.*,
   2012 WL 987590 (S.D.N.Y. Mar. 23, 2012) ........................................................................14

*Minden Pictures, Inc. v. John Wiley & Sons, Inc.*,
   2013 WL 1995208 (N.D. Cal. May 13, 2013) ("*Minden II*")...........................................7, 8, 9

*Minden Pictures, Inc. v. Pearson Education, Inc.*,
   --- F. Supp. 2d ---, 2013 WL 812412 (N.D. Cal. Mar. 5, 2013) ("*Minden I*") ............... passim

*Reed Elsevier, Inc. v. Muchnick*,
   130 S. Ct. 1237 (2010) ................................................................................................................ 13

*Righthaven LLC v. Computer Services One LLC*,
   2012 WL 694468 (D. Nev. Mar. 1, 2012) ............................................................................. 10

*Righthaven LLC v. Hoehn*,
   792 F.Supp. 2d 1138 (D. Nev. 2011), afff'd in part, vacated in part, --- F.3d ---, 2013
   WL 1908876 (9th Cir. May 9, 2013) ............................................................................. 7, 9, 10

*Righthaven LLC v. Hush-Hush Entertainment, Inc.*,
   2012 WL 688429 (D. Nev. Mar. 1, 2012) ............................................................................. 10

*Righthaven v. Eiser*,
   2012 WL 527571 (D.S.C. Jan. 13, 2012) ............................................................................. 10

*Silvers v. Sony Pictures Entertainment, Inc.*,
   402 F.3d 881 (9th Cir. 2005) ........................................................................................... 6, 7, 8

*Sims v. Viacom, Inc.*,
   2012 WL 280609 (W.D. Pa. 2012) .................................................................................. 16-17

*Thron v. HarperCollins Publishers, Inc.*,
   2002 WL 1733640 (S.D.N.Y. July 26, 2002) ........................................................................ 17

## STATUTES & OTHER AUTHORITIES

17 U.S.C. § 501 ............................................................................................................................. 6

John Wiley & Sons, Inc. ("Wiley") respectfully submits this memorandum in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## INTRODUCTION

Wiley is a 206 year old publisher of textbooks and other materials.  Since about 1992, DRK Photo ("DRK"), a stock photography provider, licensed various photographs to Wiley on a non-exclusive basis.  After DRK widely accused Wiley of committing infringement in connection with every transaction the parties entered into over a twenty-year period, Wiley initiated this action seeking a declaration of non-infringement with respect to 316 challenged uses made by Wiley of photographs licensed to it by DRK.  DRK responded by asserting counterclaims alleging that Wiley committed infringement by exceeding the terms of DRK's photo licenses.

Following extensive fact discovery, it is now clear that DRK lacks standing to assert copyright infringement claims against Wiley in the manner it has done.  With limited exceptions, DRK has held only non-exclusive rights in the photos at issue here.  Belatedly, in an effort to cure its lack of standing, DRK asked the copyright-owning photographers to sign a form document attempting to convey to DRK the photographers' right to sue.  The law, however, is clear that such a "hunting license" right is not transferrable; *i.e.,* such an agreement is ineffective to provide standing.[1]

---

[1] In addition, the record demonstrates that some of the copyright registrations upon which DRK relies are invalid, and thus DRK's claims based on those registrations would fail even if DRK had standing.

## FACTS

DRK is a stock photography agency that licenses photos for use by others on a non-exclusive basis.[2]  Penchina Dec. Ex. 30 at 78.  DRK does not employ photographers nor obtain ownership of photos through the "made for hire" provisions of the Copyright Act.  *Id.*, Ex. 30 at 75-76.  Instead, DRK enters into arrangements with photographers pursuant to which the photographers grant DRK a right to include certain of their works as part of DRK's collection of stock photographs, which DRK then offers to license to publishers and other users of photography on a non-exclusive basis.  *Id.* at 75.  The vast majority of photographers whose work is included in DRK's collection have granted DRK only *non-exclusive* rights to their work.  *Id.* at 75, 148.  Whatever license they grant to DRK, "[t]ypically, the photographers retain[] the copyright."  *Id.*, Ex. 2 at 10-11; *see id.* Exs. 1, 4.

