UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
JOHN WILEY & SONS, INC.,                                    :
                                    Plaintiff,              :
                                                            :     1:11-CV-05454-KPF
                                    v.                      :
                                                            :     ECF Case
DRK PHOTO, a sole proprietorship,                           :
                                                            :
                                    Defendant.              :
------------------------------------------------------------ :
DRK PHOTO, a sole proprietorship,                           :
                                    Counterclaimant,        :
                                                            :
                                    v.                      :
                                                            :
JOHN WILEY & SONS, INC.                                     :
                                                            :
                                    Counterdefendant.       :
------------------------------------------------------------ :

## DECLARATION OF AUTUMN WITT BOYD

I, Autumn Witt Boyd, hereby declare pursuant to 28 U.S.C. § 1746:

1.      I am an attorney employed by Harmon & Seidman LLC, counsel for Plaintiff DRK Photo

("Plaintiff" or "DRK").  I have personal knowledge of the matters herein and if called upon

could testify to them.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the final arbitration award in

*DRK Photo v. Wiley*, AAA No. 76 143 00193 11 (Feb. 1, 2013).

3.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the deposition of

Daniel Krasemann in *DRK Photo v. Wiley*, AAA No. 76 143 00193 11.

4.      DRK provided Stephen Krasemann's June 24, 2008 assignment to Wiley on June 17,

2013.  Both parties have continued producing documents; Wiley last produced new documents to

DRK on June 10, 2013.

I declare under penalty of perjury that the foregoing is true and correct.

_Autumn Witt Boyd_
Autumn Witt Boyd

DATE:  _6/21/13_

EXHIBIT 1

**AMERICAN ARBITRATION ASSOCIATION**
**Commercial Arbitration Tribunal**

| | |
|---|---|
| *In Re:* | AAA # No. **76 143 00193 11 S1M** |
| DRK Photo, Claimant, | **FINAL ARBITRATION AWARD** |
| *and* | |
| John Wiley & Sons, Inc., Respondent. | |

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreements entered into by Claimant DRK Photo ("DRK") and Respondent John Wiley & Sons, Inc. ("Wiley") -- i.e., the arbitration clause contained the Terms and Conditions of DRK's invoices/license agreements with Wiley -- and having been duly sworn and having duly heard the proofs and allegations of the Parties, as well as the arguments of counsel, and having previously rendered Interim Awards dated October 23, 2012 and November 28, 2012, do hereby, AWARD, the following FINAL AWARD:

## I.    DRK's Copyright Claims.

### A.    Standing Issues.

Given the factual record presented during the arbitration hearing, I cannot conclude that DRK's assignment agreements with its photographers confer only the bare right to sue. Instead, they at least facially convey from the photographer to DRK the copyrights and, as a result, the exclusive rights of a copyright owner. DRK, therefore, enjoys standing to assert its copyright claims.

To be sure, I find the following to raise troubling questions: (a) the stated and undisputed intent of the assignments was to enable the photographs to be registered and enforced in copyright infringement actions; (b) at least some of the photographers appear to have retained the right to license the transferred copyrighted photographs without any accounting to DRK; (c) DRK's obligation to transfer the copyrights back to the photographer upon completion of enforcement actions; and (d) the consideration for the assignments (as distinct from the prior representation agreements) appears to consist solely of a 50/50 split of any recovery of litigation or settlement proceeds. However, none of these facts alone or in combination are sufficient to bring this case within *Righthaven* line of cases.

Critical in *Righthaven* was the fact that the assignee had no real ability to monetize the copyrights except through copyright infringement actions. By contrast, DRK has the right to license the copyrighted images to publishers such as Wiley without seeking the photographers' permission. The fact that DRK had this right under its prior representation agreements with the photographers is of no compelling significance – otherwise, every assignment of a copyright by a licensor to a licensee would be suspect to an attack under *Righthaven*. Similarly, the main purpose of the assignments – to enable more efficient copyright enforcement – is not disqualifying. Indeed, the ability to bring a copyright action was the very purpose of the assignment in *Bailey v. LFP, Inc.,* No. 11-3445 (6th Cir. 2012). Finally, DRK's granting permission to photographers to monetize the copyrighted images without sharing the proceeds with DRK is similar to an informal grant-back license, something that is certainly within the bundle of rights enjoyed by a copyright owner. Only if such "grant-back licensing" becomes overwhelmingly pervasive could it render the assignment a sham. The evidence at the arbitration hearing was nothing more than that this practice is limited, sporadic, and subject to being

discontinued by DRK at any time and at its sole discretion.

