```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
JOHN WILEY & SONS, INC.,                                     :
                         Plaintiff,                          :
                                                             :  1:11-CV-05454-KPF
              v.                                             :
                                                             :  ECF Case
DRK PHOTO, a sole proprietorship,                            :
                                                             :
                                                             :
                         Defendant.                          :
                                                             :
------------------------------------------------------------ :
DRK PHOTO, a sole proprietorship,                            :
                         Counterclaimant,                    :
                                                             :
              v.                                             :
                                                             :
                                                             :
                                                             :
                                                             :
JOHN WILEY & SONS, INC.                                      :
                                                             :
                         Counterdefendant.                   :
                                                             :
------------------------------------------------------------
```

**DRK PHOTO'S RESPONSE TO WILEY'S STATEMENT OF
ALLEGEDLY UNDISPUTED MATERIAL FACTS**

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York, DRK Photo ("DRK") hereby submits, in opposition to the partial summary judgment motion filed by John Wiley's & Sons, Inc.'s ("Wiley"), its response to Wiley's statement of material facts:

1. Wiley is a publisher of textbooks and other educational materials.

**Undisputed.**

2. DRK is a stock photography agency that licenses photos for use by others.

**Undisputed.**

3. DRK does not employ photographers or obtain ownership of photos through

the work made for hire provisions of the Copyright Act.  **Undisputed.**

4. DRK enters into arrangements with photographers pursuant to which the photographers grant DRK a right to include certain of their works as part of DRK's collection of stock photographs, which DRK then offers to license to publishers and other users of photographs.  **Undisputed.**

5. The vast majority of photographers whose work is included in DRK's collection have granted DRK only non-exclusive rights to their work.  **Disputed; the agency agreements (Exhibit 1 to the Declaration of Daniel Krasemann ("D. Krasemann Decl."), filed herewith) and assignment agreements (Exhibit 13 to Declaration of Robert Penchina (Doc. 54) ("Penchina Decl.") and Exhibit 2 to D. Krasemann Decl.) granted DRK the right to issue licenses authorizing others to reproduce, distribute and display the works which are "exclusive rights" as recognized by § 106 of the Copyright Act.  Wiley is confusing "exclusive ownership" with "exclusive rights."**

6. All of the photographers whose works are identified in Exhibit 1 to DRK's Counterclaims, with the exception of Tom Bean and Peter French, granted only non-exclusive rights to DRK.  **Disputed; the agency agreements (D. Krasemann Decl. Exh. 1) and assignment agreements (Penchina Decl. Exh. 13 and D. Krasemann Decl. Exh. 2) granted DRK exclusive rights as recognized by the Copyright Act.  Wiley is confusing "exclusive ownership" with "exclusive rights."**

7. Whether they granted exclusive or nonexclusive licenses to DRK, the photographers "[t]ypically . . . retain[ed] the copyright" in the works.  **Disputed; the agency agreements (D. Krasemann Decl. Exh. 1) and assignment agreements**

(Penchina Decl. Exh. 13 and D. Krasemann Decl. Exh. 2) did not grant DRK an exclusive or a nonexclusive license.  **The agency agreements granted DRK three of the § 106 "exclusive rights."  The assignment agreements additionally granted DRK ownership of the whole copyright.**

8. At the times that Wiley allegedly infringed the copyrights in photos licensed to it by DRK, DRK did not own the copyright in the allegedly infringed works.  **Disputed; the agency agreements (D. Krasemann Decl. Exh. 1) which preceded DRK's licensing and Wiley's infringements were "a transfer of copyright ownership" under §§ 101 and 201 of the Copyright Act.**

9. Beginning around 1992, DRK began licensing photos for inclusion in textbooks and related products published by Wiley.  **Undisputed.**

10. Generally, for each transaction, Wiley would submit a letter to DRK to identify which particular stock photographs from DRK's stock Wiley desired to use, which textbook or other publication the photographs would be included in, and what the estimated print-run would be for that publication.  **Disputed; Wiley did not identify "the estimated" print run; it identified the specific number of copies it sought permission to print.  *See* Exhibit 2 to DRK's Answer and Counterclaims (Doc. 26) ("Counterclaims"); Exhibit 2 to Boyd Decl., Excerpt from Deposition of Dan Krasemann in *DRK v. John Wiley & Sons, Inc.,* AAA No. 76 14300193 11 ("when I was -- when we received the licensing request, permission request, I couldn't tell you if the person that sent that request knew if it was accurate or not.  Does that answer the question?   Q. It could have been a good faith estimate, couldn't it?  A. I don't believe anything should be an estimate.  We don't license estimates. We license finite**

-- typically we license finite use of our images.").