Beginning around 1992, DRK began licensing photos for inclusion in textbooks and related products published by Wiley.  *Id.*, Ex. 30 at 60-61.  Examples of the photos and identification of the Wiley books in which they were used are listed in Ex. A to the Amended Complaint.  Generally, for each transaction, Wiley would submit a letter to DRK to identify which particular stock photographs from DRK's stock Wiley desired to use, which textbook or other publication the photographs would be included in, and what the estimated print-run would be for that publication.  *See* Counterclaims  Ex. 2.  Thereafter, DRK would issue an invoice to Wiley for DRK's fee for Wiley's use of the photographs.  *Id.*

Generally, the prices that DRK charged Wiley were established by pricing agreements entered into between them.  Penchina Dec. Exs. 26, 27.  Pursuant to the agreement beginning in 2000, for example, DRK charged Wiley $170 for the right to print up to 40,000 copies of a book

---

[2] "Stock" photos are of ordinary and commonplace items, readily fungible with other photographs.

in which DRK's photo comprised up to half a page; and DRK charged an additional 10%—*i.e.*, $17—to print up to 80,000 copies. *Id.*, Ex. 30 at 44.

Occasionally, the demand for a particular Wiley publication exceeded Wiley's anticipated sales of the publication, and thus the estimated print-run that Wiley had furnished to DRK proved inaccurate. For example, Wiley may have obtained rights to use a particular photo in a particular publication with a print run up to 20,000 copies, but wound up actually needing to print 30,000. But, whether Wiley told DRK at the outset that it needed 20,000 or 30,000 copies—or, indeed, up to 40,000 copies—the price Wiley would have been obligated to pay would in all instances have been the same—the $170 that Wiley *did* pay. *Id.*, Ex. 30 at 45. Similarly, if Wiley had requested a print run of up to 20,000 copies but wound up actually using 75,000, the price Wiley would have paid at the outset would have been just $187—$17 (10%) more than it did pay. *Id.* Given that no, or a *de minimis*, amount of money was at stake when a print run limit was exceeded, for decades DRK made no efforts to determine whether Wiley had exceeded any press run or other license limitations.

In or about 2005, DRK's attorneys began to represent photographers and stock photo agencies asserting copyright infringement claims against textbook publishers on a contingent fee basis. *Id.*, Ex. 27. To date, they have brought dozens of cases against textbook publishers based on alleged print overruns by the publishers. *Id.* Sometime in 2008, "long after" DRK retained them as counsel, the attorneys asked Dan Krasemann, the owner of DRK, to give testimony in a case against another textbook publisher, Houghton Mifflin Harcourt. *Id.*, Ex. 2 at 107; Ex. 30 at 14-15. Simultaneously, DRK and its attorneys initiated a "program" to bring copyright infringement actions by DRK against textbook publishers to assert decades-old claims on behalf

of photographers whose works were in DRK's collection, notwithstanding that DRK did not own the copyrights at issue. *Id.*, Exs. 4, 5.[3]

To effectuate this scheme, in 2008 DRK asked photographers to sign an "assignment form," the "only purpose" for which "is for us [DRK] to be able to register the work/s for the purpose of pursuing would be infringers." *Id.*, Ex. 7. The form nominally stated that it "grants to DRK all copyrights and complete legal title in the Images."[4] *Id.*, Exs. 6, 13. The agreement also purported to assign to DRK "any accrued or later accrued claims . . . brought to enforce copyrights in the Images." *Id.* But, the form also specified that "DRK agrees to reassign all copyrights and complete legal title back to the [photographer] immediately upon completion of the registration of the Images . . . and resolution of infringement claims brought by DRK relating to the Images." *Id.* The consideration recited in the agreement was that DRK and the photographers would evenly split "[a]ny proceeds obtained by settlement or judgment for said claims." *Id.*

DRK fully understood that the photographers did not want to part with their copyrights and that DRK therefore lacked standing to assert copyright claims. *See, e.g., id.*, Ex. 8. Thus, DRK's attorneys created a form that nominally mentioned "copyright" but whose real purpose and effect was to simply assign a bare right to sue. As DRK explained to photographers:



---

[3] *See DRK Photo v. Houghton Mifflin Harcourt*, 09-cv-08225-NVW (D. Az. Dec. 14. 2009); *DRK Photo v. McGraw Hill Cos.*, 11-cv-08059-FJM (D. Az. Apr. 15, 2011); *DRK Photo v. Pearson Educ., Inc.*, 11-cv-08097-PGR (D. Az. Jun. 27, 2011); *DRK Photo v. John Wiley & Sons, Inc.*, 11-cv-08133-FJM (D. Az. Aug. 25, 2011).

[4] DRK's forms do not identify any specific photos covered by the agreement. *See id.*, Ex. 6; *see also id.*, Ex. 30 at 115.