Nevertheless, nothing in this Final Award should be construed to bar Wiley from attempting to develop a more complete factual record in the copyright infringement litigation between the parties currently pending in the Southern District of New York and to argue there that the assignments are a sham under *Righthaven*. I conclude only that the assignments are not rendered a sham under *Righthaven* given the record presented here, particularly in view of my hesitancy as an arbitrator to extend existing copyright law, a task which more appropriately should be within the domain of the federal courts with full appellate review.[1]

### B.     The Copyright Deposit Issues.

I conclude that DRK has met its burden to demonstrate that it has complied with the deposit requirements with respect to the subject matter of VAu 175-200 and VAu 516-002.

The problem with the deposit for VAu 175-200 is that what is available from the Copyright Office is unintelligible, as confirmed by the copy of the deposit Wiley obtained. I accept Stephen Krasemann's testimony that he sent the slides themselves in a legible form to the Copyright Office. His declaration – although somewhat opaque on this point (no pun intended) – is not to the contrary. The most plausible interpretation of his declaration is that he was describing the process he believes the Copyright Office must have employed to copy the deposited images, rather than the process he employed to send the images to the Copyright Office. One would think that had Mr. Krasemann sent unintelligible images to the Copyright Office, the deposit would have been rejected.

As for VAu 516-002, I credit Stephen Krasemann's testimony that he sent a complete CD, without "gaps," to the Copyright Office. Moreover, only one of the images at issue here

---

[1]     I reject the remaining standing arguments raised by Wiley, which are directed at particular assignment agreements.

falls within the "gap" in the Copyright Office's copy of the deposit and is therefore insignificant.

### C.     Copyright Infringement.

I find that DRK has met its burden to prove that Wiley engaged in copyright infringement by exceeding the scope of the applicable license(s)[2] with respect to the following invoices/publications:

1.     Invoice No. 2275 (deBlij & Miller, *Physical Geography*):  Wiley printed 123 copies of the slide package in excess of the 250 copies permitted by the license.  Wiley was otherwise compliant with this license.

2.     Invoice No. 3083 (Stahler, *Introducing Physical Geography* 1e):  Wiley distributed 2,182 copies of this textbook outside of the United States, the licensed territory.  Wiley was otherwise compliant with this license.

3.     Invoice No. 3610 (Skinner, *Blue Planet* 1e):  Wiley distributed 5,293 copies of this textbook outside of the United States, the licensed territory.  Wiley was otherwise compliant with this license.

4.     Invoice No. 3626 (Botkin & Keller, *Environmental Science* 1e):  Wiley distributed 5,237 copies of this textbook outside of the United States, the licensed territory.  Wiley was otherwise compliant with this license.

5.     Invoice No. 3696 (Brum, *Fundamentals* 1e):  Wiley distributed 1,846 copies of this textbook outside of the United States, the licensed territory.  Wiley was otherwise compliant with this license.

6.     Invoice No. 3858 (Skinner, *Dynamic Earth* 3e):  Wiley distributed 12,096 copies

---

[2]     I reject Wiley's contention that a "tolerance" of 10%, 15%, or 20% for sales outside the licensed territory should be an implied provision of the license agreements.  Wiley's proffered evidence of industry custom and practice was insufficient and conflicts with the most reasonable interpretation of the express language of the agreements.

of this textbook outside of the United States, the licensed territory, and the print run exceeded the licensed amount by 3,664. Wiley was otherwise compliant with this license.

7.    Invoice No. 4116 (deBlij, *Physical Geography* 2e): Wiley distributed 3,176 copies of this textbook outside of the United States, the licensed territory. Wiley was otherwise compliant with this license.

8.    Invoice No. 4236 (deBlij, *Physical Geography* 2e cover photo): Wiley distributed 2,142 copies of this textbook outside of North America, the licensed territory. Wiley was otherwise compliant with this license.

9.    Invoice No. 4281 (Murck, *Environmental Geology* 1e): Wiley distributed 5,808 copies of this textbook outside of the United States, the licensed territory. Wiley was otherwise compliant with this license.

10.    Invoice No. 4300 (Hazen, *Introduction to Physical Science* 1e): Wiley distributed 2,064 copies of this textbook outside of the United States, the licensed territory. Wiley was otherwise compliant with this license.