11. Generally, after approving Wiley's request, DRK would issue an invoice to Wiley for DRK's fee for Wiley's use of the photographs, and the invoice would set forth terms applicable to Wiley's use of photos licensed by DRK.  **Undisputed.**

12. Wiley paid the invoices issued to it by DRK.  **Undisputed.**

13. From time to time, DRK and Wiley would enter into pricing agreements setting forth the prices that DRK charged Wiley for use of photos licensed by DRK.  **Undisputed.**

14. Pursuant to the pricing agreement in place during 2000 and 2001, DRK charged Wiley $170 for the right to print and distribute in North America (with up to 10% of the distribution permitted to be abroad) up to 40,000 copies of a book (printed in the English language) in which DRK's photo comprised up to half a page; and DRK charged an additional 10%—*i.e.*, $17—to increase the permitted print run up to 80,000 copies.  **Undisputed.**

15. Pursuant to the pricing agreement in place during 2000 and 2001, whether Wiley told DRK at the outset that it needed 20,000, 30,000 or up to 40,000 copies, the price Wiley would have been obligated to pay would have been $170 for the right to include a DRK photo as up to half a page in a textbook printed in English and distributed in North America (with no more than 10% of the distribution abroad).  **Disputed to the extent it implies Wiley could secure a license for 20,000 copies and rely on it to print 40,000 copies without obtaining an additional license.  The deposition testimony Wiley cites for this paragraph does not support any such implication.**

16. Pursuant to the pricing agreement in place during 2000 and 2001, if Wiley

requested a license to include a DRK photo as up to half a page in a textbook printed in English and distributed in North America (with no more than 10% of the distribution abroad) for more than 40,000 copies up to a maximum of 80,000 copies, the price DRK would have charged Wiley was the same price as for up to 40,000 copies ($170) plus an additional 10% of that price ($17). **Disputed to the extent it implies Wiley could secure a license for 50,000 copies and rely on it to print 80,000 copies without obtaining an additional license. The deposition testimony Wiley cites for this paragraph does not support any such implication.**

17. DRK's attorneys have been representing photographers and stock photo agencies asserting copyright infringement claims against textbook publishers since at least 2005. **Undisputed.**

18. DRK retained its present litigation counsel no later than in 2008. **Disputed; counsel for the present litigation was retained in 2011. Harmon & Seidman represented DRK in an unrelated matter in 2008 (*DRK Photo v. Houghton Mifflin Harcourt Publ'g Co., et al.,* Case No. 3:09-cv-8225 (D. Ariz.)).**

19. In 2008, Dan Krasemann, the owner of DRK, voluntarily gave testimony in a case against textbook publisher, Houghton Mifflin Harcourt, at the request of his attorneys. **Undisputed.**

20. In 2008, DRK initiated a program to register copyrights for the photos in DRK's collection. **Undisputed.**

21. No later than in June 2008, DRK's attorneys provided to DRK a form agreement for DRK to use to obtain from photographers rights to assert copyright infringement claims. **Disputed to the extent it implies the sole purpose of the**

5

**agreements were to obtain rights to assert copyright infringement claims.** *See* **Penchina Decl., Exh. 13, and D. Krasemann Decl. Exh. 2, assignments.**

    22.    The text of DRK's Assignment Form is as follows:

<u>Copyright Assignment, Registration, and Accrued Causes of Action Agreement</u>

The undersigned photographer, the sole owner of the copyrights in the undersigned's images ("the Images") selected by DRK PHOTO ("DRK") and included in DRK's collection, hereby grants to DRK all copyrights and complete legal title in the Images. DRK agrees to reassign all copyrights and complete legal title back to the undersigned immediately upon completion of the registration of the Images, as evidenced by DRK's receipt of a Certificate of Registration from the United States Copyright Office for such Images, and resolution of infringement claims brought by DRK relating to the Images.