█████████████████████████████████████████████

*Id.*, Ex 9; *see also, e.g., id.*, Ex. 11 ████████████████████████

█████████████████████████████████████████████████

Thus, despite the form's nominal mention of transfer of copyright, both DRK and the photographers understood that the agreement did nothing more "substantive" than purport to permit DRK to file infringement suits.  Indeed, DRK reassured the photographers that by signing DRK's form agreement, the photographers would not be giving up their rights: ███████████

███████████████████████████████████████████████████

████████████████████████ *Id.*, Ex. 8; *see, e.g., id.*, Ex. 9 ███████████

████████████████████████████████████████████████████

█████████████████████████ DRK told the photographers that "this Agreement is not a permanent assignment" but "is necessary as DRK PHOTO is initiating a copyright registration program with the United States Copyright Office to officially register many of the images in its collection," and "with this Agreement we [DRK] receive the authorization necessary to initiate and settle copyright infringement claims."  *Id.*, Exs. 4, 5; *see, e.g., id.*, Ex. 30 at 120 ("there were no other reasons.").  Thus, as one of the photographers confirmed in writing to DRK, the photographers had ████████████████████████████

██████████████████████████████████████ *Id.*, Ex. 12.  Consistent with the fact that they never parted with their copyrights, following their signing of the form, the photographers continued to sell and license the photographs on their own or

5

through stock agencies other than DRK, and continued to display copyright notices in their own name, without any accounting to DRK. *Id.*, Ex. 1; Ex. 30 at 97, 98, 102-03, 147.

Following Wiley's initiation of this suit, DRK initiated an arbitration asserting claims for fraud against Wiley relating to <u>all</u> of the transactions that are the subject of the instant action, as well as claims for copyright infringement occurring prior to 1997. The Arbitrator held that Wiley did not commit fraud. Final Arb. Award, *DRK Photo v. John Wiley & Sons, Inc.*, AAA # No. 76 143 00193 11 (Feb. 1, 2013) at 20. The Arbitrator found some copyright infringement, but held that such infringement was not willful. In reviewing the copyright assignments, the Arbitrator found that there were "troubling questions," including that "the stated and undisputed intent of the assignments was to enable the photographs to be registered and enforced in copyright infringement actions." *Id.* at 2. But, the Arbitrator believed that the issue of DRK's standing "more appropriately should be within the domain of the federal courts with full appellate review" and that nothing in the arbitration award "should be construed to bar Wiley from attempting to develop a more complete factual record in the [federal court proceeding] and to argue there that the assignments are a sham." *Id.* at 3.

<u>**ARGUMENT**</u>

## I.     DRK LACKS STANDING TO ASSERT COPYRIGHT INFRINGEMENT CLAIMS

"The Copyright Act authorizes only two types of claimants to sue for copyright infringement: (1) owners of copyrights, and (2) persons who have been granted exclusive licenses by owners of copyrights." *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 32 (2d Cir. 1982); *see, e.g., Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 884 (9th Cir. 2005); 17 U.S.C. § 501. And, "[t]he bare assignment of an accrued cause of action is

impermissible under [17 U.S.C. §] 501(b)."  *Minden Pictures, Inc. v. Pearson Educ., Inc.*, --- F. Supp. 2d ---, 2013 WL 812412, at *5 (N.D. Cal. Mar. 5, 2013) ("*Minden I*") (citing *Silvers*, 402 F.3d at 890); *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 2013 WL 1995208, at *7 (N.D. Cal. May 13, 2013) ("*Minden II*") ("these agreements convey nothing more than a bare right to sue, and thus cannot be the basis for standing under the Copyright Act.").  DRK lacks standing for 250 of the 295 instances of infringement it alleged because it is neither the copyright owner nor the exclusive licensee for the photos that it claims were infringed.[5]  And, its attempt to conjure standing by "drafting a contract calling [itself] the copyright owner" utterly fails because "merely calling someone a copyright owner does not make it so."  *Righthaven LLC v. Hoehn*, --- F.3d ---, 2013 WL 1908876, at *1 (9th Cir. May 9, 2013).

When agreements are proffered as the basis for standing, the agreements must be viewed in context, and "[i]t is the substance of the agreement, not the labels that it uses, that controls [the court's] analysis."  *HyperQuest, Inc. v. N'Site Solutions, Inc.*, 632 F.3d 377, 383 (7th Cir. 2011), *pet. for reh'g and reh'g en banc denied*, 2011 U.S. App. LEXIS 4512 (7th Cir. Feb. 23, 2011) (rejecting standing based on agreement reciting grant of "exclusive license" where context reflected that rights obtained were not exclusive); *see, e.g.*, *Minden I*, 2013 WL 812412, at *5 ("The nature of the rights conveyed by an agreement is governed by the substance of what is given, not the label that the parties put on an agreement.").  Sham agreements like those of DRK's contingent fee attorneys—which purport to transfer copyright but which are in reality nothing more than an attempted transfer of accrued copyright infringement claims—cannot provide standing to assert copyright claims.