11.    Invoice No. 4561 (Strahler, *Introducing Physical Geography* 1e update): Wiley distributed 3,140 copies of the textbook update outside of the United States, the licensed territory, and the print run exceeded the licensed amount by 12,965 (per the 007 spreadsheet). Wiley was otherwise compliant with this license.

12.    Invoice No. 4794 (Murck, *Dangerous Earth* spin-off version): Wiley distributed 2,264 copies of this textbook version outside of the United States, the licensed territory, and the print run exceeded the licensed amount by 4,616. Wiley was otherwise compliant with this license.

13.    Invoice No. 4959 (Strahler, *Science of Physical Geography*): Wiley distributed

5

12,072 copies of this textbook outside of the United States, the licensed territory. Wiley was otherwise compliant with this license.

14.     Invoice No. 5318 (Botkin & Keller, *Environmental Science* 2e):  Wiley distributed 4,216 copies of this textbook outside of North America, the licensed territory. Wiley was otherwise compliant with this license.

15.     Invoice No. 5443 (Trefil, *The Sciences* 2e):  Wiley distributed 1,769 copies of this textbook outside of North America, the licensed territory, and the print run exceeded the licensed amount of 20,000 by 22,242.  Wiley was otherwise compliant with this license.[3]

## II.     Statutory Damages, Actual Damages, and Profits Disgorgement for Wiley's Copyright Infringement.

### A.     Statutory Damages.

DRK is entitled to statutory damages for infringement of Image ID 1s901854, *Aerial Permafrost Polygons*, for the entirety of its copyright claim with respect to Invoice No. 2275 and for a portion of its copyright claims with respect to Invoice Nos. 3083, 4116, 4561, and 4959.

I reject DRK's contention that Wiley's infringement was willful.  Although Wiley's infringement was the result of miscommunication among its departments, mismanagement, and perhaps even carelessness, this conduct falls short of the sort of intentional or reckless behavior that is a prerequisite to a finding of willful infringement.  Moreover, the problem here is that Wiley exceeded the scope of its licensed rights rather than engaging in entirely unlicensed activity.  The parties have cited no cases and I have found none where willful infringement was found in circumstances where the infringement consisted solely of exceeding specific license

---

[3]     There is some confusion as to whether Invoice No. 5443 is a fraud-only claim.  Although DRK's damages models characterize this invoice as involving only fraud claims, the arbitration clause in this invoice uses the "old language" which does not exclude copyright claims.  As a result, I conclude that any copyright claim with respect to Invoice No. 5443 is subject to arbitration.

restrictions as to the number of copies or geographic distribution.

Nevertheless, the infringement of *Aerial Permafrost Polygons* was not insignificant and there were multiple infringements, thus justifying an award that is substantially above the minimum amount. I conclude that $10,000 in statutory damages would be reasonable. [4]

### B.    Actual Damages/Lost License Fees.

DRK seeks actual damages in the form of lost license fees. The parties dispute the proper measure of damages. Wiley contends that the damages measure should be based upon what the original license amount would have been had Wiley obtained a license that included the uses that are determined to have exceeded the scope of the license. DRK contends that damages should be calculated based upon what the parties would have agreed to had the parties re-negotiated the license just prior to the time Wiley would have needed to increase the scope of the license.

DRK's argument, however, is inconsistent with Mr. Krasemann's deposition testimony and DRK modified its position two or three times during the hearing as to just how fees in the re-negotiated license agreement would have been calculated. Moreover, while DRK's damages theory has some color with respect to print overruns, it has little or no application to the bulk of the infringement claims, which consist of distribution beyond the geographic territory specified in the licenses. As a result, the proper measure to calculate lost license fees damages is that urged by Wiley – i.e., the fees that the original invoice would have included had Wiley been granted the scope of rights it would have needed to cover its actual print run and/or geographic distribution.

---

[4]    In determining the amount of statutory damages for infringement of *Aerial Permafrost Polygons*, I have considered its infringing use only in connection with Invoice Nos. 2275, 3083, 4116, 4561, and 4959, but not in connection with any other invoice (i.e., the invoices that were the subject only of fraud claims in this arbitration proceeding, but which are the subject of copyright infringement claims in the litigation currently pending in the Southern District of New York).