The undersigned agrees and fully transfers all right, title and interest in any accrued or later accrued claims, causes of action, choses in action--which is the personal right to bring a case--or lawsuits, brought to enforce copyrights in the Images, appointing and permitting DRK to prosecute said accrued or later accrued claims, causes of action, choses in action or lawsuits, as if it were the undersigned.

Any proceeds obtained by settlement or judgment for said claims shall, after deducting all costs, expenses and attorney's fees, be divided and paid 50% for the undersigned and 50% for DRK.

**Disputed; this is the language in every form except Stephen Krasemann's second assignment (D. Krasemann Decl. Exh. 2).**

    23.    At the time DRK transmitted DRK's Assignment Form to the photographers and asked them to sign it, DRK knew that it did not have standing to assert copyright infringement claims relating to infringements of the photographers' works. **Disputed; DRK's opinion was that it did not, but DRK actually did have standing based on the prior grant of licensing rights which constituted "a transfer of copyright ownership" under the Copyright Act. D. Krasemann Decl. Exh. 1.**

    24.    Beginning in June 2008, DRK transmitted the DRK Assignment form to

photographers by email and asked the photographers to sign it and return it to DRK. **Undisputed.**

25. DRK's email transmitting DRK's Assignment Form to photographers (the "Transmittal Email") told photographers that the purpose of the form was that DRK was "initiating a copyright registration program with the United States Copyright Office," "[w]ith a Certificate of Registration in hand . . . we will be in a much stronger position with much more leverage for settling copyright infringement claims," and the "Agreement is not a permanent assignment." The Transmittal Email explained to the photographers that by signing the form, the photographers "receive the piece [sic] of mind of knowing that many of your images will be registered with the United States Copyright Office, and with this Agreement we [DRK] receive the authorization necessary to initiate and settle copyright infringement claims." The Transmittal Email did not mention anything about licensing or sales of the works covered by the form. **Undisputed.**

26. There were no purposes for DRK's Assignment Form other than what was mentioned in the Transmittal Email. **Disputed; the purpose of the Assignment Form was as to unambiguously assign legal title in the copyrights to DRK. With legal title, DRK would have the right to do the things mentioned in the Transmittal Email. Penchina Decl., Exh. 13, and D. Krasemann Decl. Exh. 2.**

27. The purpose of DRK's Assignment Form was to allow DRK to register photographs "as the 'copyright holder by assignment'" and for DRK "to have the legal standing with the courts to pursue would be infringers." **Undisputed.**

28. Dan Krasemann repeatedly assured photographers that the purpose of DRK's Assignment Form was to permit DRK to register the photos in its collection and to pursue

7

claims against infringers.  **Disputed as to "repeatedly assured"; Wiley cites only three e-mails between DRK and photographers, out of at least 34 photographers who executed the assignment agreements.**

29.     At the time photographers executed DRK's Assignment Form, DRK already held the right to issue licenses for third parties to use the works covered by DRK's Assignment Form.  **Undisputed.**

30.     Following their execution of DRK's Assignment Form, photographers continued to offer works covered by that agreement for sale on their own and through agencies other than DRK and had no duty to account to DRK for any sales they may have made.  **Disputed as to "photographers" generally; Wiley has shown that only nine out of approximately 100 photographers who signed the assignment form independently licensed images, with DRK's consent.  Penchina Decl. Exh. 1, 30, Excerpts from Deposition of Dan Krasemann in DRK v. John Wiley & Sons, Inc., AAA No. 76 14300193 11, pp. 97, 98, 102-03, 147; *see also* D. Krasemann Decl. ¶ 17.**

31.     Following their execution of DRK's Assignment Form, photographers' [sic] who were parties to non-exclusive representation agreements with DRK and had previously provided photographs to DRK continued to have the right to offer those photographs on their own websites and through other means based on the terms of the representation agreement they had signed prior to their execution of DRK's Assignment Form.  **Disputed; the "right" to license the photographs after the assignment agreements were signed was not "based on" the prior representation agreements, but derived from DRK's consent.  Penchina Decl. Exh. 30, Excerpts from Deposition of Dan Krasemann in DRK v. John Wiley & Sons, Inc., AAA No. 76 14300193 11, pp. 97, 98, 102-03, 147.**