---

[5] DRK held exclusive licenses for the works of Tom Bean and Peter French, but not for any of the 33 other photographers whose works are at issue.  DRK has alleged 43 instances of infringement of Tom Bean photos, and one instance relating to Peter French.  The remaining 250 alleged instances relate to photos for which DRK has no standing as it holds only non-exclusive licenses.

DRK's form is just like a similarly worded form drafted by DRK's same attorneys that courts have twice rejected as "exactly the type of disguised assignment of a cause of action prohibited by *Silvers*."  *Minden I*, 2013 WL 812412, at *5; *see also Minden II*, 2013 WL 1995208, at *7 (judge in second case agrees with ruling by judge in prior case that Minden's forms are shams).  In *Minden I*, another stock photography agency represented by DRK's attorneys attempted to bring copyright infringement claims relating to a publisher's supposed excess use of photos for which the agency held only non-exclusive rights.  2013 WL 812412, at at *1.  Because Minden Pictures, as a non-exclusive licensee of the photographers, lacked standing to assert such claims, the attorneys drafted a form "Copyright Assignment, Accrued Causes of Action, and Litigation Agreement" for the purpose of transferring an interest in the photographers' copyrights and the right to sue for past infringements.  *Id.* at *5.[6]  The court, however, recognized the forms for what they really were—a sham "insufficient to confer standing because they simply disguise an assignment of a bare right to sue."  *Id.*  Minden's form—with wording nearly identical to DRK's form—recited that it was transferring an interest in copyrights.  The *Minden I* court, however, looked beyond the labels employed in the forms by DRK's attorneys and readily found that: "When the contract is viewed as a whole, the clear and unambiguous intent of the parties was to assign to Minden the bare right to sue" and the forms' reference to transfer of copyright "was merely a label intended to disguise the assignment of the cause of action as something else."  *Id.* at 6.  It was clear to the *Minden I* court that:

> The sole function of the copyright assignment is to grant an exclusive license *to bring suit and divvy up any returns*; there is no right to *participate in any royalties apart from the litigation*. Beyond the express

---

[6] The assignment forms used in *Minden I* are similar to the "Copyright Assignment, Registration and Accrued Causes of Action Agreement" form used by DRK here, except that the *Minden I* forms purported to transfer only "co-ownership of all copyrights in the Images" while DRK's forms purport to assign "all copyrights." 2013 WL 812412, at *5; Penchina Dec. Ex. 6.

> terms, the parties' intent is also evident from what is missing from the
> agreement: a term specifying the duration of the license. Instead, the
> copyright assignment terminates automatically upon conclusion of any
> litigation with the reassignment of "co-ownership" back to the copyright
> owners.  If the parties genuinely intended to transfer co-ownership, under
> the terms of the contract Minden would retain that co-ownership in
> perpetuity if it failed to bring suit. Such a reading would put Minden on
> coequal footing with the copyright owners. The copyright assignments,
> however, cannot reasonably be read in this manner.  Implicitly, the
> contracting parties intended for Minden to bring the instant suit and not
> for it to be a genuine, potentially-permanent owner of any of the
> exclusive rights under Section 501(b).

*Id*. (emphasis added). *See also Minden II*, 2013 WL 1995208, at *7 ("this Court finds Judge

Alsup's reasoning on the effect of these agreements persuasive, and follows *Pearson* in finding

that these agreements convey nothing more than a bare right to sue, and thus cannot be the basis

for standing under the Copyright Act.").

Similarly, numerous courts—including most recently the 9th Circuit—have rejected the

standing of Righthaven, LLC, an entity that attempted to initiate a number of copyright

infringement cases based on agreements purporting to transfer copyrights in the works at issue.

Like DRK, Righthaven was not the owner of the copyrights at issue at the time of the alleged

infringements.  *See Righthaven LLC,* 2013 WL 1908876, at *5.  Also, like DRK, Righthaven

subsequently entered into an agreement with the copyright holder purportedly assigning to

Righthaven:

> all copyrights requisite to have Righthaven recognized as the copyright
> owner of the Work for purposes of Righthaven being able to claim
> ownership as well as the right to seek redress for past, present, and future
> infringements of the copyright . . . in and to the Work.

*Id*. at *3.  Righthaven and its assignor also were parties to a separate agreement pursuant to

which the Assignor was granted a license to exploit the content that was the subject of the

copyright assignment and to retain the proceeds from such assignment.  The separate agreement

also specified that ownership of the transferred copyright would be reassigned back to the

assignor under certain conditions, such as if Righthaven does not pursue an infringement action within a specified time.  *Id.* at *5-6.