At the hearing, the parties debated whether there can be any lost license fee damages where Wiley requested print run rights less than 40,000 and printed copies in excess of the amount requested, but less than 40,000.  Wiley argues that DRK has no damages in this situation, because the price would have been the same had Wiley asked for the amount actually printed. DRK argues that Wiley should be assessed damages based upon what was asked for, not what could have been asked for at the same price.  I agree with Wiley, but only with respect to Invoice No. 5443.  Thus, damages for Invoice No. 5443 shall be based upon a print overrun of 2,242 rather than 22,242.  On the other hand, Wiley's argument cannot fairly be applied to Invoice Nos. 4561 and 4794, each of which was an update or reprint, where DRK charged a license fee substantially lower than the standard fee because it was anticipated that the production run for the update or reprint would be significantly lower than 40,000.  Thus, with respect to Invoice Nos. 4561 and 4794, had Wiley provided DRK with a higher print run request, the license fee would most likely have been higher.

Next, DRK and Wiley disagree over whether the license fees damages calculations should utilize a 10% premium over the base rate for print runs over 40,000 copies, which the parties agreed to in their 2001-02 pricing agreement, or whether DRK's standard practice of charging a 25% premium over the base rate should be employed.  I find no basis to retroactively apply to the 1992-97 time period the provisions of a one-year agreement in effect many years later.  License fee damages for print runs in excess of 40,000 copies shall be calculated using a premium of 25% over the base rate.

Finally, The parties also dispute how to calculate the license fees with respect to print overruns involving Invoice Nos. 4561 and 4794, each of which involved an update or reprint version.  With respect to these two invoices, I find that Wiley's calculation of license fees to be

8

more logical and more reflective of what would likely have happened in the "real world" than is DRK's calculation.

### C.    Disgorgement of Wiley's Profits.

DRK has met its burden to establish a causal connection between Wiley's infringement and the revenues Wiley earned on textbook sales that exceeded the scope of the license. Wiley, in turn, has provided sufficient evidence to meet its burden to enable one to determine the appropriate profit margin and the appropriate allocation of profits between infringement and other factors. I conclude that Wiley's profit margin to be used in these calculations should be pre-tax profit. Exhibit N-1 and other FinSims indicate that 25% is within the typical range of pre-tax profit. I also conclude that each licensed image, excluding *Aerial Permafrost Polygons,* shall be allocated .25% of Wiley's pre-tax profit attributable to infringing sales of that textbook. Thus, where a particular textbook contained four DRK images, the allocable profit would be a total of 1% of the pre-tax profit earned on the infringing sales. For the same reasons explained in the previous section, DRK is entitled to profits attributable to a print overrun only in the amount of 2,242 with respect to Invoice 5443, but is entitled to profits for the entire print overrun with respect to Invoices 4561 and 4794.

Therefore, the formula for calculating profits attributable to infringement is as follows: revenues x % of unauthorized units x 25% profit margin x .25% profit allocation x number of images. The percentage of unauthorized units is calculated by dividing the number of unauthorized units (i.e., amount of the print overrun or number distributed outside the territory) by the total number of units (including unauthorized units). Where the infringement consists both of excess print runs and unauthorized geographic distribution, these calculations should be performed separately. Because not every textbook printed in excess of the licensed amount was

likely distributed only in the licensed territory and not every textbook distributed outside the

licensed territory was likely within the licensed amount, the profits attributable to the

infringement will be overstated if one simply adds the two profit numbers. As a result, in section

II.D below, I have made those adjustments I deem appropriate based upon a form of *pro rata*

calculation.

In submitting their proposed profits calculations, the parties vigorously disagreed over

how to calculate revenues for purposes of determining profits. With respect to each invoice,

DRK multiplied the price-per-book --apparently U.S. list price information obtained from a

Wiley document produced during discovery -- by the number of books printed. DRK explained

that it utilized this methodology because, prior to the arbitration hearing, Wiley had represented

that it was unable to provide revenue and unit sales data for periods prior to FY 1997 and did not

present any such information at the arbitration hearing. DRK explains that it also used this

methodology for textbooks published during and after FY 1997 -- i.e., Invoice No. 4561 through

and including No. 5443 -- where revenue data is available, because it believes that Wiley's data

is flawed and incomplete.

Wiley utilized two different methodologies. With respect to Invoice No. 3083 through

and including No. 4300, it calculated per-book revenues from data available in 1997-98, assumed

that the per-book revenue would have been the same for the pre-1997 time period, and then

calculates total revenues by multiplying the per-book revenue by the number of books sold.

With respect to these invoices, Wiley also utilized unit sales data contained in the attachment to

its damages/profits calculation submission. The unit sales data in the attachment, however, was

not disclosed to DRK during discovery or presented at the arbitration hearing, but instead

proffered for the first time on November 16, 2012. With respect to Invoice No. 4561 through

10

No. 5443, Wiley utilized actual revenue and unit sales data.