8

32. Following their execution of DRK's Assignment Form, photographers continued to display copyright notices in their own names, or in the name of agencies other than DRK, in connection with photos covered by DRK's Assignment Form.  **Disputed as to "photographers" generally; Wiley has shown that only nine out of approximately 100 photographers who signed the assignment form independently licensed images, with DRK's consent, sometimes displaying copyright notices in their own names, or in the name of agencies other than DRK.  Penchina Decl. Exh. 1, 30, Excerpts from Deposition of Dan Krasemann in *DRK v. John Wiley & Sons, Inc.*, AAA No. 76 14300193 11, pp. 97, 98, 102-03, 147; *see also* D. Krasemann Decl. ¶ 17.**

33. DRK did not submit the application to the Copyright Office that resulted in Registration No. VAu 175-200.  **Undisputed.**

34. DRK did not submit the application to the Copyright Office that resulted in Registration No. VAu 516-002.  **Undisputed.**

35. Stephen Krasemann personally obtained Registration Nos. VAu 175-200 and VAu 516-002.  **Undisputed.**

36. Registration Nos. VAu 175-200 and VAu 516-002 each cover a collection of unpublished photographs.  **Undisputed.**

37. Stephen Krasemann obtained Copyright Registration Nos. VAu 175-200 and VAu 516-002 long before Dan Krasemann asked him to sign DRK's Assignment Form.  **Undisputed.**

38. Dan Krasemann understood that DRK needed a separate "re-worked form that dealt with his previous registrations" in order for Stephen Krasemann to assign the copyright in the photos covered by Registration Nos. VAu 175-200 and VAu 516-002.

**Disputed; Mr. Krasemann misunderstood that DRK needed a separate assignment form. D. Krasemann Decl. ¶ 6.**

39. During discovery in this matter, DRK produced a single assignment for executed by Stephen Krasemann but did not produce a separate assignment agreement with Stephen Krasemann relating to photos covered by Registration Nos. VAu 175-200 and VAu 516-002. Krasemann form. **Disputed; the 2009 assignment assigned Stephen's images to DRK, as did the 2008 assignment (produced during discovery, which has been ongoing with continuing production by both parties). *See* D. Krasemann Decl. Exh. 2; Boyd Decl. ¶ 4.**

40. Each photograph at issue in this case was published within the meaning of the Copyright Act no later than at the time a photographer provided that photograph to DRK and DRK accepted that photograph into its collection. **Disputed; the time photographer Stephen Krasemann provided a photograph to DRK was sometimes different than the time that DRK accepted that photograph into its collection. D. Krasemann Decl. ¶¶ 7-9.**

41. With the exception of some photographs created by Stephen Krasemann, for each of the photographs at issue in this case, the date of publication that DRK supplied on its applications to register copyright for the photograph was the date that DRK accepted the photograph into its collection. **Undisputed.**

42. When DRK accepted a photograph into its collection, it would assign an image number to the photograph, which number was assigned in numerical order sequentially. **Disputed; DRK assigned an image number to some of Stephen Krasemann's photographs prior to releasing them into DRK's collection or making**

them available for license.  **D. Krasemann Decl. ¶¶ 7-9.**

43.   DRK maintains records of the dates on which it accepted photographs into its collection, and DRK used these records to determine dates of publication in connection with its applications to register copyrights for those photographs. **Disputed; DRK assigned an image number to some of Stephen Krasemann's photographs prior to publication by releasing them into DRK's collection or making them available for license.  D. Krasemann Decl. ¶¶ 7-9.**

44.   Registration No. VAu 516-002 was applied for on, and has an effective date of, March 13, 2001.  **Undisputed.**

45.   The photograph identified in line 8 of Exhibit 1 to the Counterclaims as Masai Livestock Tanzania, image number 902499, was published on or before December 31, 2000.  **Undisputed.**