Analyzing Righthaven's grant, the Ninth Circuit explained that just because "the assignment agreements used language purporting to transfer ownership to Righthaven is not conclusive. We must consider the substance of the transaction."  *Id.* at *3.  The court concluded that, notwithstanding inclusion of language purporting to transfer copyright to Righthaven, "all it was really assigned was a bare right to sue for infringement."  *Id.* at *2.   In the end, "Righthaven did not actually possess any exclusive rights under the Copyright Act."  *Id.* at *3.  As the district court had observed, Righthaven's assignment agreement—like DRK's—granted Righthaven "no right to exploit or profit from the work in any way other than that associated with recovery from an infringement action."  *Righthaven LLC v. Hoehn*, 792 F. Supp. 2d 1138, 1146 (D. Nev. 2011), *aff'd in part, vacated in part*, --- F.3d ---, 2013 WL 1908876 (9th Cir. May 9, 2013).  *See also, e.g., Righthaven v. Eiser*, 2012 WL 527571, at *1 (D.S.C. Jan. 13, 2012); *Righthaven LLC v. Hush-Hush Entm't, Inc.*, 2012 WL 688429, at *2 (D. Nev. Mar. 1, 2012); *Righthaven LLC v. Computer Servs. One LLC*, 2012 WL 694468, at *2 (D. Nev. Mar. 1, 2012).

Here, just as in the *Minden* and the *Righthaven* cases, the indisputable record shows that, years after the alleged infringements, DRK asked photographers to sign an "assignment" form, the "only purpose" for which was "for us [DRK] to be able to register the work/s for the purpose of pursuing would be infringers."  Penchina Dec. Ex. 7.  The form nominally stated that it "grants to DRK all copyrights and complete legal title in the [unspecified] Images."  *Id.*, Ex. 6. But, as conceded by DRK's principal, "the gist of the form to me, is that they authorize us to do the registrations" and "if we take any actions against people . . . any proceeds after deduction on this would be shared 50 percent between each of us."  *Id.*, Ex. 30 at 109; *see also, e.g., id.*, Ex. 32

at 35-36 ("Those agreements would have been for us to register images with [the] copyright office"; "Q. Were there any other reasons for the assignment? A. Not that I recall.").  Rather than obtaining rights to the photographs or an interest in their copyrights, DRK's ███████████

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

████████████████████████ *Id.*, Ex. 8.  The agreement gave DRK "nothing more."  *Id.*

DRK conceded, as it had to, that the transfer forms did not grant DRK the right to license the photographers' photos because "[a]t the time the copyright assignments were executed, DRK already had the right to issue licenses to third parties."  *Id.*, Ex. 28 at 12.  DRK likewise admitted that the right to license was governed by the prior non-exclusive agency agreements and not the assignments.  (Krasemann Dep. 102:8-15).  Accordingly, DRK did not gain any rights under copyright from the transfer forms.  Indeed, despite DRK's supposed ownership of the copyright, *the photographers continue to this day to offer the photos* – bearing copyright notices in their own name – *for sale* to the public by themselves or through other agencies, and they have absolutely no obligation to account for any sales to the supposed copyright owner DRK.  *See, e.g.*, *id.* at 97:18-25; *id.*, Ex. 1.[7]

Thus, just as the court observed in *Minden I*, the "sole function" of DRK's assignment was to grant a "license to bring suit and divvy up any returns; there is no right to participate in any royalties apart from the litigation."  2013 WL 812412, at *6.  The contracting parties merely intended for DRK to bring suit, "not for it to be a genuine, potentially-permanent owner of any

---

[7] DRK admits that the photographers have the right to license their photos notwithstanding the purported assignment—not because of any license back or new permission from DRK—but instead because the original agency agreements with the photographers granted only a non-exclusive license to DRK. Penchina Dec. Ex. 30 at 102. In other words, DRK admits no exclusive rights under the Copyright Act were granted to it.

of the exclusive rights under Section 501(b)." *Id*. DRK's forms were "no more than disguised assignments of the bare right to sue" and did "not provide [DRK] with standing to sue on behalf of the individual photographers." *Id*., at *8.[8] Accordingly, the motion for summary judgment on 250 of the 295 instances of infringement claimed by DRK should be granted.[9]

## II.    DRK HAS NO VIABLE CLAIMS RELATING TO STEPHEN KRASEMANN'S PREVIOUSLY REGISTERED PHOTOS

In the event the Court disagrees with Wiley's analysis in Point I, there are separate bases to dismiss 31 instances of infringement of photos taken by Stephen Krasemann. These photos are covered by two registrations that Stephen Krasemann personally obtained, VAu 175-200 (issued Feb. 1, 1990) and VAu 516-002 (issued Mar. 13, 2001).[10] The purpose of the "assignments"—to pursue "infringers"—discussed in Point I makes clear that, even if the assignments conveyed rights for other photographers, the assignments conveyed no rights to DRK in the photos covered by Stephen's registrations. Summary judgment is, therefore,