DRK's methodology essentially assumed that (a) each and every book printed was actually sold and (b) each every book was sold at full list price, rather than at a discount. It is unlikely that either assumption is correct. Indeed, the unchallenged testimony at the arbitration hearing was that foreign sales, which represent the lion's share of infringing sales, are made at a substantial discount when compared with prices charged in the United States. As a result, DRK's methodology runs a substantial risk of overstating revenues. This risk is readily apparent when one compares DRK's revenue calculations for Invoice No. 4561 through and including No. 5443 with Wiley's actual revenue data. Notwithstanding DRK's complaints about Wiley's data, one would expect that Wiley's reported revenue data would be less than the amount obtained by multiplying list price by the number of textbooks printed. It is not surprising that the number of textbooks sold is less than the number of copies that are printed, and that some textbooks (particularly those sold abroad) are sold at a price less than U.S. list price.

By contrast, Wiley's methodology for Invoice No. 3083 through and including No. 4300 runs the risk of understating revenues. Wiley assumed that the per-book revenue for a later time period (i.e., later in the textbook's life cycle) would be identical to the per-book revenue for earlier phases of the book's life cycle. I question whether it is proper to assume that prices and discounts offered later in a textbook's life cycle would also have been offered earlier in the textbook's life cycle. On the contrary, one would think that discounting would be more prevalent later in a textbook's life cycle than during earlier time periods.

Thus, we have a situation where DRK's methodology poses the risk of overstating revenues for each of the invoices at issue and Wiley's methodology poses the risk of understating revenues with respect to Invoice No. 3083 through and including No. 4300. My

11

resolution of this dilemma is instructed by the following considerations, some of which lead in opposite directions:

1.      DRK has already been fully compensated for its actual damages measured by lost license fees. The purpose of awarding profits to a copyright owner is to ensure that the infringer is not unjustly enriched as a result of its infringement and therefore should be required to transfer to the copyright owner any profits earned by reason of its infringement. As a result, there can be no disgorgement of profits for textbooks printed, but never sold. Moreover, profits should be calculated on the basis of revenues actually received, rather than revenues that could have been realized had each textbook printed been sold and at full U.S. list price.

2.      Section 504 (b) of the Copyright Act imposes the burden upon DRK to prove Wiley's gross revenues. Wiley, however, was unable to provide revenue data for pre-FY 1997 sales. It does not surprise me that Wiley's financial databases do not contain 16-20 year old financial data on a per-textbook basis. Wiley has provided such financial data for FY 1997 through the present. There was testimony at the hearing that this data for the time period at issue here may not accurately distinguish between foreign and domestic sales revenues, while foreign unit sales data was available from another database. Nevertheless, there is insufficient evidence for me to conclude that Wiley's financial data for FY 1997 onward is so unreliable that it must be disregarded entirely, as DRK asks me to do.

3.      The law also appears to encourage me to err on the side of a more fulsome recovery.

4.      I should not consider Wiley's newly presented unit sales data in the attachment to its submission, because it was neither produced during discovery nor presented at the arbitration hearing.

As a result, I conclude that DRK's methodology is the "lesser of the two evils" with respect to calculating revenues for Invoice No. 3083 through and including No. 4300, while Wiley's reliance upon its revenue data is the more appropriate methodology with respect to Invoice No. 4561 through and including No. 5443.

### D.    Actual Damages and Profits Calculations.

I find that the actual damages (i.e., lost license fees) and profits calculations shall be as follows:

1.    Invoice No. 3083 (Stahler, *Introducing Physical Geography* 1e):  License fees of $625.00 and profits of $327.25.

2.    Invoice No. 3610 (Skinner, *Blue Planet* 1e):  License fees of $453.13 and profits of $885.82.

3.    Invoice No. 3626 (Botkin & Keller, *Environmental Science* 1e):  License fees of $490.63 and profits of $1,308.43.

4.    Invoice No. 3696 (Brum, *Fundamentals* 1e):  License fees of $300.00 and profits of $350.51.

5.    Invoice No. 3858 (Skinner, *Dynamic Earth* 3e):  License fees of $597.04 and profits of $3,325.49 (adjusted to avoid double counting of print overruns and foreign distribution).