46.   The photograph identified in line 31 of Exhibit 1 to the Counterclaims as Wind Generators and Mountains Gorgonio Pass, CA, image number 905268, was published on or before December 31, 2000.  **Undisputed.**

47.   The photograph identified in line 48 of Exhibit 1 to the Counterclaims as Red Fox in winter leaping after mouse, image number 902839, was published on or before February 28, 2001.  **Undisputed.**

48.   The photograph identified in line 69 of Exhibit 1 to the Counterclaims as Aerial view Cape Cod and surf, image number 904674, published [sic] on or before December 31, 2000.  **Disputed; Wiley relies on DRK's label numbers in alleging this photograph was published prior to December 31, 2000.  But the label numbers of Stephen Krasemann's images – unlike those from other photographers not related to Daniel**

**Krasemann – do not reliably indicate the date that the image was first released for publication. D. Krasemann Decl. ¶¶ 7-9. At the time Stephen Krasemann submitted Image 904674 to the Copyright Office for registration, he was operating under the good faith belief that this image had not been published to the public. Declaration of Stephen Krasemann ("S. Krasemann Decl.") ¶ 8.**

49. The photograph identified in line 69 of Exhibit 1 to the Counterclaims as Aerial view Cape Cod and surf, image number 904674, was first identified as image number 127413 when it was accepted into DRK's collection. **Disputed; DRK assigned this photograph the image number 127413 when DRK received the photograph from Stephen Krasemann, but DRK has no records on whether it was released into DRK's collection or available for license at that time. D. Krasemann Decl. ¶ 10.**

50. Photographs identified by image numbers 127141 to 134177, including image number 127413 (which DRK now identifies as image number 904674), were accepted into DRK's collection during the period from November 1985 to April 1986. **Disputed; DRK assigned this photograph the image number 127413 when DRK received the photograph from Stephen Krasemann, but DRK has no records on whether it was released into DRK's collection or available for license at that time. D. Krasemann Decl. ¶ 10.**

51. The photograph identified in line 70 of Exhibit 1 to the Counterclaims as Lunch Creek Waterfall, Montana, image number 905367, was published on or before December 31, 2000. **Disputed. DRK assigned this photograph the image number 109581 (which DRK now identifies as image number 905367) when DRK received the photograph from Stephen Krasemann, but DRK has no records on whether it was released into DRK's collection or available for license at that time. D. Krasemann Decl.**

12

**¶ 13. DRK first licensed Image 905367 on October 10, 2001, and that is the date of publication I listed on the copyright registration application for that image. D. Krasemann Decl. ¶ 14;** *see also* **Exhibit 21 to Penchina Decl. (VA 1-849-343).**

52.  The photograph identified in line 70 of Exhibit 1 to the Counterclaims as Lunch Creek Waterfall, Montana, image number 905367, was first identified as image number 109581 when it was accepted into DRK's collection. **Disputed. DRK assigned this photograph the image number 109581 when DRK received the photograph from Stephen Krasemann, but DRK has no records on whether it was released into DRK's collection or available for license at that time. D. Krasemann Decl. ¶ 13.**

53.  Photographs identified by image numbers 100001 to 112610, including image number 109581 (which DRK now identifies as image number 905367), were accepted into DRK's collection during the period from 1980 to December 28, 1984. **Disputed; Wiley relies on DRK's label numbers in alleging this photograph was accepted into DRK's collection between 1980 and 1984. But the label numbers of Stephen Krasemann's images – unlike those from other photographers not related to Daniel Krasemann – do not reliably indicate the date that the image was first released for publication. D. Krasemann Decl. ¶¶ 7-9.**

54.  The photograph identified in line 70 of Exhibit 1 to the Counterclaims as Lunch Creek Waterfall, Montana, image number 905367, was not included as part of the deposit copy accompanying VAu 516-002. **Undisputed**.