---

[8] Even if DRK's forms were capable of providing standing to DRK—which they cannot—DRK still lacks standing to assert claims regarding photos taken by Michael Collier. On April 21, 2011, before it asserted claims against Wiley, DRK granted back to Mr. Collier all of his copyrights, stating in writing that "DRK hereby reassigns back to you all legal title and interest in the copyrights you originally assigned to DRK." Penchina Dec. Ex. 16. Thus, DRK lacks standing for the following lines of Exhibit 1 to DRK's Counterclaim: 21, 61, 62, 80, 81, 109, 115, 124, 125, 144, 145, 167, 168, 217, 218, 240, 241, 281 and 286.) After learning of the overreaching claims made by DRK's attorneys, Mr. Collier wrote to DRK's attorneys and demanded "to have my name removed from this Wiley/DRK suit. I do not want you or DRK using my name in any future lawsuits." *Id*., Ex. 17.

[9] All of the instances of infringement listed in Exhibit 1 to the Counterclaims, except those involving photos by Tom Bean or Peter French, should be dismissed.

[10] Although related to Dan Krasemann, the principal of DRK, "Stephen Krasemann is one of many photographers represented by DRK Photo," he "has absolutely no ownership interest in DRK Photo," and he "has never been an employee of DRK Photo." Penchina Dec. Ex. 30 at 13-14. The photos that Stephen Krasemann registered on his own (Reg. No. VAu 175-200 issued on Feb. 1, 1990, and Reg. No. VAu 516-002 issued on Mar. 13, 2001) (*id*., Exs. 19 and 18, respectively) relate to 31 claims of infringement by DRK identified on the following lines of Exhibit 1 to DRK's Counterclaim: 7, 8, 14, 23, 31, 47, 48, 68, 69, 70, 89, 90, 91, 92, 132, 133, 134, 153, 154, 155, 156, 175, 176, 177, 228, 229, 230, 251, 252, 253, and 282.

appropriate.  And, summary judgment also should be granted because Stephen's registrations are invalid.

## A.    DRK Has No Rights in the Previously Registered Photos of Stephen Krasemann

The "only purpose" of the form assignments used by DRK was "for [DRK] to be able to register the work/s for the purpose of pursuing would be infringers."  *Id.*, Ex. 7. However, Stephen Krasemann registered the photos years earlier.  *Id.*, Ex. 30 at 69-71.  Accordingly, the assignment agreement did not cover these photos.[11]  DRK's deposition testimony confirmed that DRK understood it needed a *separate* "re-worked form that dealt with his  previous registrations" in order for Stephen Krasemann to be able to transfer "copyrights from anything he [Stephen] previously registered to DRK."  *Id.*, Ex. 30 at 170-71. ("Stephen . . . signed two different Copyright Assignment and Accrued Causes of Action Agreements").  But, DRK produced only the one "assignment" agreement.  DRK failed to produce a second document that would have provided it with standing to assert claims for Stephen's copyrights.  Thus, as there is no agreement conveying to DRK copyright in Stephen's already registered photos, DRK has no standing for those photos.

## B.    Stephen Krasemann's Copyright Registration Nos. VAu 175-200 and VAu 516-002 Are Invalid

"[T]he Copyright Act requires copyright holders to register their works before suing for copyright infringement."  *Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1239 (2010).  It was Congress' view that "[r]egistration promotes orderly resolution of copyright disputes."  *Bouchat v. Bon–Ton Dep't Stores, Inc.*, 506 F.3d 315, 329 (4th Cir. 2007).  Thus, under the statute, "[t]he

---

[11] Other photos created by Stephen Krasemann which were not previously registered are also involved in this case.  These other photos arguably could be covered by the transfer agreement but, as discussed above, that agreement is ineffective to give DRK standing.

absence of a valid copyright registration . . . bar[s] a plaintiff from bringing a viable copyright infringement action." *L.A. Printex Indus., Inc. v. Le Chateau, Inc.*, No. 11 Civ. 4248(LTS), 2012 WL 987590, at *3 & n.4 (S.D.N.Y. Mar. 23, 2012). Registration Nos. VAu 175-200 (issued Feb. 1, 1990) and VAu 516-002—upon which DRK asserts 31 instances of infringement—are both invalid for multiple reasons.