6.    Invoice No. 4116 (deBlij, *Physical Geography* 2e):  License fees of $500.00 and profits of $664.63.

7.    Invoice No. 4236 (deBlij, *Physical Geography* 2e cover photo):  License fees of $212.50 and profits of $86.95.

8.    Invoice No. 4281 (Murck, *Environmental Geology* 1e):  License fees of $425.00

13

and profits of $1,131.83.

9.      Invoice No. 4300 (Hazen, *Introduction to Physical Science* 1e):  License fees of $100.00 and profits of $112.17.

10.     Invoice No. 4561 (Strahler, *Introducing Physical Geography* 1e update):  License fees of $1,093.75 and profits of $225.69 (adjusted to avoid double counting of print overruns and foreign distribution).

11.     Invoice No. 4794 (Murck, *Dangerous Earth* spin-off version):  License fees of $318.50 and profits of $142.63 (no adjustment made due to the small amount).

12.     Invoice No. 4959 (Strahler, *Science of Physical Geography*):  License fees of $384.38 and profits of $2,519.00 (per Interim Award No. 1).

13.     Invoice No. 5318 (Botkin & Keller, *Environmental Science* 2e):  License fees of $250.02 and profits of $373.43.

14.     Invoice No. 5443 (Trefil, *The Sciences* 2e):  License fees of $126.56 and profits of $35.84.

Thus, the totals are:  (a) license fees/actual damages of $5,876.51 and (b) profits of $12,183.06.  These sums are in addition to the award of $10,000.00 in statutory damages for copyright infringement of *Aerial Permafrost Polygons*.

## III.   Wiley's Fraud Claims.

I conclude that DRK has not met its burden to prove by clear and convincing evidence each of the elements of intentional fraud under Arizona law.  In particular, DRK has not presented clear and convincing evidence that Wiley knowingly and intentionally misrepresented to DRK that it would not distribute textbooks containing the licensed images (a) beyond the geographic territory requested, (b) in electronic format where not requested, and (c) beyond the

14

print run requested.  Under Arizona law, a claim of fraud cannot be predicated on unfulfilled promises, expressions of intention, or statements concerning future events unless they were made with the present intention not to perform.  *Staheli v. Kauffman*, 595 P.2d 172, 175 (Ariz. App. 1979).  This is what distinguishes fraud from breach of contract.

Critical to DRK's fraud theory is its contention that, because Wiley is a corporation, the knowledge of each and every Wiley employee must be imputed to Wiley, not just the knowledge of the Wiley employee acting for Wiley in communicating with DRK in connection with the licensing transactions.  The law, however, is directly contrary to DRK's contention.  *S Dev. Co. v. Pima Capital Mgmt. Co.,* 31 P.3d 123, 134 (Ariz. App. 2001); *Restatement (Third) of Agency* § 5.03 cmt (d)(2) (2006).  The knowledge of Wiley's employees may not be imputed to Wiley under agency principles unless they were directly involved in the transaction with DRK.  Thus, the fact that the relevant FinSim may have projected foreign sales or the fact that someone in Wiley's production department contemplated foreign distribution may not be imputed to Wiley for purposes of asserting a fraud claim, unless DRK proves by clear and convincing evidence that the photo department representative communicating with DRK also had that knowledge at the time of the licensing negotiations.

DRK has not demonstrated by clear and convincing evidence the requisite knowledge possessed by Ms. Newman or any other photo department personnel communicating with DRK with respect to any particular transaction and at the time of the transaction rather than at a later point in time - i.e., "What did he/she know and when did he/she know it?"  At most, DRK has demonstrated that it is possible that, in certain unspecified instances, the FinSim may have been distributed to unidentified photo department personnel or that portions thereof may have been discussed at a non-specified launch meeting.  But mere possibility or speculation falls far short of

clear and convincing evidence of the requisite knowledge and intent. Simply put, there is no clear and convincing evidence that any photo department member communicating with DRK knew at the time of the relevant licensing communications that Wiley intended to exceed the scope of the license's limitations as to print run, electronic use, or geographic distribution.

In sum, Wiley's failure – even systematic failure – to communicate to DRK during license negotiations the full extent of the license rights it may ultimately need certainly may cause breach of contract and copyright infringement by Wiley, but any such failure does not constitute fraud in the inducement of the license agreements in the absence of the requisite scienter among those Wiley employees actually negotiating with DRK.