55.  On January 22, 2013, DRK submitted a new application to register the copyright in the photograph identified in line 70 of Exhibit 1 to the Counterclaims as Lunch Creek Waterfall, Montana, image number 905367. **Undisputed.**

56. Registration No. VAu 175-200 was applied for on, and has an effective date of, February 1, 1990.  **Undisputed.**

57. The photograph identified in line 7 of Exhibit 1 to the Counterclaims as Aerial Permafrost Polygons, image number 901854, was accepted into DRK's collection prior to February 1, 1990.  **Disputed; Wiley relies on DRK's label numbers in alleging this photograph was accepted into DRK's collection prior to February 1, 1990.  But the label numbers of Stephen Krasemann's images – unlike those from other photographers not related to Daniel Krasemann – do not reliably indicate the date that the image was accepted into DRK's collection.  Image number 901854 was assigned an image number when DRK received it, but DRK has no records on whether it was released into DRK's collection or available for license at that time.  D. Krasemann Decl. ¶ 11.**

58. The photograph identified in line 7 of Exhibit 1 to the Counterclaims as Aerial Permafrost Polygons, image number 901854, was published prior to February 1, 1990.  **Disputed; Wiley relies on DRK's label numbers in alleging this photograph was published prior to February 1, 1990.  But the label numbers of Stephen Krasemann's images – unlike those from other photographers not related to Daniel Krasemann – do not reliably indicate the date that the image was first released for publication.  Image number 901854 was assigned an image number when DRK received it, but DRK has no records on whether it was released into DRK's collection or available for license at that time.  D. Krasemann Decl. ¶ 11.  Image 901854 was not published or made available for license prior to February 1, 1990.  S. Krasemann Decl. ¶ 10.  DRK first licensed image 901854 from Copyright Registration VAu 175-200 for publication in a 1993 John Wiley & Sons, Inc. textbook.  D. Krasemann Decl. ¶ 12.**

59. The photograph identified in line 7 of Exhibit 1 to the Counterclaims as Aerial Permafrost Polygons, image number 901854, was accepted into DRK's collection prior to the photographs identified as Lunch Creek Waterfall, Montana, image number 905367, or Aerial view Cape Cod and surf, image number 904674.  **Disputed; Wiley relies on DRK's label numbers in alleging this photograph was accepted into DRK's collection prior to image numbers 905367 or 904674.  But the label numbers of Stephen Krasemann's images – unlike those from other photographers not related to Daniel Krasemann – do not reliably indicate the date that the image was accepted into DRK's collection.  D. Krasemann Decl. ¶¶ 7-9.  DRK has no records on when this image was released into DRK's collection or available for license.  D. Krasemann Decl. ¶ 11.**

60. At the time the photograph identified in line 7 of Exhibit 1 to the Counterclaims as Aerial Permafrost Polygons, image number 901854, was submitted to the Copyright Office for registration by Stephen Krasemann, DRK had assigned a DRK image number to that photograph, which meant that the photograph already had been accepted into DRK's collection.  **Disputed; many times, DRK assigned label numbers to Stephen Krasemann photographs when DRK received the photographs from Stephen Krasemann, but did not release the images into DRK's collection for licensing until a later date.  D. Krasemann Decl. ¶¶ 7-9.  Image 901854 was not published or made available for license prior to February 1, 1990.  S. Krasemann Decl. ¶ 10.   At the time Stephen Krasemann submitted image number 901854 to the Copyright Office for registration on February 1, 1990, it was unpublished.  *Id.***

61. Notwithstanding that he had purported to register the photograph identified in line 7 of Exhibit 1 to the Counterclaims as Aerial Permafrost Polygons, image number

901854, as part of Registration No. VAu 175-200 in 1990, Stephen Krasemann also included that same photograph among the photos he submitted for registration in connection with Registration No. VAu 516-002.  **Undisputed.**

62.     The photograph identified in line 7 of Exhibit 1 to the Counterclaims as Aerial Permafrost Polygons, image number 901854, was published prior to its registration as part of the collection of unpublished photos covered by Registration No. VAu 516-002.  **Undisputed.**

63.     On April 21, 2011, DRK reassigned to Michael Collier ownership of copyrights in all of Mr. Collier's photographs that previously were included in DRK's collection.  **Disputed; the assignment document (Penchina Decl. Exh. 16) speaks for itself: "DRK hereby reassigns back to [Mr. Collier] all legal title and interest in the copyright you originally assigned to DRK for purposes of these registrations.  This reassignment applies only to those images that have been both submitted to and registered with the Copyright Office for registration up to the date of this letter."**