First, the "VAu" prefix covers *unpublished* works. *See, e.g., Family Dollar Stores, Inc. v. United Fabrics Int'l, Inc.*, 896 F. Supp. 2d 223, 225 (S.D.N.Y. 2012) ("Based on UFI's representations, the Copyright Office issued a registration certificate for an unpublished collection, with registration number 'VAu 978–345' (the "Registration"). *The 'u' represents that the works are unpublished.*" ) (emphasis added); *Determined Prods., Inc. v. Koster*, 1993 WL 120463, at *1 (N.D. Cal. Apr. 13, 1993) ("the registration number assigned—VAu 208684—indicates that the registration is for an unpublished work"). DRK's registrations, however, <u>cover</u> both *unpublished* works <u>and</u> previously *published* photos.

The Copyright Act permits the registration of groups of individual works such as photographs together "as a single work." *Family Dollar Stores, Inc.*, 896 F. Supp. 2d at 229. But, "[c]opyright regulations divide these 'single work registrations' into published and unpublished collections," and there are different criteria for registration of each type of collection. *Id.* (citation omitted). Fundamentally, "a published [item] included in an unpublished collection copyright registration application *cannot be registered as part of the collection.*" *Id.* at 230 (emphasis added). Thus, "[w]rongly identifying a number of published individual works as an unpublished collection is a fundamental registration error" which invalidates the registration of those works and requires that claims for their infringement be dismissed. *Koster*, 1993 WL 120463, at *1.

For example, in *Family Dollar Stores, Inc.* the plaintiff obtained a VAu-series registration for a collection of unpublished designs, but "published the [allegedly infringed] design by selling it before the effective date of registration." 896 F. Supp. 2d at 230. The court observed that the "Copyright Office's *Compendium II: Compendium of Copyright Office Practices*, states that, 'Where the applicant seeks registration as an unpublished work and provides the Office with a statement of facts which clearly show that publication has occurred, the Office will not register a claim to copyright in the work as unpublished.'" *Id.* Thus, the court concluded that the design "which was concededly published prior to the registration of the unpublished collection at issue, is not protected by [the plaintiff's] putative Registration," and the prior publication therefore "invalidate[s] the registration as to the previously published designs." *Id.* at 231.

Likewise, in *Koster*, it became clear that the plaintiff's works "were published before their effective date of registration as an unpublished collection." 1993 WL 120463, at *1. The court found this to be a "fundamental registration error" invalidating plaintiff's registration. Because there was no valid copyright registration, the court dismissed the copyright infringement claim. *Id.*; *see also, e.g., Granse v. Brown Photo Co.*, 1985 WL 26033, at *16 (D. Minn. July 1, 1985) ("Because Granse registered published works as unpublished collections, those registrations . . . are invalid.").

The result here should be no different. The record is clear that the photos at issue in this case covered by VAu 175-200 and VAu 516-002 were published *before* Stephen Krasemann submitted his applications to the Copyright Office. Although identifying it as covered by VAu 516-002, which was applied-for on March 13, 2001, DRK admits that the "photograph identified in line 8 of Exhibit 1 as Masai Livestock Tanzania, image number 1s902499, was published on

or before December 31, 2000." Penchina Dec. Ex. 29, ¶6.  The same is true for "Wind

Generators and Mountains Gorgonio Pass, CA," image number 1s905268, appearing in line 31,

*id*., ¶10; and "Red Fox in winter leaping after mouse," image number 1s902839, appearing in

line 38, *id*., ¶18.  Similarly, the image identified in line 69 of Exhibit 1 as "Aerial view Cape Cod

and surf," image number 1s904674, was published as early as November 1985, the date it came

into DRK's collection.[12]

Likewise, "Lunch Creek Waterfall, Montana," image number 905367, appearing in line

70 is not validly registered.  Not only was it published no later than 1984 (when accepted into

DRK's collection as no. 109581, *see* Penchina Dec. Exs. 22-24), but it was not even submitted to

the Copyright Office as part of the deposit copy accompanying VAu 516-002.[13]

---

[12] DRK testified that, for all of the collections of *published* photos it registered, the date of publication it
used and submitted to the Copyright Office for the works was the date that the photos came into DRK's
collection.  *See, e.g.*, Penchina Dec. Ex. 31 at 66 (publication occurs on the date photos "were released
from the photographers to us [DRK] and went into our system."); *id*., Ex. 30 at 136 ("Q. How were they
published?  A. They were submitted to us.").  A series of documents provided by DRK demonstrates that
the Cape Cod photo, image number 1s904674, came into DRK's collection in November 1985.  When
photos are accepted into DRK's collection, "they would get numbered in numerical order sequentially."
*Id*., Ex. 31 at 65.  DRK maintains a handwritten log and other records documenting when each photo was
accepted by it.  *Id*., Exs. 22-24.  DRK's numbering system began in 1980 with image number 100001.  *Id*.
According to DRK's testimony, when particular photos are popular and have been licensed multiple times
by DRK, DRK makes duplicates of that photo and gives it a new image number with a prefix in the "800"
or "900" range to signify that there are multiple copies.  *Id*., Ex. 30 at 198-200.  And, DRK provided a
chart which specifies the original image numbers for those having an 800 or 900 prefix number.  *Id*., Ex.
22.  According to this chart, the original image number for 904674, the Cape Cod photo, was 127413. *Id*.
DRK's handwritten log and other records indicate that images in the range of 127141 to 134177
(including 127413) were accepted into DRK's collection, and therefore were published, between
November 1985 and April 1986—long before the image was registered in a collection of unpublished
photos. *Id*., Exs. 23, 24.