**IV.  Prejudgment Interest on Actual Damages and Profits.**

A trial court is afforded considerable discretion in terms of deciding whether or not to award prejudgment interest and how prejudgment interest is to be calculated. The key factor in making these determinations is to "effectuate the legislative purpose of making copyright holders whole and removing incentives for copyright infringement." *Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700, 718 (9th Cir. 2004). Contrary to Wiley's contentions, prejudgment interest need not run from the date the litigation is initiated, but may run from the date of the last act of infringement. *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.,* 886 F.2d 1545, 1552 n. 11 (9th Cir. 1989). Nor must prejudgment interest be calculated at the same rate as post-judgment interest if "the equities demand a different rate." *Id.* at 1552-53.

As a result, I agree with DRK that prejudgment interest should be calculated from January 1, 1998 through December 31, 2012. I disagree, however, with DRK's interest calculation methodology, as well as Wiley's methodology. Given the length of time that has passed since the infringement took place and the substantial fluctuation in both post-judgment

and prime interest rates during this 15-year time period, I conclude that the most equitable

interest rate to apply is the current prime interest rate of 3.25% without compounding (i.e.,

simple interest) through December 31, 2012 (i.e., 15 years of interest).  Thus, the amount of

prejudgment interest should be $8,804.04.

## V.      Attorneys' Fees, Costs, and AAA Fees.

The parties' license agreements relevant to the 15 invoices identified in Section I.C.

above specifically provide that DRK is entitled to its reasonable attorneys' fees and costs

incurred in asserting copyright infringement claims in arbitration proceedings arising out of those

agreements.[5]  As previously stated in Interim Arbitration Award No. 2 and in e-mail

communications with the parties, I have exercised my discretion to conclude that DRK is the

prevailing party in this litigation, albeit only partially so.  The cases cited by Wiley at pp. 4-5 of

its responsive papers are wholly inapposite, as each involved a contract dispute in which each

party asserted a claim against the other party or parties for money damages and prevailed on at

least part of its damages claim.  Moreover, the amounts awarded were similar and thus largely

offset each other.  It was largely fortuitous as to whether a party was a plaintiff/counterdefendant

or a defendant/counterclaimant.  By contrast, Wiley asserted no counterclaims against DRK.

Although DRK did not prevail on the fraud claims, it prevailed on its copyright right claims with

---

[5]      There is no indication that the attorneys fees' provision in the agreement at issue in *Gerig v. Krause Publications, Inc.*, 58 F. Supp.2d 1261 (D. Kans. 1999), specifically included copyright claims within its scope and, therefore, appears to be distinguishable from the attorneys' fees clauses in the license agreements at issue here.  In any event, Wiley's "Section 412 preemption" argument is largely an academic one, as *Aerial Permafrost Polygons* was the subject of five of the fifteen invoices involved in the copyright infringement claims. Since the analysis of the infringement issues proceeded on an invoice-by-invoice basis, there would not appear to be any significant difference in litigation costs whether these five invoices included only timely registered photographs or a mixture.  As a result, even if Wiley's argument were to be accepted, DRK would be entitled to an award of attorneys' fees with respect to at least a significant portion of the invoices.

respect to 15 of the invoices.

Therefore, the result in this arbitration proceeding is no different than any other case where a plaintiff prevails on some claims, but not others, and where the defendant does not assert a counterclaim. In those cases, the plaintiff typically recovers a portion of its attorneys' fees with no such award to the defendant. As a result, I have exercised my discretion to conclude that (a) DRK is the prevailing party, although only partially so, and therefore is entitled to at least some portion of the attorneys' fees it has incurred in this litigation and (b) Wiley is not a prevailing party, or at the very least, should not be awarded attorneys' fees in any amount.

In exercising my discretion, I may and do take into account that DRK prevailed only on its copyright claims, that it did not prevail on its fraud claims, and that the amount of statutory damages and profits awarded was less than what DRK had urged that I award. In particular, the copyright claims involved 15 invoices, whereas approximately three times as many invoices were the subject only of fraud claims at the arbitration hearing. On the other hand, the fraud damages are lower for any particular invoice than would copyright actual damages combined with profits disgorgement. Thus, had DRK prevailed on the fraud claims, the total amount of damages awarded would not have tripled, but would have increased by a much lower factor. Thus, it is overly simplistic and somewhat misleading to look at apportionment only from the perspective of percentage of invoices/photographs that were the subject of successful claims, as Wiley would have it.