64.     Michael Collier understood that, when he signed DRK's Assignment Form, all he was granting to DRK was the ability to register copyrights and a "right to enter into negotiations with people that he [Dan Krasemann] felt had overused, overstepped the licensing in the past."  **Disputed; Mr. Collier also testified that he "underst[ood] that through that program [he] would be assigning rights in [his] copyright to DRK"; that he "assigned copyright out of my name into Mr. Krasemann's name – or DRK. I don't know which . . . . I certainly understood that in signing copyright out of my name, I was turning a lot of power for those photographs over to him." (Penchina Decl. Ex. 33 (Transcript of the Deposition of Michael Collier conducted in this case on March 18, 2013, at 20-21).**

16

**Mr. Collier also answered the question, "you understood that everything else pertaining to the photo and copyright still resided with you?" by saying "Well, not the copyright, because I was dumb enough to sign it over to him . . ." (*Id*. at 21-22).**

65.   Michael Collier sent an email to DRK's attorney asking "to have my name removed from this Wiley/DRK suit" and stating "I do not want you or DRK using my name in any future lawsuits."  **Undisputed.**

66.   DRK does not claim that Wiley committed infringement with respect to the transactions identified in lines 293, 294, 296 and 299 to 316 of Exhibit A of the Amended Complaint.  **Disputed; DRK has not asserted any claim for copyright infringement with respect to the transactions identified in lines 293, 294, 296 and 299 to 316 of Exhibit A of the Amended Complaint in this lawsuit (*see* Doc. 26, DRK Answer and Counterclaim), however, Wiley has not provided any information to DRK about these transactions to enable DRK to form an opinion about whether Wiley committed infringement with respect to these transactions.**

<u>DRK PHOTO'S ADDITIONAL UNDISPUTED MATERIAL FACTS</u>

67.   DRK obtained the right to license the photos at issue in this case through execution of various written agreements from the photographers who took them.  *See* D. Krasemann Decl. ¶ 3 and Exhibit 1.

68.   Stephen Krasemann executed two copyright assignment documents to DRK, one in 2008 and one in 2009.  *See* D. Krasemann Decl. ¶ 5 and Exh. 2; Penchina Decl. Exh. 13.

69.   DRK misunderstood that it needed the second assignment form from Stephen Krasemann.  In fact, the 2008 assignment transferred all of Stephen Krasemann's copyrights to DRK, including those in photographs he had previously registered.  *See* D. Krasemann Decl. ¶ 5

Exh. 2, which assigns "all copyrights and complete legal title in the [undersigned's] Images [selected by DRK PHOTO ("DRK") and included in DRK's collection]." This first assignment did not exclude the previously registered photographs. D. Krasemann Decl. ¶¶ 5-6.

70. Stephen Krasemann had good faith belief Images 902499, 905268 and 902839 were unpublished when he submitted applications for their registration. S. Krasemann Decl. ¶¶ 7-8.

Dated: June 24, 2013

Respectfully submitted,

s/ *Maurice Harmon*
Maurice Harmon
Harmon & Seidman LLC
The Pennsville School
533 Walnut Drive
Northampton, PA 18067
Tel: (610) 262-9288
Fax: (610) 262-9557
maurice@harmonseidman.com

Christopher Seidman
Harmon & Seidman LLC
P.O. Box 3207
Grand Junction, CO 81502
Tel: (970) 245-9075
Fax: (970) 245-8086
Email: chris@harmonseidman.com

Edward Hernstadt
Hernstadt Atlas LLP
11 Broadway, Suite 615
New York, New York 10004
Tel: 212-809-2501
Fax: 212-214-0307
ed@heatlaw.com

                                              Adam DiLeo
                                              Harmon & Seidman LLC
                                              688 5th Avenue, PMB 4
                                              Brooklyn, NY 11215
                                              (917) 742-0880
                                              adam@harmonseidman.com

                         <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 24, 2013, I caused a true and correct copy of the foregoing pleading to be filed via the cm/ecf system, which will serve a notice of electronic filing to all counsel of record.


                                        <u>s/ Autumn Witt Boyd</u>
                                        Autumn Witt Boyd