[13] The deposit was a disc containing images numbered from 900001 to 905344.  Lunch Creek Waterfall,
image 905367, was beyond that range and *not* included.  Penchina Dec. Ex. 20.  DRK conceded that this
photo was not registered when, just weeks ago on *January 22, 2013*, it submitted a new application to
register this photograph.  Id., Ex. 21.  DRK's claims relating to this photograph fail, however, because
DRK was required to apply for and obtain a copyright registration *prior* to asserting claims.  *See, e.g.,*
*Sims v. Viacom, Inc.*, 2012 WL 280609, at *5 (W.D. Pa. 2012) ("the registration requirement in 17 U.S.C.
§ 411(a) imposes a mandatory precondition to filing a copyright infringement lawsuit.  Accordingly,
Plaintiff's copyright infringement claim must be dismissed for failure to file a registration prior to
instituting this lawsuit.").

Finally, "Aerial Permafrost Polygons," image number 901854, appearing in line 7, also was previously published and improperly was included in a registration for unpublished photos. By definition, the mere fact that it had a DRK image number when it was submitted for registration means that it already had been published because it would not have had a DRK image number unless it already was accepted into DRK's collection. Moreover, as discussed above, DRK assigned image numbers sequentially when it accepted the photos. The Cape Cod and Lunch Creek photos discussed above, had *higher* image numbers than the Polygons photo, and they were accepted by DRK no later than 1985. *A fortiori*, the Polygons photo was accepted before then, and therefore was published years before the 1990 effective date of registration VAu 175-200. This "invalidate[s] the registration as to the previously published designs." *Family Dollar Stores, Inc.*, 896 F. Supp. 2d at 231.

Second, that Stephen's photos were already published presents an additional fatal defect—they were registered before regulations permitting group registration of published photos were in effect. Each of these registrations is for a collection of unpublished photographs. VAu 175-200 was applied for on February 1, 1990, and VAu 516-002 on March 13, 2001. But, as courts have made clear, these registrations are "defective, because the relevant regulations permitting the group registration of photographs did not take effect *until August 16, 2001*"—after Stephen Krasemann applied for these registrations. *Thron v. HarperCollins Publishers, Inc.*, 2002 WL 1733640, at *1 (S.D.N.Y. July 26, 2002) (emphasis added) (granting summary judgment where registration for group of published photos was issued prior to effective date – August 16, 2001 – of the regulation). *See, e.g., Kay Berry, Inc. v. Taylor Gifts, Inc.*, 421 F.3d 199, 204 (3d Cir. 2005) (confirming that group registration improper if issued before Register of Copyrights "promulgated regulations allowing for group registration" of that type of work.).

Here, Stephen Krasemann's copyright registrations, just like the one in *Thron*, were issued before the effective date of the regulations permitting group registration of published photos and therefor are invalid.

## III.   A DECLARATION OF NON-INFRINGEMENT SHOULD BE ISSUED

Wiley's Amended Complaint seeks a declaration of non-infringement for 316 instances where DRK threatened infringement claims, and DRK asserted counterclaims with respect to 295 of these instances.   A declaration of non-infringement should be issued for all 316 instances pleaded by Wiley.   At a minimum, however, the declaration should be issued with respect to the 21 instances omitted from DRK's counterclaim, as DRK has presented no evidence of infringement for any of those instances.[14]

---

[14] These instances are lines 293, 294, 296 and 299 to 316 of Exhibit  of the Amended Complaint.

## **CONCLUSION**

For all of the foregoing reasons, Wiley respectfully requests that the Court grant

summary judgment in its favor.

Dated:   New York, New York            LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
         May 23, 2013


               By: _____/s/ Robert Penchina_____

                    Robert Penchina
                    Christopher P. Beall
               321 West 44th Street, Suite 510
               New York, NY 10036
               (212) 850-6100
               (212) 850-6299 (Fax)

               Joseph J. Barker
               JOHN WILEY & SONS, INC.
               111 River Street
               Hoboken, NJ 07030
               (201) 748-7862

               *Attorneys for John Wiley & Sons, Inc.*