Although some form of apportionment of DRK's attorneys' fees is in order, the parties vigorously disagree as to the appropriate percentages. I reject both DRK's contention that it should be entitled to approximately $194,000 in attorneys' fees (i.e., essentially 85-90% of the total amount incurred) and Wiley's contention that DRK should be entitled to only 18.1% of the

total amount incurred (i.e., which would be approximately $39,000). I find each party's apportionment theory to be substantially unrealistic. Without the fraud claims, the case would have been simpler and less time-consuming than how DRK would have it, but more complex and time-consuming than how Wiley would have it. For example, without the fraud claims, the 3-4 day arbitration hearing would have been shortened by much more than a few hours (per DRK's apportionment), but would have been much longer than three-quarters of a day (per Wiley's apportionment). Similarly, if DRK had prevailed on the fraud claims, its total monetary recovery would certainly be well more than 15% greater (per DRK's apportionment) than that achieved but certainly not five times more (per Wiley's apportionment).

Although determining the appropriate apportionment percentage is necessarily an imprecise exercise, after weighing all of the factors I consider relevant (particularly a rough measurement of the extent of DRK's success in seeking monetary relief and the effort reasonably necessary to achieve that level of success), I conclude that DRK should be awarded the sum of $100,000 in attorneys' fees and $9,377.94 in costs, exclusive of the AAA's fees and Arbitrator's compensation.[6]

Because they are analogous to taxable costs in litigation, I conclude that DRK is entitled to recover the entirety of the AAA's fees and Arbitrator's compensation it has incurred in this arbitration proceeding.

### Conclusion

I conclude that DRK is entitled to an arbitration award in the following amounts:

1.      Statutory damages in the amount of $10,000 for copyright infringement of *Aerial*

---

[6]      Although Wiley tries to make much of DRK's settlement proposals, they are of little of no relevance even if one were to agree that the demands were as unreasonable as Wiley contends. Wiley does not indicate that it made any settlement proposal whatsoever, let alone one that might implicate the letter or spirit of the second sentence of A.R.S. § 12-341.01.

*Permafrost Polygons*;

2. Actual damages in the form of lost license fees in the amount of $5,876.51;

3. Disgorgement of Wiley's profits in the amount of $12,183.06;

4. Prejudgment interest in the amount of $8,804.04;

5. Attorneys' fees and costs (other than AAA fees and the Arbitrator's compensation) in the total amount $109,377.94; and

6. The administrative filing and case service fees of the AAA, totaling $2,600.00, shall be borne as follows: entirely by Wiley. The fees and expenses of the arbitrator, totaling $34,191.92, shall be borne as follows: entirely by Wiley. Therefore, Wiley shall reimburse DRK the sum of $19,695.96, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by DRK.

Finally, I find in Wiley's favor on the entirety of DRK's fraud claims.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

Dated: February 1, 2013

_____
Arbitrator

BLD:scw
4683894

EXHIBIT 2

```
0001

 1                AMERICAN ARBITRATION ASSOCIATION

 2

 3     DRK PHOTO,                      )

 4                                     )
            Claimant,                  )
 5     vs.                             ) No. 76 14300193 11
 6                                     )
       JOHN WILEY & SONS,              )
 7                                     )
                                       )
 8          Respondent.                )
                                       )
 9

10

11

12              DEPOSITION OF DANIEL KRASEMANN

13                    Scottsdale, Arizona

14                      June 7, 2012
                        9:26 a.m.
15

16

17

18

19

20

21

22

23                            REPORTED BY:

24                            YVONNE L. WHITEFIELD, CSR

25     (Copy)                 Certificate No. 50611
```

0034

1    A.   There's no way I can know what Wiley is up to.

2    Q.   So you don't know what Wiley knew?

3    A.   I don't know what Wiley's thinking is at this

4    moment.

5    Q.   Do you have any evidence that the person who

6    communicated print numbers to you knew that those numbers

7    were incorrect?

8    A.   I would say that -- when I was -- when we

9    received the licensing request, permission request, I

10   couldn't tell you if the person that sent that request

11   knew if it was accurate or not.

12        Does that answer the question?

13   Q.   It could have been a good faith estimate,

14   couldn't it?

15   A.   I don't believe anything should be an estimate.

16   We don't license estimates.  We license finite --

17   typically we license finite use of our images.

18   Q.   It could have been a number for finite uses that

19   was given to you in good faith, couldn't it have been?

20   A.   I would assume that anything that a publisher

21   gives to us requesting licensing should be in good faith.

22   Q.   And you have no evidence --

23   A.   It has to be accurate, in good faith and accurate

24   or we can't license from it.

25   Q.   Is it the case that no print run request that was