UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JOHN WILEY & SONS, INC.,                                    :
          Plaintiff, Counterclaim Defendant,     :          11-CV-05454 (KPF)
                                             :          ECF Case
                        v.                          :
                                           :
DRK PHOTO,                                                 :
          Defendant, Counterclaimant.             :
                                           :
-------------------------------------------------------------X

### RESPONSE DECLARATION OF ROBERT PENCHINA

ROBERT PENCHINA, pursuant to 28 U.S.C. § 1746, states:

      1.      I am a member of Levine Sullivan Koch & Schulz, LLP, counsel for John Wiley & Sons, Inc. in the above-captioned action.  I respectfully submit this declaration in response to the motion for partial summary judgment made by DRK Photo ("DRK").

      2.      Attached as Exhibit 1 hereto is a true and correct copy of the terms and conditions that appear on the back of DRK's invoices.  The document that is Exhibit 1 previously was submitted to the Court as "Exhibit 7" to the Declaration of Dan Krasemann dated August 25, 2011 as page 24 of 33 of Dkt. #4-1, and was described in that Declaration as among the "terms and conditions that have been printed on the reverse side of every DRK invoice to Wiley" and, in particular, "was printed on invoices issued on or after June 17, 2003."

      3.      Attached as Exhibit 2 hereto is a true and correct copy of a printout from Westlaw of the Expert Report of James H. Pickerell submitted in *Semerdjian v. Littell*, 07-CV-7496 (LMM) (S.D.N.Y.), which report was marked as "Pickerell-5" during the deposition of Mr. Pickerell conducted in this case on June 6, 2013.

      4.      Attached as Exhibit 3 hereto are true and correct copies of excerpts of the transcript of the Deposition of James H. Pickerell conducted in this case on June 6, 2013.

5.      Attached as Exhibit 4 hereto are true and correct copies of excerpts of the transcript of the Deposition of Maryann Price conducted in the arbitration captioned *DRK Photo v. John Wiley & Sons, Inc.*, AAA Case No. 76 143 00193 11 (the "Related Arbitration").

6.      Attached as Exhibit 5 hereto are true and correct copies of excerpts of the transcript of the Deposition of Lisa Suarez conducted in the Related Arbitration.

7.      Attached as Exhibit 6 hereto are true and correct copies of excerpts of the transcript of the Deposition of Daniel Krasemann conducted in the Related Arbitration.

8.      Attached as Exhibit 7 hereto are true and correct copies of documents bearing production numbers DRK v. Wiley AAA 00150 and DRK v. Wiley AAA 00155 that were produced in discovery in the Related Arbitration by DRK.

9.      Attached as Exhibit 8 hereto is a true and correct copy of a printout of the article entitled "DRK Refuses to License to Geographic Publications" from the newsletter "Selling Stock," accessible at www.selling-stock.com, which printout was marked as "Pickerell-12" during the deposition of Mr. Pickerell conducted in this case on June 6, 2013.

10.     Attached as Exhibit 9 hereto is a true and correct copy of a printout of the article entitled "Infringement at Glencoe" from the newsletter named "Selling Stock," accessible at www.selling-stock.com, which printout was marked as "Pickerell-9" during the deposition of Mr. Pickerell conducted in this case on June 6, 2013.

11.     Attached as Exhibit 10 hereto are true and correct copies of excerpts of the transcript of a deposition given on December 10, 2008 by Daniel Krasemann in the case W*ood v. Houghton Mifflin Harcourt Publishing*, 07 CV 1516-DME-BNB (D. Co.), which transcript was produced to Wiley by DRK in connection with discovery in the Related Arbitration.

12.     Attached as Exhibit 11 hereto is a true and correct copy of a document bearing production numbers DRK v. Wiley AAA 00650 that was produced in discovery in the Related Arbitration by DRK, and which was marked as D53 at the Deposition of Daniel Krasemann conducted in the Related Arbitration on June 7, 2012.

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed at:   New York, New York
Dated:         July 26, 2013

Robert Penchina

*John Wiley & Sons, Inc. v. DRK Photo*

Case No. 11-cv-5454 (KPF)

Response Declaration of Robert Penchina

# Exhibit 1

Submission of images for examination or use is conditioned upon the Recipient agreeing to all the terms contained herein. If you object to any of these terms including the arbitration or stipulated damage provisions, you must return the images immediately.

### TERMS RELATIVE TO SUBMISSION

■ Photographs, transparencies, negatives, illustrations, digital images or any visual depiction (hereafter "images") may be held for 30 days' approval. Unless a longer period is requested and granted by DRK PHOTO in writing, a holding fee of $10 dollars per week per image will be charged after such 30 day period and up to the time of return.

■ Images may not be used in any way, including layouts, sketches, xerography or scanning until submission of and payment of an invoice indicating Recipient's right to do same, or indicating the purchase of the image(s) outright, which shall be only on the terms of use hereinafter specified. Projection of any transparency is not permitted. You may not ARCHIVE, REPUBLISH or TRANSMIT images on any DATABASE without DRK PHOTO's prior written consent. You may not remove any image from its cardboard mount. You will be charged a $200 fee for any removal or damage to the mount without consent.

■ Recipient is solely responsible for loss or damage to images delivered to it, from the time of receipt until return to DRK PHOTO. Recipient shall be responsible for the safe delivery and return of images to DRK PHOTO and shall indemnify DRK PHOTO against any loss or damage to images in transit or while in possession of Recipient. This agreement is not considered a bailment and is specifically conditioned upon the images so delivered being returned to DRK PHOTO in the same condition as delivered. Duplicate transparencies, internegatives, digital files and copy prints will not be accepted in exchange for a lost or damaged image. Recipient assumes an insurer's liability herein for the safe and undamaged return of the images to DRK PHOTO. Such images are to be returned by bonded messenger or by registered mail (return receipt requested), prepaid and fully insured, with description of contents enclosed.

■ The monetary damage for loss or damage of an original color transparency or image shall be determined by the value of each individual image. Recipient agrees however, that the reasonable value of such lost or damaged transparency shall be two thousand ($2,000) dollars, that a lost or damaged black-and-white print is two hundred ($200) dollars and a duplicate transparency is two hundred ($200) dollars. DRK PHOTO agrees to the delivery of the goods herein only upon the express covenant and understanding by Recipient that the terms contained in this Paragraph are material to the Agreement. Recipient assumes all responsibility for its employees, agents, assigns, messengers and freelance researchers for the loss, damage or misuse of the images.

### TERMS AS TO USE

■ Unless otherwise specifically stated, images remain the property of DRK PHOTO or the particular photographers. Upon submission of and payment of an invoice to DRK PHOTO a license is only granted to use the images for the use specified on the invoice and for no other purpose, unless such images are purchased outright. Such use is granted for the United States only, and only for a one-year period, unless otherwise specified. Recipient does not acquire any right, title or interest in or to any image, including, without limitation, any electronic reproduction or promotional rights, and will not make, authorize or permit any use of the particular image(s), plates(s) or digital files made there from other than as specified herein. Full credit and copyright information must remain with the image. Any authorized duplicate must be returned to DRK PHOTO after use. Used images are to be returned within three months after date of invoice, except in cases of outright purchase. Recipient agrees to pay, as reasonable charges, the sum of ten ($10) dollars per week per image after such three-month period to date of return. If an image is not returned by six months after the invoice date, holding fees will cease to accrue and at that time will become fixed and the image(s) will be deemed to be lost and liquidated damage provisions shall govern.

■ If Recipient desires to re-use an image or extend previous usage, then Recipient must request and pay for additional rights prior to publication. You agree not to make, authorize or permit any use of an image or its derivative (use of an image as a source to create another image) except as authorized by the invoice. In the event you use an image for any use other than that indicated on the invoice, including but not limited to the number of uses, the publication using, or the size of reproduction, DRK PHOTO agrees to forego its rights to sue for copyright infringement and breach of contract if you pay, as liquidated damages, a sum equal to ten (10) times the maximum price we would have charged for such use, within 10 (ten) days of us billing such fee. This is not a penalty but an agreed fair use charge. If you fail to make such payment in ten (10) days, we shall have the right to sue for copyright infringement and breach of contract. No model releases or other releases exist on any images unless DRK PHOTO specifies the existence of such release in writing. Recipient shall indemnify DRK PHOTO against all claims arising out of the use of any images where the existence of such release has not been specified in writing by DRK PHOTO. In any event, the limit of liability of DRK PHOTO shall be the sum paid to it per the invoice for the use of the particular image involved. User will hold DRK PHOTO harmless from all claims for the use of the images, including defamatory use. DRK PHOTO gives no right or warranties with respect to the use of names, trademark, logo types, registered or copyrighted designs or works of art depicted in any image, and the client must satisfy himself that all necessary rights, consents or permissions as may be required for reproduction are secured.

■ *Digital files are provided "as is". DRK PHOTO makes no representation or warranty, either express or implied, including but not limited to any implied warranties of merchantability, fitness for any particular purpose, noninfringement, quality of image, or compatibility with any computer hardware or other equipment, operating system or software program. You may have additional rights under some state laws.*

■ Unless otherwise specified in writing by DRK PHOTO, "exclusive" reproduction rights shall mean exclusive to the specific image as DRK PHOTO can control within the confines of it's own operations. DRK PHOTO is not responsible for any licensing of the same image(s) by other parties.

■ This agreement is not assignable or transferable on the part of the Recipient.

■ This contract contains all the terms of the agreement between DRK PHOTO and Recipient concerning delivery and review of images, and no terms and conditions may be added or deleted unless made in writing and signed by both DRK PHOTO and Recipient. These terms and the terms of any subsequent invoice supercede any and all terms of the Client's purchase order. Any subsequent invoice DRK PHOTO may issue may contain additional terms relating to the rights granted and the type of use allowed. Time is of the essence in the performance by Recipient of its obligations and return of images hereunder. No rights are granted until payment is made to DRK PHOTO even though Recipient has received an invoice.

■ Payment herein is to be net thirty (30) days. A service charge of two (2%) percent per month on any unpaid balance will be charged thereafter. Any claims for adjustment or rejection of terms must be made to DRK PHOTO within ten (10) days after receipt of invoice. In the event that any images are used by Recipient in publications, then Recipient shall send to DRK PHOTO, on a semi-annual basis (June 30 and December 31) a certified statement setting forth the total number of sales, subcontracts, adaptations, translations and any other uses. Recipient shall provide DRK PHOTO with two (2) free copies of such publication immediately upon printing.

■ With all transactions in which payment is received in the form of royalties DRK PHOTO and/or its duly authorized representative shall have the right at any time and without limitation to check, inspect, and audit the Client's books, records, and accounts in order to verify or clarify any and all such statements, accountings, and payments. The expense of such examination shall be borne by DRK PHOTO unless errors of accounting amounting to five (5%) percent or more of the total sums paid or payable to DRK PHOTO shall be found to its disadvantage, in which case the expense of such examination shall be borne by the Client.

■ Rights are being reserved to Recipient when an invoice is created. If Recipient does not use the invoiced image it must notify DRK PHOTO within five (5) days from receipt of the invoice. If Recipient fails to do so, it is responsible for full payment of the invoice.

■ Images used editorially should bear a credit line as indicated by DRK PHOTO. DRK PHOTO reserves the right to charge a treble fee for use without a credit. Recipient must register copyright in their name to afford protection to the image. Such copyright shall be immediately reassigned upon request, without charge.

■ All rights not specifically granted herein to recipient are reserved for DRK PHOTO's use and disposition without any limitations whatsoever.

■ Recipient agrees that the above terms are made pursuant to Article 2 of the UNIFORM COMMERCIAL CODE and agrees to be bound by same. Objection to any terms must be made in writing within ten (10) days.

### DISPUTES OR CLAIMS ARISING OUT OF SUBMISSION AND/OR USE.

■ Any and all disputes, with the exception of copyright claims, under or in connection with this agreement, including, without limitation, the validity, interpretation, performance and breach hereof, shall be settled by arbitration in Arizona pursuant to the rules of the American Arbitration Association. Judgment upon the award rendered may be entered in the highest court of the forum, State or Federal, having jurisdiction. This agreement, its validity and effect, shall be interpreted under and governed by the laws of Arizona.

■ If Recipient of this contract is an agent for or an employee of a non-US company that operates in a place of business in the United States or its territories, said Recipient expressly agrees that any disputes regarding this contract shall be adjudicated within the United States in the manner described here.

■ Copyright claims shall be brought in the Federal court having jurisdiction.

If DRK PHOTO is caused to present claims or suit as a result of any breach of the above terms set forth, it shall be made whole for such reasonable legal fees or costs by Recipient or user herein.

TC6    6/17/03

*John Wiley & Sons, Inc. v. DRK Photo*

Case No. 11-cv-5454 (KPF)

Response Declaration of Robert Penchina

# Exhibit 2

Hilda SEMERDJIAN, Plaintiff, v. McDougal LITTELL, A..., 2008 WL 5630530...

2008 WL 5630530 (S.D.N.Y.) (Expert Report and Affidavit)
United States District Court, S.D. New York.

Hilda SEMERDJIAN, Plaintiff,
v.
McDougal LITTELL, A Division of Houghton Mifflin Company, and R.R. Donnelley & Sons Company,
Defendants.

No. 07-CV-7496 (LMM).June 19, 2008.

**Expert Report of James H. Pickerell**

**Case Type:** Contracts >> License
**Case Type:** Fraud & Misrepresentation >> Fraud - Fraud & Misrepresentation
**Case Type:** Intellectual Property >> Copyright
**Jurisdiction:** S.D.N.Y.
**Name of Expert:** James H. Pickerell
**Area of Expertise:** Art, Entertainment & Media >> Photographer

**Representing:** Defendant

I have been asked to outline the normal, late 1990s stock photo industry practices for establishing the fees that would have been charged for circulations greater than 40,000.

It is my understanding that in the mid to late 1990s McDougal Littell licensed stock photos for use in books that licensors allege were limited to "under 40,000" circulation. The images in question were later printed in a significantly higher number of books than the licensors authorized.

*Background*

The first thing to recognize is that it has never been an industry practice to establish a fixed fee per book and then multiply that number by the total number of books published. In my 40 years in the business there has always been a sliding scale for larger circulations which amount, in practice, to a substantial discount the more books that are printed.

Thus, a fee of $200 charged for a circulation of up to 40,000 is not viewed as being $0.005 per book, and then that number multiplied by the total number of books eventually printed to arrive at a fee for higher circulations.

Before explaining how the "sliding scale" works and outlining a reasonable fee that could have been charged, there are a few other relevant facts about the industry that should be understood.

In the 1980s and early 1990s it was very rare for more than 40,000 copies of any book to be printed due to the printing technology available at the time. When more copies were needed of any given title a new edition was usually produced and it was normal practice to charge 75% of the original fee for such an edition. During this period, sellers generally had two prices for stock photo usage, one for "under 40,000" circulation and the other for "over 40,000" circulation. The "over 40,000" figure was usually about 25% higher than the "under 40,000". If a publishing company paid the "over 40,000" fee it was entitled to print an unlimited number of copies of the same edition. However, in spite of this great deal, in my experience most requests from publishers until the early 2000s were for circulations of "under 40,000".

WestlawNext' © 2013 Thomson Reuters. No claim to original U.S. Government Works.


Pickerell-5
6-6-13  RP

Hilda SEMERDJIAN, Plaintiff, v. McDougal LITTELL, A..., 2008 WL 5630530...

It is worth noting that if the defendant had asked for an "over 40,000" quote in 1997, under industry practices at the time, it would likely have been granted for about 25% above the fee actually paid.

In the mid-90s printing technology began to change making it more economical for publishers to print books in very short runs and also to easily go back on press and print additional copies as needed. When this happened, stock agencies began to quote prices based on ranges of circulations such as: under 20,000; 20,000 to 40,000; 40,000 to 80,000 and over 80,000. These breakdowns were included in the 1997 edition of *Negotiating Stock Photo Prices*, a book I published and which was widely used in the industry. Over the years I have spoken at numerous seminars on the subject of pricing stock photography and one of the major themes after the mid-90s was to drop the concept of a single price for "over 40,000" circulation and establish prices that were more closely tied to actual usage while still offering discounts for larger usages.

One agency's pricing schedule that I have seen from the 1997 period had breakdowns going up to 1,000,000, but at this time most stock agencies believed it was rare for a printing to go above 100,000. Publishers have never provided image sellers with the actual number of copies printed, so it has always been difficult to tell how many books were actually being printed.

Many individual sellers were slow to understand the changes that were taking place in the printing industry and continued to quote prices for under 40,000 and over 40,000 for several years. When given that option publishers invariably chose the cheaper under 40,000 price. In recent years it has become much more common for publishers to ask sellers to quote prices for total circulations of 500,000; 1,000,000 and 1,500,000.

*Sliding Scale Factors*

The multiples for circulations larger then 40,000 vary slightly with each seller and have increased slightly in the last 10 years as larger press runs have become more common. The base price for 40,000 on which these multiples are calculated has increased in some cases over 100% in the last decade as it has been recognized that many more copies of books are now circulated than was previously the case.

Below I have provided six different schedules and the multiples licensors have charged for circulations above the 40,000 base fee. The information from three agencies was supplied on a confidential basis. I am not at liberty to identify the actual fees charged or the publisher who paid these fees. Also included are the base numbers from the 1997 and 2001 editions of my book, *Negotiating Stock Photo Prices*. Finally, I have supplied the current fees Corbis charges for inside use in textbooks. Corbis is one of the two largest companies in the industry. These fees are publicly available at Corbis.com by using the company's price calculator which prices uses based on circulation and other factors. The multiples from the base price reflected in these examples are consistent with my observations from a wider range of licensors and stock agencies as well.

The base number in these schedules will vary depending on several factors, and it has risen significantly since 1997. The factors include:

1 - the size the image is used on the page,

2 - whether it is used one time in one book or multiple times in different books,

3 - if the book is published in more than one language,

4 - the part of the world where the book will be distributed,

5 - the number of years before an additional payment is required regardless of the number of copies published, and

6 - whether the image is published electronically.

It is my understanding that all of these other issues were covered in the original license and the only thing that changed is the circulation.

Hilda SEMERDJIAN, Plaintiff, v. McDougal LITTELL, A..., 2008 WL 5630530...

**Circulation and Multiple Factors**

TABLE

Note: NSPP refers to Negotiating Stock Photo Prices.

*Conclusion*

The purpose of this analysis is to determine what the publisher should have been charged in 1997 if the fill amount of the copies eventually made had been licensed at the outset. In my opinion the total that a reasonable buyer and seller would have agreed on for circulations of 1,400,000 copies is about (3) times whatever the original fee for 40,000 was. In other words if the fee for 40,000 copies was $100 the fee for 1,400,000 copies would have been about $300 if rights to print the higher amount had been licensed initially.

My experience is also that a license fee for North American rights normally includes the right to distribute up to 5% of the copies internationally.

These opinions are based on the documents I examined, industry practice and my professional judgment after more than 40 years in the photography and photojournalism industries. At trial, if asked, I may comment and opine about additional matters or upon matters responsive to the testimony of other witnesses.

**End of Document**                                           © 2013 Thomson Reuters. No claim to original U.S. Government Works.

*John Wiley & Sons, Inc. v. DRK Photo*

Case No. 11-cv-5454 (KPF)

Response Declaration of Robert Penchina

# Exhibit 3

Page 1

1

2   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

3   11-CV-5454(GBD)

    - - - - - - - - - - - - - - - - -x

4   JOHN WILEY & SONS, INC.,      :

                             :

5               Plaintiff,   :

                             :

6       - against -        :

                             :

7   DRK PHOTO,               :

                             :

8             Defendant.  :

                             :

9   - - - - - - - - - - - - - - - - -x

10

11                   321 W. 44th Street

12                   New York, New York

13                   June 6, 2013

14                   10:00 a.m.

15

16

17

18

19

20         DEPOSITION OF JAMES H. PICKERELL, held

21  at the above-mentioned time and place, before

22  Randi Friedman, a Registered Professional

23  Reporter and Notary Public within and for the

24  State of New York.

25

Page 107

1                    J. Pickerell

2        A.    No, I don't.

3        Q.    And I think we talked about this

4  morning other opinions that you have given that

5  state that a license for North America typically

6  would include, as industry practice, 5 percent

7  distribution beyond North America; correct?

8        A.    Yes.  I think industry practice at

9  that time was correct.  That that's correct.

10       Q.    But you didn't mention that in your

11 geographic distribution terms in this report?

12       A.    No.

13       Q.    Is there a reason why you didn't?

14       A.    No.

15       Q.    Moving to Sub (4), which has the

16 heading Other License Terms; do you see that?

17       A.    Right.

18       Q.    The last sentence says that, "It is

19 understood that if the publisher pays the

20 invoice, the publisher is agreeing to the

21 seller's terms outlined on that invoice"; do you

22 see that?

23       A.    Yes.

24       Q.    What is the basis for that opinion?

25       A.    My primary basis for that opinion is

Page 75

1                    J. Pickerell
2       A.     It was --
3                    MR. HARMON:   Excuse me.   Objection
4       as to form.
5                    THE WITNESS:   It was beginning to
6       become aware -- that I was beginning to
7       become aware of it in 1999 that you could no
8       longer use it.   In the earlier '90s, it was
9       commonly believed that the publishers would
10      abide by the agreements that they had made.
11      We were beginning to learn in 1999 that we
12      could no longer trust the publishers to
13      abide by the agreements that they had made.
14   BY MR. PENCHINA:
15      Q.     Your report talks about the early
16   2000's; doesn't it?   And by my reckoning, that's
17   after 1999.
18      A.     Right.   Yes.   And I don't think it was
19   generally known, even though I had written this
20   in 1999.   I don't think it was generally known or
21   generally believed that publishers were not
22   abiding by this until much later.
23      Q.     Weren't you trying to make it known?
24      A.     Yes, but unfortunately I don't reach
25   all of the photographers and stock agencies of

Page 76

1                    J. Pickerell

2     the world.

3          Q.    But you reached many; don't you?

4                MR. HARMON:   Objection, form.

5                THE WITNESS:   I reached -- I

6     reached some.

7     BY MR. PENCHINA:

8          Q.    Would you say based on your use of

9     this term earlier today, you reached a

10    significant number?

11               MR. HARMON:   Objection to form.

12               THE WITNESS:   Yes.

13    BY MR. PENCHINA:

14         Q.    And Exhibit 9 wasn't the only time

15    that you attempted to get the word out about

16    this; was it?

17         A.    No.

18         Q.    What other ways did you get the word

19    out?

20         A.    Well, I'm trying to think if I've

21    specifically given talks at various seminars at

22    various times, so I may have mentioned this at

23    those seminars.  But Selling Stock has been the

24    primary -- Selling Stock and my books have been

25    the primary way that I've tried to get the word

Page 77

1                    J. Pickerell

2      out.

3           Q.    And did the various photographers and

4      trade associations try and get that same word

5      out?

6           A.    Absolutely.

7           Q.    Including PACA?

8           A.    I believe so, yes.

9           Q.    And when did PACA begin to try and get

10     that word out?

11                    MR. HARMON:  Objection to form.

12                    THE WITNESS:  I would think at

13           about this time.  Maybe even a little

14           earlier than I wrote this article.  I would

15           have hoped I was writing this article about

16           the time it was beginning to become -- that

17           people were beginning to become aware of it.

18     BY MR. PENCHINA:

19           Q.    Turning to Section Roman Numeral IV of

20     your opinion, you write that in your "1992 NSPP

21     buyer's guide under the copyright section, I

22     pointed out that it is a criminal offense to

23     willfully infringe a copyright," and then it goes

24     on.

25                    What was the basis for your statement

*John Wiley & Sons, Inc. v. DRK Photo*

Case No. 11-cv-5454 (KPF)

Response Declaration of Robert Penchina

# Exhibit 4

1               AMERICAN ARBITRATION ASSOCIATION
                ARIZONA
2               AAA 761430019311

3    IN RE:                :
     DRK PHOTO,
4                          :
          Claimant,              DEPOSITION OF:
5                          :
          and                MARYANN PRICE
6                          :
     JOHN WILEY & SONS, INC,
7                          :
          Respondent.
8    - - - - - - - - - - - -

9    B E F O R E:

10        TRANSCRIPT of testimony as taken by and before

11   LAURIE A. LANDRIGAN, a Certified Shorthand Reporter

12   and Notary Public of the State of New Jersey, at the

13   offices of JOHN WILEY & SONS, 111 River Street,

14   Hoboken, New Jersey, on Tuesday, June 19, 2012,

15   commencing at 9:50 a.m., pursuant to Notice.

16

17

18

19

20

21

22

23
              ESQUIRE DEPOSITION SERVICES
24             90 Woodbridge Center Drive
             Woodbridge, New Jersey  07095
25           (732) 283-1008  or  (800) 247-8366



1           MR. BARKER:  She can testify to if

2    there was communication between DRK and Wiley

3    regarding what North American meant.

4           MR. HARMON:  Right.  That's where I'm

5    going.  Your objection is noted.

6       Q.     We would like you to testify on behalf

7    of Wiley because you're in the area where photo

8    research and licensing is done, but the contention

9    here is, that's not one of the topics.

10   A.     North American English or English rights, it

11   was our understanding, and an industry standard at

12   the time, would include use in Canada, North America,

13   and it would include 10 percent and under overseas

14   sales.  If it went above that, then it was broader

15   rights needed.

16      Q.     So use in Canada, and I think you said

17   North America, but we can't use that to define it.

18   Did you mean U.S.?

19   A.     U.S., Canada, any North American countries.

20      Q.     But that's my point.  Does North

21   America mean Central America in Wiley's view?

22   A.     Not to my knowledge.

23      Q.     You also said North America English

24   language kind of together?

25   A.     Yeah.

MARYANN PRICE                                    June 19, 2012
IN RE DRK PHOTO                                          47

```
 1    Sorry.
 2         Q.      Do you know whether there's any effort
 3    made within Wiley to keep records which tell you what
 4    images are used in custom editions or ancillaries?
 5    Do you know what I mean by "ancillaries"?
 6    A.      Yes, I do.   Custom editions, we just have to
 7    assume that all the pictures will be in it because we
 8    don't know which chapters custom clients will pick.
 9    So they may want so many chapters of the book and not
10    all of them, but that would be very difficult to
11    track.  So we assume that all the pictures are in the
12    custom edition even if they may not be.
13         Q.      So when you say "we assume," you mean
14    the people in Wiley assumes that for licensing
15    purposes?
16    A.      Yes.
17         Q.      Same for the ancillaries?
18    A.      The ancillaries usually don't have the in-text
19    photos in the ancillary itself.  If it does, we would
20    have a separate Filemaker file on it and send out
21    separate purchase orders for it.
22         Q.      If you did not send out separate
23    purchase orders for it, then use would not generally
24    be permitted in ancillaries?
25    A.      Usually they don't have the photos from the
```



1   main textbook in them.  Usually the cover photos,

2   sometimes on the cover of the ancillary, so we would

3   negotiate that upfront when we do the main cover or

4   send out a separate purchase order for the use of the

5   cover on the ancillary.

6          Q.      Has that been the practice for as long

7   as you've been a full-time and part-time employee

8   here?

9   A.      Yes.

10         Q.      The authors of textbooks are

11  compensated on the basis of units sold; are they not?

12  A.      I believe so.  I believe they probably receive

13  royalties.  I'm not sure how their contracts were

14  worked out.

15         Q.      Are any of the visual art licenses that

16  you entered into comparably based instead of a

17  licensing fee upfront, you pay a royalty for each

18  reproduction made of that image?

19  A.      No, not to my knowledge.

20              MR. HARMON:  I think aside from the

21  questions related to Elle Wagner's knowledge or the

22  monitoring of licenses going forward, that is, the

23  creation and implementation of the policy, I don't

24  have any other questions unless you have some

25  questions, Joe.

*John Wiley & Sons, Inc. v. DRK Photo*

Case No. 11-cv-5454 (KPF)

Response Declaration of Robert Penchina

# Exhibit 5

Lisa Suarez                                    June 18, 2012

1

AMERICAN ARBITRATION ASSOCIATION
                    Case No. AAA 76 143 00193 11

DRK PHOTO,                                    :
                                             :
        Plaintiff,                           :
                                             :
                                             :
    vs.                                      :
                                             :
                                             :
                                             :
                                             :
                                             :
JOHN WILEY & SONS, INC.,                     :
                                             :
        Defendant.                           :
                                             :
                                             :
                                             :
                                             :
                                             :

    ----------------------------------------
    DEPOSITION UNDER ORAL EXAMINATION OF:
              LISA SUAREZ
           June 18, 2012
           ------------
    REPORTED BY:   JENNIFER L. WIELAGE, CCR
              ------------


        ESQUIRE DEPOSITION SOLUTIONS
        90 Woodbridge Center Drive
        Woodbridge, New Jersey 07095
        (732) 283-1008 or (800) 247-8366


    JOB #  346654



Toll Free: 800.211.DEPO
Facsimile: 732.283.1640

Suite 445
33 Wood Avenue South
Iselin, NJ 08830
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1   are concerned, there was no determination made to

2   that.  There were separate determinations made where

3   we reviewed which products may have had photographs

4   or not had photographs.

5   BY MR. HARMON:

6        Q.      But is it your testimony that that

7   audit or examination was not complete; it was just

8   for particular publications that you checked?

9        A.      Well, we're talking about these

10  titles here in question are the only ones that I'm

11  referring to, right?

12       Q.      Okay.  So I guess my point is that if

13  a product was distributed overseas, are you -- did

14  anyone check the ancillaries and custom editions for

15  those overseas publications to see if they contained

16  photographs?

17       A.      It depends on the ancillary.  It

18  depends on whether we had access to it.  Certainly a

19  reg code, like something like a reg code to Microsoft

20  En Carta, we would not check.  That's a

21  commercially-viable product.  Microsoft made it.  We

22  just provide the reg code.  So there's really nothing

23  for us to check.  It's not our product.  You know,

24  something like Science News, which was on another

25  sheet, we buy that.  That's not a product we make.



Toll Free: 800.211.DEPO
Facsimile: 732.283.1640

Suite 445
33 Wood Avenue South
Iselin, NJ 08830
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Lisa Suarez                                           June 18, 2012

112

1    It's a little magazine called Science News.  We know
2    there's no images in there.  There's the Geoscience
3    things, the C.D., it's animations.  We know there's
4    no photos on there.  Take Note is all line art.
5    Study guides never have photographs.  Lab manuals,
6    usually the only photographs they would have are from
7    the author who created the lab manual.  You know, so
8    those are blanket policies of what we've done, which
9    is how we exclude most of the ancillaries.
10            Q.       And, therefore, not by actually
11   looking at them physically, but rather relying upon
12   the common practice of the company?
13            A.       These titles are old.  It's hard for
14   us to get copies of them.  Like I said, any copies we
15   have, we gave you.  You know, most of them are not
16   readily accessible, but I can tell you based upon the
17   specs, most of them are one color booklets that
18   wouldn't do justice to a photograph.
19            Q.       I understand, but to answer my
20   question then, you didn't make a physical
21   examination --
22            A.       No.
23            Q.       -- of all of the ancillaries?
24                     How about the custom editions?  So
25   with respect to these overseas uses is what I'm



Toll Free: 800.211.DEPO
Facsimile: 732.283.1640

Suite 445
33 Wood Avenue South
Iselin, NJ 08830
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Lisa Suarez                                      June 18, 2012

118

1    right, because, you know, it's not just photo

2    licensing, but it's, you know, a whole host of things

3    that are controlled by market restrictions.    A

4    programmer would take a literal definition of

5    market -- of North America; not a customary photo

6    licensing definition, but a literal definition.  So

7    then I went and I did some research as to, again, the

8    definition of North America and I am still back to

9    North America, including Central America.

10          Q.      Okay.

11          A.      So that's my whole story about what I

12   did with that.

13          Q.      Well, it's intriguing.   Is that

14   Wiley's position as a company, that North America

15   includes Central America?

16          A.      Yes, it would have to if the market

17   restrictions were programmed that way.

18          Q.      Does Wiley still believe that a

19   percentage of overseas sales, 1 percent, 5 percent,

20   10 percent are included in a North America license or

21   does it view that no overseas sales are permitted?

22          A.      Yes, it seems from what I've gathered

23   and the people that I've spoken to is that has always

24   been the customary practice, if it was under 15 or --

25   I think 15 or 20 percent, it was customary that that


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 732.283.1640

Suite 445
33 Wood Avenue South
Iselin, NJ 08830
www.esquiresolutions.com

1    was acceptable.

2              Q.      Was that ever discussed, if you know,

3    if the photographers or their agencies?

4              A.      Well, I actually did see an invoice

5    or a request or an agreement, something to that sort

6    that mentions that and I believe it was actually a

7    DRK agreement.

8              Q.      Do you know which one?

9              A.      Offhand, I don't.

10             Q.      Do you know if Wiley ever told DRK

11   that it believed North America included Central

12   America and also a percentage of sales overseas?

13             A.      I did see in the agreement the

14   percentage of sales overseas.  I did not see any

15   definition of North America.

16             Q.      When you say "in the agreement", do

17   you mean an agreement between Wiley and DRK?

18             A.      I'm sorry; not an agreement, in

19   pricing request or -- it was something like that.  It

20   was -- you know, it was pricing terms and there was a

21   term for a percentage over North America, outside of

22   North America.

23             Q.      But wasn't that percentage related to

24   the scope of the license and not to mean that North

25   America means without stating it in the license that



Toll Free: 800.211.DEPO
Facsimile: 732.283.1640

Suite 445
33 Wood Avenue South
Iselin, NJ 08830
www.esquiresolutions.com

*John Wiley & Sons, Inc. v. DRK Photo*

Case No. 11-cv-5454 (KPF)

Response Declaration of Robert Penchina

# Exhibit 6

DRK PHOTO v. WILEY & SONS                    DANIEL KRASEMANN

AMERICAN ARBITRATION ASSOCIATION

DRK PHOTO,                              )
                                       )
        Claimant,                      )
                                       )
vs.                                    ) No. 76 14300193 11
                                       )
JOHN WILEY & SONS,                     )
                                       )
                                       )
        Respondent.                    )
                                       )

DEPOSITION OF DANIEL KRASEMANN

Scottsdale, Arizona
June 7, 2012
9:26 a.m.

REPORTED BY:

YVONNE L. WHITEFIELD, CSR

(Copy)                          Certificate No. 50611

BARTELT and KENYON
(602) 254-4111

DRK PHOTO v. WILEY & SONS                    DANIEL KRASEMANN

Page 19

```
        1   or anything that they said to you in that call.
        2           But with that as background, who was this other
        3   person who told you to give them a call?
        4       A.   The other person, I don't recall his name.  He
09:47   5   worked for Gail and Barbara Rowell Photo Agency.  Mountain
        6   something Photo in California.  I should know that name.
        7   It's just gone off the tip of my tongue right now.
        8   Mountain something.
        9       Q.   What is it that he said was going on with Harmon
09:47  10   & Seidman?
       11       A.   He didn't tell me what was going on, but he said
       12   there were some interesting developments and I might like
       13   to talk to someone at Harmon & Seidman on what was
       14   happening.
09:48  15       Q.   Developments relating to what?  What sense of the
       16   subject matter did you have?
       17       A.   That was it.  That's all he said.  That was the
       18   gist of his comments.  And I thought they were interesting
       19   enough to call the phone number he had given me.
09:48  20       Q.   Do you know when you had that conversation with
       21   the person from this agency?
       22       A.   No.  I don't recall.
       23       Q.   Was it more than five years ago?
       24       A.   Five years ago would have been 2007.  I would
09:48  25   guess it was within the last five years.
```

DRK PHOTO v. WILEY & SONS                    DANIEL KRASEMANN

Page 37

1        A.   My view did change.

2        Q.   When?

3        A.   My view changed early 2010, perhaps.  Around

4   there.  I began to become suspicious.

10:24  5        Q.   Why did you begin to become suspicious?

6        A.   Because we had some photos suddenly dropped from

7   a textbook, which is very unusual.

8        Q.   What was it about having photos dropped from a

9   textbook that made you suspicious?

10:24 10        A.   We received a photo request for re-permissioning

11   of some photos in the fifth edition of a textbook.  I

12   believe it was Strahler Physical Geography, fifth edition,

13   2010 fifth edition.

14            And I took that opportunity to ask about the

10:25 15   adequacy of our licensing for the second, third and fourth

16   editions of the same title because these pictures have

17   been used pretty consistently throughout each edition.

18            And I got this request in for the fifth edition

19   with a rush to license, we got to do this quick.  And I

10:25 20   said prior to moving forward with this, can you answer

21   these questions:  I would like to know some details on the

22   second, third and fourth just to find out if we're good.

23   And within a couple of days, we got an e-mail saying due

24   to deadlines, we have dropped all your pictures.

10:25 25            I had even offered, because of the deadline, I

DRK PHOTO v. WILEY & SONS                    DANIEL KRASEMANN

Page 38

10:26   1   had offered a proviso licensing saying if this would help

2   your deadline, why don't we issue proviso licensing which

3   could be converted to permanent licensing conditional upon

4   things being in order on the second, third and fourth

5   editions.

6         Once they got that, they pulled the chair out

7   from under everything and dropped all our pictures.

8     Q.   Why did you ask at that point about the second,

9   third and fourth editions?

10:26 10     A.   I asked at that point because we were starting to

11   do a little more auditing on previous licensing.

12     Q.   Why were you starting to do more auditing on

13   previous licensing?

14     A.   We had some time to do it.  By that time, I had

10:26 15   gone -- was involved with and perhaps closed up stuff with

16   HMH.

17     Q.   When you got involved with the HMH dispute, did

18   you form a view about the textbook industry as a whole?

19     A.   I wouldn't say the textbook industry as a whole,

10:27 20   no.

21     Q.   What would you say?

22     A.   When I got involved with HMH, we had an issue at

23   HMH.  I have no other qualms with anyone else.

24     Q.   Well, you have disputes with others as well?

10:27 25     A.   There's disputes.  We were asking questions of

DRK PHOTO v. WILEY & SONS                    DANIEL KRASEMANN

Page 61

           1      A.   I do have it in front of me.

           2      Q.   Is this a rights request letter from John Wiley

           3   to DRK?

           4      A.   It appears to be a request for licensing and

11:23      5   billing.

           6      Q.   What is fraudulent about this letter?

           7      A.   I don't know if there's anything fraudulent about

           8   this letter to date.

           9      Q.   What is misrepresented in this letter?

11:24     10      A.   I don't know if anything is misrepresented in

          11   this letter.

          12      Q.   There's to print run number on here, is there?

          13      A.   There doesn't appear to be a print run specified

          14   on this letter.

11:24     15      Q.   So this letter did not specify a full print

          16   number, did it?

          17      A.   There's no -- this letter has no print run

          18   information on it.

          19      Q.   If you flip three pages from the letter we were

11:25     20   just looking at, do you see a letter on John Wiley

          21   letterhead dated November 8, 1993 to DRK Photo?

          22      A.   I do have a letter here November 8, 1993

          23   involving Strahler-Introducing, first edition.

          24      Q.   What's fraudulent about this letter?

11:25     25      A.   I don't know if there's anything fraudulent about

DRK PHOTO v. WILEY & SONS                    DANIEL KRASEMANN

Page 62

```
          1    this letter because I don't know what has occurred with

          2    this specific publication.

          3         Q.   There's no print run request in there, is there?

          4         A.   There's a print run of 20,000 copies on the

11:26     5    bottom of my notes.

          6         Q.   Those are your notes?

          7         A.   Those are my notes.

          8         Q.   Is there a print run number in Wiley's letter?

          9         A.   There's not.  There's a print run number on the

11:26    10    letter based, I assume, on a phone conversation that I had

         11    clarifying what was going on with this publication.  I

         12    don't remember the date of the phone call.

         13         Q.   Do you remember having the call?

         14         A.   Someone had this call with them because we

11:26    15    clarified the copyright year and the number of copies they

         16    needed.

         17         Q.   My question is, do you remember having that call?

         18         A.   1993?  I do not recall.

         19         Q.   And the 20,000 that was handwritten by you was

11:27    20    not contained in the letter sent by Wiley; isn't that

         21    correct?

         22         A.   20,000 was not typed out by Wiley on their

         23    letter, that's correct.

         24         Q.   No print run number was contained in Wiley's

11:27    25    letter?
```

DRK PHOTO v. WILEY & SONS                    DANIEL KRASEMANN

Page 63

1     A.   I see no print run that Wiley typed on this
2     letter.  Doesn't contain a number typed out on it.
3          Q.   Will you turn three more pages?  Do you see a
4     letter on John Wiley & Sons letterhead dated August 15,
11:27 5     1994 to DRK Photo?
6          A.   Yes, I do have that letter.
7          Q.   There's no print run information in that letter
8     either, is there?
9          A.   I see no print run information provided on this
11:27 10    letter.
11         Q.   So there's nothing fraudulent in that letter, is
12    there?
13         A.   No.  I don't believe there is, no.
14         Q.   Turn, please, I believe, three more pages.  It's
11:28 15    a letter on John Wiley letterhead dated August 22nd, 1994
16    to DRK Photo.  Do you see that?
17         A.   I do have it, August 22nd, 1994, yes.
18         Q.   There's nothing fraudulent about this letter, is
19    there?
11:28 20    A.   I have no reason to believe there's anything
21    fraudulent about this letter.
22         Q.   There's nothing fraudulent about any of the Wiley
23    letters that don't have print run numbers and are in the
24    same form as this; is that correct?
11:28 25    A.   I hate it when they use "any" because I don't

BARTELT and KENYON
(602) 254-4111

DRK PHOTO v. WILEY & SONS                    DANIEL KRASEMANN

Page 66

1      Q.   You are correct.  It is five pages into Exhibit

2   B, and it is a letter on John Wiley & Sons' letterhead

3   dated February 15, 1996 to DRK Photo.  Do you see that

4   one?

11:33  5      A.   I do have that copy in front of me.

6      Q.   It starts out saying, "Please grant us an

7   extension of rights for the following photos which we

8   previously licensed."

9           Do you see that?

11:33 10      A.   Yes.  I do see that.

11      Q.   What does that mean to you?

12      A.   It would mean to me that just looking at that

13   grouping of words, that they need additional rights for

14   pictures they previously licensed for this book.

11:33 15      Q.   So is this letter, John Wiley & Sons, coming back

16   to DRK for additional rights in a photo that they

17   previously requested rights for?

18      A.   It appears that they previously licensed these

19   images and now they need additional -- need re-permission.

11:34 20   They're asking us to re-permission something additional.

21   I'm not looking down at the letter.

22           Shall I review the whole letter?

23      Q.   Feel free if it will help you.

24      A.   Okay.  I looked it over.

11:35 25      Q.   So is this a request by Wiley for additional

DRK PHOTO v. WILEY & SONS                    DANIEL KRASEMANN

Page 67

 1  permission to use photographs licensed to it from DRK?

 2      A.  It looks like they're asking to print some

 3  additional copies with less than 10 percent changes.

 4      Q.  I'm just going to put this here as a placeholder

11:35  5  so you can find that again.  Would you please turn back to

 6  the front of D1 and look at paragraph 14 on page 3?  The

 7  last sentence of that paragraph says, "Wiley never sought

 8  from DRK additional permission to use the photographs."

 9          Do you see that?

11:36 10      A.  I do see that sentence.

11      Q.  That sentence is false, isn't it?

12      A.  If we're looking at this particular letter where

13  they're requesting an extension of rights as it applies to

14  the letter we were just talking about, it strikes me it

11:36 15  could be incorrect because they have contacted us to ask

16  for some re-permissioning on this one project.

17      Q.  Now, look back to where we were before.  If you

18  turn five pages, there is a letter on John Wiley

19  letterhead dated June 6, 1996 to DRK Photo.  Do you see

11:38 20  that?

21      A.  I do have a letter in front of me June 6, 1996

22  involving Murck Environmental Geology.

23      Q.  This is another request for additional rights; is

24  that correct?

11:38 25      A.  This is a request for a new unique product called

DRK PHOTO v. WILEY & SONS                    DANIEL KRASEMANN

Page 201

1    look it up.  It's just another safety net that we could

2    always find out what it's a picture of.

3              (Deposition Exhibit Number D52 was marked for

4              identification.)

05:42  5  BY MR. PENCHINA:

6         Q.   Would you please take a look at the document

7    that's been marked as Exhibit D52 and tell me if D52 is

8    familiar to you?

9         A.   It does look familiar, yes.

05:42 10       Q.   What is D52?

11        A.   The same as the last one we were talking about,

12   D51.  The same circumstances would be in place with that.

13   It's the text portion of our invoice number 006934 that

14   would have been printed onto our official form and was

05:42 15   printed onto our official form, but when the payment came

16   in, I couldn't find a copy of the form.

17        Q.   Just to clarify for the record, your testimony is

18   not that D52 is the same document as D51, but rather it's

19   the same circumstances to how it came to be printed in

05:43 20   this fashion?

21        A.   D51 is our invoice number 006933.  D52 is our

22   006934.  They are uniquely different licenses for, I

23   believe, different publications.

24        Q.   Do you know Jay Mizell?

05:43 25       A.   I heard the name.

DRK PHOTO v. WILEY & SONS                    DANIEL KRASEMANN

Page 218

1        A.   No.  I don't recall any.

2        Q.   Let me just broaden that because I focused on

3   e-mail.

4             Do you recall sending any type of communication

06:11  5   to Wiley requesting the same type of information with

6   respect to past volumes prior to D53?

7        A.   I don't recall prior to this sending out any

8   similar request to John Wiley, nor do I recall the last

9   time John Wiley sent us a re-permissioning request that

06:12  10   may have triggered a response to check up on previous

11   editions.

12        Q.   But you do recall sending similar types of

13   requests to other publishers?

14        A.   Yes, we have.

06:12  15        Q.   And you sent similar types of requests to other

16   publishers prior to this e-mail to Wiley; is that correct?

17        A.   I believe we did.

18        Q.   Did you send those requests as long as five years

19   ago?

06:13  20        A.   I don't know if it would go back five years.  I

21   don't know the date.  I don't know the date of our first

22   letter similar to this to whatever publisher it may have

23   been to.

24        Q.   But it was a recurring practice of yours to

06:13  25   inquire of publishers for information about their past

DRK PHOTO v. WILEY & SONS                    DANIEL KRASEMANN

Page 219

1     publications, correct?

2         A.   It was a recurring policy of ours that as we

3     received re-permissioning requests, that we follow up with

4     an e-mail like this to inquire about previous editions and

06:13  5     adequacy of previous licensing for the last title or the

6     same whatever.

7         Q.   I'm just trying to get a timeframe of when those

8     kinds of requests for re-permissioning would have come to

9     you and when you would have responded to those requests.

06:14 10         Is that something that occurs throughout the life

11     of your relationship with publishers?

12         A.   If I had to ballpark it, I would say it probably

13     started up within the last five years.

14         Q.   Was there anything, again, that prompted you to

06:14 15     start that up within the last five years?

16         A.   We just thought it would be prudent on our part

17     to do some checking up as a responsibility in a sense that

18     we take on as an agency to protect our photographers'

19     interests and our licensing and our copyrights.

06:14 20         Q.   Are there any other steps that you took that

21     would have been or were prudent in checking up in

22     protecting your photographers?

23         A.   In what regard?  I'm not sure I understand that

24     question.

06:15 25         Q.   I think you said you started doing the sort of

*John Wiley & Sons, Inc. v. DRK Photo*

Case No. 11-cv-5454 (KPF)

Response Declaration of Robert Penchina

# Exhibit 7

PAID  **006933**

60444   3-17-00

John Wiley & Sons
6th Floor Photo Dept.
605 Third Avenue
New York, NY   10158-0012

01/12/00

212-850-6359
Jill Tatara

One-time, non-exclusive, North American, English language reproduction and distribution rights
for publication inside one (1) print version of the copyright 2000 John Wiley & Sons, Inc.
TEXTBOOK publication titled DYNAMIC EARTH, 4TH EDITION, by Skinner. The total number of copies
to be printed is not to exceed 20,000 copies. No other rights known or unknown to mankind are g
granted or implied. No electronic publishing rights granted.

"Photographer's Name"/DRK PHOTO

| IMAGE | DESCRIPTION | SIZE | PHOTOGRAPHER | |
|-------|-------------|------|--------------|---|
| 848870 | (H) (P-21) CALVING ICEBERG, HUBBARD GLACIER, ALASKA | 1/2 PAGE | TOM AND SUSAN BEAN, INC. | $281.25 |
| 207011 | (H) (P-44A) ACID DRAINAGE, ABANDONED MINE SITE | 1/4 PAGE | JOHN CANCALOSI | $250.00 |
| 848472 | (H) (P-57) CINDER CONE/AERIAL | 1/4 PAGE | TOM AND SUSAN BEAN, INC. | $250.00 |
| 848468 | (H) (P-80) IGNEOUS ROCK SILL INTRUDED IN SEDIMENTARY LAYER, TEXAS | 1/4 PAGE | TOM AND SUSAN BEAN, INC. | $250.00 |
| 128853 | (H) (P-86A) FELLED TREES, DEVASTATION ON SLOPES OF MT. SAINT HELENS | 1/4 PAGE | JEFF HUTCHERSON | $250.00 |
| 157222 | (V) (P-126) RIPPLE PATTERNS IN ROCK / COLORADO NATIONAL MONUMENT | 1/4 PAGE | STEPHEN TRIMBLE | $250.00 |
| 147683 | (H) (P-161) FOSSIL / TRILOBITE GROUP (UOK-0005) (PICKUP/REUSE) | 1/4 PAGE | TOM WIEWANDT | $187.50 |
| 214952 | (H) (P-183) SUNSET LIGHT ON DOWNTOWN TUCSON W/CATALINA MTNS. BEHIND | 1 1/2 PAGE | TOM AND SUSAN BEAN, INC. | $515.62 |

DRK PHOTO Federal ID # 39-1452673

All fees are to be NET TO DRK PHOTO after any applicable taxes, surcharges,
or bank exchange fees. User shall provide two (2) free copies of uses
appearing in print.

PLEASE NOTE TERMS ON REVERSE SIDE.        THANK YOU

30 days after separations.

0577

$2,234.37

DRK v. Wiley AAA 00150

PAID

66444   3-17-00

**006934**

John Wiley & Sons
6th Floor Photo Dept.
605 Third Avenue                                    01/12/00
New York, NY  10158-0012

212-850-8657
Lisa Gee, Associate Photo Editor

One-time, non-exclusive, North American, English language reproduction and distribution rights
for publication inside one (1) print version of the copyright 2000 John Wiley & Sons, Inc.
TEXTBOOK publication titled INTRODUCING PHYSICAL GEOGRAPHY, by Strahler, 2ND EDITION COPYRIGHT
UPDATE ONLY. The total number of copies to be printed of this 2000 copyright update edition is
not to exceed 20,000 copies. No other rights known or unknown to mankind are granted or
implied. No electronic publishing rights granted.

"Photographer's Name"/DRK PHOTO

| IMAGE | DESCRIPTION | SIZE | PHOTOGRAPHER | |
|---|---|---|---|---|
| 200035 | (H) (P-74) NATIVE PRAIRIE / IOWA | 1/2 PAGE | ANNIE GRIFFITHS BELT | $140.62 |
| 901854 | (V) (P-148) AERIAL OF PERMAFROST POLYGONS / ALASKA | 1/4 PAGE | STEPHEN J. KRASEMANN | $125.00 |
| 184640 | (H) (P-170) AERIAL - GLACIAL KETTLE POND | 1/2 PAGE | TOM AND SUSAN BEAN, INC. | $140.62 |
| 160936 | (H) (P-186) FLASH FLOOD / FLOODED ARROYO (UAZ-2186) | 1/2 PAGE | TOM WIEWANDT | $140.62 |
| 846735 | (H) (P-191) EXPOSED ROCK LAYERS / ERODED RAPLEY MONOCLINE | SPREAD   CO | TOM AND SUSAN BEAN, INC. | $343.75 |
| 846735 | (H) (P-191A) EXPOSED ROCK LAYERS / ERODED RAPLEY MONOCLINE | 1/4 PAGE | TOM AND SUSAN BEAN, INC. | $125.00 |
| 164973 | (H) (P-192) BRIGHT ANGEL CANYON / GRAND CANYON (403GS040X2) | 1/2 PAGE | LARRY ULRICH STOCK PHOTO.,INC. | $140.62 |

DRK PHOTO Federal ID # 39-1452673

All fees are to be NET TO DRK PHOTO after any applicable taxes, surcharges,
or bank exchange fees. User shall provide two (2) free copies of uses
appearing in print.

PLEASE NOTE TERMS ON REVERSE SIDE.          THANK YOU

30 days after separations.

0577                                              $1,156.23

DRK v. Wiley AAA 00155

*John Wiley & Sons, Inc. v. DRK Photo*

Case No. 11-cv-5454 (KPF)

Response Declaration of Robert Penchina

# Exhibit 8

DRK Reduses to License to Geographi - Stock Photography News, Analysis and Opinion.    Page 1 of 4

 **Selling Stock**

Log In | Subscribe / Buy Credits

Home    Subscribe / Buy Credits    Advanced Search    About    Contact Us

Search: [        ] Go

## DRK Reduses to License to Geographi
Posted on 4/4/1998 by Jim Pickerell | Printable Version | Comments (0)

134

### DRK REFUSES TO LICENSE TO GEOGRAPHIC PUBLICATIONS

April 3, 1998

Editors Note: The following information relative to the situation of the re-use of images by National Geographic Society in their "108 Years of National Geographic on CD-ROM" was supplied by Daniel Krasemann of DRK PHOTO. My comments and recommendations to photographers and Stock Agencies are at the bottom of this article.

This article is protected by Copyright, and intended solely for the use of subscribers to Selling Stock. Anyone wishing to distribute this material in any way, must get written permission from Selling Stock and/or Daniel Krasemann prior to such distribution. No excerpts of the material are allowed without prior written permission.

In an effort to keep the lines of communication open as to what actions DRK PHOTO has taken in response to the current non-payment by the National Geographic Society for use of our imagery in the 1997 NGI "108 YEARS CD-ROM" product I would like to share the following copy of our letter to a Ms. Nina Hoffman (Senior V.P. Publications - NGS) dated February 24, 1998. Copies of the letter were mailed to some 50+ individuals at the National Geographic Society that DRK PHOTO has worked with over the years.

Letter to National Geographic

February 24, 1998

Ms. Nina Hoffman

Senior V.P. of Publications

National Geographic Society

1145 17th Street, NW

Washington, DC 20036-4688

Dear Nina Hoffman:

It is with great anxiety that I find myself writing to you to inform you of a situation that has developed with the National Geographic Society; non-payment of our invoice #005736, which has necessitated our placement of an immediate and hopefully temporary moratorium on the granting, licensing, or re-licensing of any reproduction rights to all divisions of the National Geographic Society until such time as our invoice has been settled to the mutual satisfaction of both parties.

The invoice in question relates to the "108 Year" CD-ROM product which uses many images represented by this office. After offering a contract to DRK PHOTO in May of 1997 for use of our images in this product, for a fee of $20.00 per image, which DRK PHOTO refused, negotiations began. To date, the National Geographic Society has failed to negotiate in good faith to settle our invoicing which puts

### Stay Connected
Sign up to receive our FREE weekly email listing new stories posted.

[        ]

[ Submit ]

Follow us:  
Facebook  RSS  LinkedIn  Twitter

### Free Stuff

**2013 Stock Photography Trends**
The stock photography business has changed dramatically from what it was five or ten years ago and the future does and the future does not look promising. In this article we've provided links t...
Read More

**Education Market Shifts To Digital**
If supplying pictures for educational use is a significant part of your business you need to be aware of how the market is trending toward digital delivery and how that is likely to affect the p...
Read More

**Understanding The Stock Photo Business**
Every few months I put together a summary of some of our most important recently published stories. This selection is designed to help investors who are trying to understand the industry as well as...
Read More

**Making Stock Photography Profitable**
If your goal is to earn a full-time living from photography -- and particularly stock photography -- you need to read this series of articles. They were originally written in the summer of 2010....
Read More

**Pricing Stock Images Based On Usage**
There are a number of stories on this site that will aid you in determining what to charge for a stock photo usage. Below is a list of story titles and the number of credits required to read the enti...
Read More

**Microstock Trends -- February 2012**
This article provides a selection of stories that will help the reader better understand microstock photography and the state of the market for images at microstock prices at the beginning of 2012....
Read More

**Stock Photo Market Trends in 2011**
For those looking for statistical and trend information related to stock photo industry this story provides links to a series of articles produced over the past year that examine various aspect of th...
Read More

**Top Stories In 2011**
If you're new to this site, or have missed some of the stories we have published in 2011, check out these links to 52 of this year's most important and thought provoking stories. This summary of info...
Read More

**Understanding The Stock Photo Industry**
For those who would like background on the stock photo industry, its history and trends this story provides links to a number of stories on PhotoLicensingOptions.com that readers may want to review.
Read More


Pickerell-12
6-6-13 RF

Case 1:11-cv-05454-KPF-JCF   Document 91   Filed 07/26/13   Page 45 of 58

DRK Reduses to License to Geographi - Stock Photography News, Analysis and Opinion.          Page 2 of 4

both of us in this uncomfortable position.

DRK PHOTO is greatly disappointed that the actions of the National Geographic Ventures/Interactive division have forced us to this end. After enjoying a successful business relationship of several decades we hope this will be a temporary situation and that the powers-that-be at the National Geographic Society will move quickly to free our hands by resolving the matter without us having to resort to legal action.

We are sincerely sorry for what ever problems the moratorium may cause; now, or in the future. I encourage you to contact a Mr. Terrance Adamson, Esq., or a Mr. Angelo Grima at N.G.S. 202-857-7405 to make them aware of the ramifications as they affect you and your division/s. Perhaps if they hear from all involved parties at the National Geographic Society this matter can be settled immediately with as little disruption as possible.

Thank you for your time. Please feel free to contact me if you have any questions.

Sincerely,

Daniel R. Krasemann, President

Background

Mr. Krasemann supplied the following background for his decision.

In May of 1997 - DRK PHOTO was offered a contract for the use of our images in the "108 Years" CD-ROM product for a fee of $20.00 per image; this was to be full payment for permissions for twenty (20) years, world-wide, all languages -- including CD-ROM, CD-I, DVD, and other versions, editions, adaptations, or sequels to the original title. After going back and forth to clarify wording in the contract we refused the $20.00 per picture offer and submitted what we felt to be a reasonable figure for such far reaching permissions. Upon receiving our fee suggestion, Mr. Tom Stanton (NGI) returned a letter referencing our "preposterously high" fee and went on to effectively say that after re-examining paperwork they felt they did not need our authorization to use our images in the CD-ROM.

On December 22, 1997, DRK PHOTO invoiced the National Geographic Society for use of images by our photographers in the "108 Years" CD-ROM. After roughly forty-five days had elapsed I called Mr. Stanton to inquire about the status of our invoice and was referred to legal counsel.

In speaking with both a Mr. Terrance Adamson, 202-857-7449, (the NGS V.P. of Business and Legal Affairs) and a Mr. Robert Sugarman, 212-310-8000, (the NGS legal counsel in New York) it became obvious that the NGS isn't about to settle our invoice until such time as current legal cases before "the courts" decide it must.

DRK PHOTO and many of the photographers it represents have licensed hundreds of images over the past several decades to the various divisions of the National Geographic Society; these include NG Magazine, NG Books, NG Traveler, NG Educational Media, NG World Magazine, NG Television, NG International Publications, etc. We feel the current position being taken of non-payment of our invoicing for the "108 Years" CD-ROM product is unacceptable if not illegal, is not in the spirit of the original licensing and agreements, and certainly is a breach of the immensely important trust we have established over the decades

Useful Stock Photo Statistics And Trend Information

This story provides links to a series of articles that include the results of a photographer income survey, analysis of the sales of microstock photographers, the size of the market for stock photogr...
Read More

DRK Reduses to License to Geographi - Stock Photography News, Analysis and Opinion.    Page 3 of 4

which we must now reconsider. To the best of my knowledge, the National Geographic Society is the only client of DRK PHOTO who has produced a CD-ROM product without first negotiating, obtaining, and paying for reproduction rights for use in such a product. In any case we cannot condone their position, nor allow the possibility of this happening again with other products of this nature by continuing to submit images to the National Geographic Society. Just recently we were contacted by an individual from NGI regarding yet another National Geographic project - "109 Years of National Geographic Maps". Where will it end? Do they intend to negotiate these uses? Or simply, "damn the torpedoes - full steam ahead".

DRK PHOTO has never been one to jump immediately to legal action, we have always been able to settle matters of dispute through mutual negotiations with our clients. We do, however, believe that in many cases there are alternative options to press a point, and that it was time for action to be taken.

Perhaps others who recognize the precedent setting implications of these NGS actions will support DRK PHOTO's position by sending a similar message to the National Geographic Society that they too may have to consider implementing a moratorium on [licensing] reproduction rights until such time as NGS deals with this situation.

It cannot be in the best interest of individual agencies, the best interest of the future of this industry, nor the best interest of our photographers to condone policies such as this one taken by the National Geographic Society. I welcome comment and/or contact from anyone interested in discussing the position DRK PHOTO has taken.

Thank you for your time,

Daniel R. Krasemann/DRK PHOTO

Phone: 520-284-9808, Fax: 520-284-9096, E-mail: drkphoto@sedona.net

Pickerell's Comments

I think every photographer and stock agency should applaud Dan Krasemann for the courageous stand he has taken for the long range welfare of our industry. I encourage you to send him a note to that effect.

I would encourage individual photographers to send notes to their agencies asking the agency not to allow any of the photographer's photos to be used by any National Geographic publication, until NGS and all its various publications establish an acceptable policy with regard to payment for future uses. Also encourage your agency to take the same stand that DRK took.

I would encourage all agencies to take a hard look at their books and determine how much of their total income comes from National Geographic Society publications. Then look at how much income they receive from other publications when they re-license rights to that publications for a picture the publication used previously. I believe that in the vast majority of cases the re-licensing from all publications will be much higher than the earnings from NGS. This will make the economic stand the agency needs to take very simple. If Geographic gets away with all-future-use of an image for a low one-time-rights fee, and the right to ignore all contracts, every other publication in the U.S. will eventually do the same. Can you stay in business if this happens?

Agencies that don't want to mortgage their future need to take a stand NOW. The

HOME
Subscribe / Buy Credits
Advanced Search
About
Contact Us

CATEGORIES
Acquisitions
Advertising
Agencies/Distributors
Assignments
Associations
More...

SOCIAL
Facebook
Twitter
LinkedIn
RSS Feed

LEGAL
Privacy Policy

Case 1:11-cv-05454-KPF-JCF   Document 91   Filed 07/26/13   Page 47 of 58

DRK Reduses to License to Geographi - Stock Photography News, Analysis and Opinion.                    Page 4 of 4

sad thing -- the almost incomprehensible thing -- is that agencies, and

photographers, who make very few sales to NGS and therefore have almost nothing

to lose, and everything to gain, by establishing industry precedents for the

future have refused to take a stand on this issue.

I would encourage everyone to re-think their position and take a long range view

of their careers, and how National Geographic can severely damage those careers

if they are allowed to do so.

Like    Send    Sign Up to see what your friends like.

Copyright © 1998 Jim Pickerell. The above article may not be copied, reproduced, excerpted or distributed in any manner without written permission from the author. All requests should be submitted to Selling Stock at 10319 Westlake Drive, Suite 162, Bethesda, MD 20817, phone 301-251-0720, fax 301-309-0941, e-mail: info@selling-stock.com

Jim Pickerell is founder of www.selling-stock.com, an online newsletter that publishes daily. He is also available for personal telephone consultations on pricing and other matters related to stock photography. He occasionally acts as an expert witness on matters related to stock photography. For his current curriculum vitae go to: http://www.jimpickerell.com/cv.asp.

## Comments

Be the first to comment below.

## Post Comment



Post

Selling Stock

Copyright © 2013 Selling Stock. All rights reserved.
10319 Westlake Drive, Suite 162
Bethesda, MD 20817
info@selling-stock.com | 301.251.0720
Site by Twin Harbor Web Solutions.

*John Wiley & Sons, Inc. v. DRK Photo*

Case No. 11-cv-5454 (KPF)

Response Declaration of Robert Penchina

# Exhibit 9

# Selling Stock

My Account | Log Out | Renew Subscription (87 Days Remaining)

Home    Subscribe / Buy Credits    Advanced Search    About    Contact Us

## Infringement at Glencoe
Posted on 11/3/1999 by Jim Pickerell  |  Printable Version  |  Comments (0)

260

Search: [            ] GO

### Stay Connected
Sign up to receive our FREE weekly email
listing new stories posted.

[                    ]

[ Submit ]

Follow us:  
Facebook   RSS   LinkedIn   Twitter

## INFRINGEMENT AT GLENCOE

November 3, 1999

In late September we sent out an alert

(Story 253)

about the Glencoe division of

McGraw-Hill not paying for re-use for pictures that appeared in the 1998 revision of
**Biology: The Dynamics of Life** . These images were originally published in the 1995
edition.

It now seems that was only one of the problems. Glencoe has produced another series of
science books for middle schools for which they have not cleared copyright or made
proper payment. This series is called **Science Voyages 2000** and includes three
different texts for 6th, 7th and 8th grades (red, green and blue). The ISBN numbers
for these books in order are: 0-02-828629-4, 0-02-828579-4 and 0-02-828669-3.

The books have a publication date of May 2, 1999 and are currently available for
purchase. However, we have been unable to find any stock agency, credited in these
book, who has even received notification that the books have been published, let alone
received payment for the usages.

At this point Glencoe is clearly in violation of federal copyright law for every image
in these books since they did not request a license prior to publication. Based on
what just recently happened with Dynamics of Life this is not a single oversight, but a
pattern. It is the standard custom in the photo industry that publishers who have not
properly cleared copyright before publication will be offered a "retroactive license"
once the error is discovered. The usual fee for a retroactive license is ten (10)
times the fee that would have been charged for a 'normal' license requested and paid
for prior to publication."

We were able to contact Alexander Mlawsky, Vice President and Director of Art, Design &
Production at Glencoe. He refused to comment on any of the issues regarding this
series except to say, "This was not an oversight. We are in the process of notifying
suppliers."

In this situation, it is recommended that all photographers and agencies who have
images in one of these three books should invoice for a "retroactive license."

This series has another unusual problem. Many of the images are credited to Morgan
Cain & Associates, a research firm in Tucson, Arizona that handled trafficking to the
printers of pictures already acquired by Glencoe. Morgan Cain did not do any of the
basic research on this project and did not receive any images directly from stock
agencies or photographers. John Meyer of Morgan Cain has no explanation for how the
pictures could have been credited to his company because they had absolutely nothing to
do with preparing the photo credits that appeared in the books. Normally, images must

### Free Stuff

**2013 Stock Photography Trends**
The stock photography business has changed
dramatically from what it was live or ten years
ago and the future does and the future does not
look promising. In this article we've provided links
t...
Read More

**Education Market Shifts To Digital**
If supplying pictures for educational use is a
significant part of your business plan you need to
be aware of how the market is trending toward
digital delivery and how that is likely to affect the
p...
Read More

**Understanding The Stock Photo Business**
Every few months I put together a summary of
some of our most important recently published
stories. This selection is designed to help
investors who are trying to understand the
industry as well as...
Read More

**Making Stock Photography Profitable**
If your goal is to earn a full-time living from
photography — and particularly stock photography
— you need to read this series of 14 articles. They
were originally written in the summer of 2010....
Read More

**Pricing Stock Images Based On Usage**
There are a number of stories on this site that will
aid you in determining what to charge for a stock
photo usage. Below is a list of story titles and the
number of credits required to read the enti...
Read More

**Microstock Trends — February 2012**
This article provides a selection of stories that will
help the reader better understand microstock
photography and the state of the market for
images at microstock prices at the beginning of
2012....
Read More

**Stock Photo Market Trends In 2011**
For those looking for statistical and trend
information related to stock photo industry this
story provides links to a series of articles
produced over the past year that examine various
aspect of th...
Read More

**Top Stories In 2011**
If you're new to this site, or have missed some of
the stories we have published in 2011, check out
these links to 52 of this year's most important and
thought provoking stories. This summary of info...
Read More

**Understanding The Stock Photo Industry**
For those who would like background on the stock
photo industry, its history and trends this story
provides links to a number of stories on
PhotoLicensingOptions.com that readers may
want to review.
Read More



be credited to the photographer and/or agency who provided the images.

In order to be sure how many images you have in these books you should obtain copies and check the actual usage. It is likely that Glencoe's records are incorrect. In those cases where credit is incorrect, photographers and agencies should bill three (3) times the normal usage fee for improper credit.

To order copies of the books you may call Glencoe's main office in Westerville, OH at 1-800-848-1567. Ask for the sales or marketing department. It is also a good idea to ask for a copy of Glencoe's most recent catalog and try to get on their mailing list for future catalogs, if you are a regular supplier.

## Dynamics of Life

There are additional problems with the Dynamics of Life book. In addition to the Student Edition there are other versions listed in the Glencoe catalog for which there should have been payment. There is a Teachers Edition, a Spanish language translation and a CD-ROM edition in English.

The description of the CD-ROM edition in the catalog says it has "every illustration and image" in the student edition. This is part of a 6 disc series and has a list price of $539.94.

In addition there is 2000 edition of Dynamics of Life which is out and available. Some sellers have been paid for new images included in this edition, but not for the pick up images from previous editions.

In an effort to try to settle this matter Glencoe has finally started sending some agencies checks to cover the usage in the 1998 edition. Along with the check comes a letter that says, "We propose to pay you at 100% of your new image fee, instead of a reuse charge of 75%. By cashing this check, you acknowledge receipt of full payment for all rights necessary to use these photos in the 1998 edition and the full resolution of this matter."

Sounds like they are giving more in recognition of their late payment doesn't it. In fact, the amount offered is about what sellers would have charged for the "student edition" alone. Glencoe's language implies that this payment covers "all" uses connected with the 1998 edition.

One agent calculated the amount owed for all the various uses connected with the 1998 edition, and invoiced for more than seven (7) times the amount Glencoe offered with their check.

Another irritation about this letter and check is that the letter was dated September 24th, but not mailed until almost a month later because it arrived at least one agency on October 21st. Anything to delay payment a little longer.

There is also a connection between Glencoe and National Geographic. NGS prepares a mini chapter which is bound in the center of most, but not necessarily all, of the Glencoe science books. NGS is offering to pay photographers for a 40,000 press run for a Spanish language usage in this book. It is unclear whether the NGS chapter will also be inserted in the English language edition of this book.

Glencoe is claiming that the combined total a press run of the English and Spanish language versions is UNDER 40,000. We don't know who is making the mistake here, but it defies belief that National Geographic would pay for more usage than necessary.

## What About Other McGraw-Hill Divisions?

Clearly, it seems that the different divisions at McGraw-Hill do not talk to each other and that each division has different policies and practices.

Useful Stock Photo Statistics And Trend Information

This story provides links to a series of articles that include the results of a photographer income survey, analysis of the sales of microstock photographers, the size of the market for stock photogr...
Read More

For example, in October we reported that McGraw-Hill is now asking for:

> Rights Granted: For the ten (10) year period commencing April 14, 2000, licensor
> hereby grants to McGraw-Hill the following non-exclusive rights for inclusion of the
> Licensed Materials in the Program materials: i. the right to edit and use the
> *permission material in the Program Materials and in connection with the Program,*
> including use in minor revisions (concerning no more than 25%) of the Program..."

While this request raises some deep concerns, so far it has only come from the College
division of McGraw-Hill which includes Burr Ridge, IL and Dubuque, IA. This may not be
the policy of all McGraw-Hill companies.

**What To Do?**

- You can no longer depend on this publisher -- and maybe any publisher -- to tell
  you when they have published your work. You can't wait to be notified.

- When you deliver images to a book publisher you must get the tentative
  publication date as well as the working title of the publication.

- Get the publisher's catalog and keep checking to see when titles appear for which
  you have supplied images. Buy a copy of the book. One photo seller reports he
  purchases every book in which his images are published to validate his usages. He
  invariably finds at least one error the publisher has made in its favor. At $60 to $70
  these books are expensive, but this sellers says the additional money he makes from
  spotting errors nets him at least $20,000 a year.

- You must follow up. Business practices are not the same as they were a decade
  ago. You can no longer trust the publisher to supply you with the information you need
  to properly invoice.

- Invoice for retroactive licenses.



Like   Send :   Be the first of your friends to like this.

Copyright © 1999 Jim Pickerell. The above article may not be copied, reproduced, excerpted or distributed in any manner without written
permission from the author. All requests should be submitted to Selling Stock at 10319 Westlake Drive, Suite 162, Bethesda, MD 20817, phone
301-251-0720, fax 301-309-0941, e-mail: info@selling-stock.com

Jim Pickerell is founder of www.selling-stock.com, an online newsletter that publishes daily. He is also available for personal telephone
consultations on pricing and other matters related to stock photography. He occasionally acts as an expert witness on matters related to stock
photography. For his current curriculum vitae go to: http://www.jimpickerell.com/cv.asp.

## Comments

Be the first to comment below.

## Post Comment

```
[                    ]
[                    ]
[                    ]
```

[ Post ]

Selling Stock
Copyright © 2013 Selling Stock. All rights reserved.
10319 Westlake Drive, Suite 162
Bethesda, MD 20817
info@selling-stock.com | 301.251.0720
Site by Twin Harbor Web Solutions.

| HOME | CATEGORIES | SOCIAL | LEGAL |
|---|---|---|---|
| Subscribe / Buy Credits | Acquisitions | Facebook | Privacy Policy |
| Advanced Search | Advertising | Twitter | |
| About | Agencies/Distributors | LinkedIn | |
| Contact Us | Assignments | RSS Feed | |
| | Associations | | |
| | More... | | |

*John Wiley & Sons, Inc. v. DRK Photo*

Case No. 11-cv-5454 (KPF)

Response Declaration of Robert Penchina

# Exhibit 10

1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLORADO

3

4
   TED WOOD,
5
        Plaintiff,
6
   vs.                                  Civil Action No.
7                                        07-CV-01516-DME-BNB
   HOUGHTON MIFFLIN HARCOURT
8  PUBLISHING COMPANY, and R.R.
   DONNELLEY & SONS COMPANY,
9
        Defendants.
10 ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

11

12

13

14                 DEPOSITION OF

15                 DAN KRASEMAN

16

17             December 10, 2008

18                 1:00 p.m.

19

20

             6000 East Camelback Road
21
             Scottsdale, Arizona

DRK v. Wiley AAA 01135

24    magazine on a regular basis and say, "Did you exceed -- or

25    how many copies of this issue did you print?"  Because

40

1    they gave us that number prior to us issuing the license,

2    and we reflected that number on the license, why would I

3    call them up a month later and say, "Is that what you

4    did?"

5        Q    So were there any steps that you took to monitor

6    your licenses?

7        A    We have on occasion double checked with

8    publishers.

9        Q    Okay.  And how would you do that?

10       A    We'd phone them.  We'd e-mail them.  There's --

11   say there's an advertising use, you might e-mail them and

12   ask if they need to extend that advertising use, because

13   typically that's for a time period.

14       Q    In the circumstances that you're describing, were

15   there specific events that triggered that inquiry?

16       A    Which inquiry?

17       Q    Well, describe for me when you have made efforts

DRK v. Wiley AAA 01184

18    to monitor a license.

19         A    We might hear something through the grapevine

20    that there's a problem with a particular book from a

21    photographer who has asked those questions and knew we

22    were involved, knew that we licensed his images or hers to

23    the same book.  They might say, "You might want to contact

24    them and ask them about it," and then we would.

25         Q    Okay.  So I think -- let me see if I'm getting

                                                                41

1    this correctly.  So over time, if you got a specific

2    inquiry from a photographer, you would make an inquiry

3    with the licensee?

4         A    I might ask the publisher what's going on, that

5    we heard something and we just wanted to double check that

6    we're within the realm of the license still.  But on all

7    the other licenses, unless something like that occurred,

8    there's no reason to think that anything is amiss.

9         Q    So other than the circumstances that we were just

10   discussing, did you take any other steps to monitor the

11   licenses?

10   you got to print them all then?

11      A    They go to press one time.  They have one time

12   permission to reproduce.

13      Q    Okay.  Let me ask you, generally, how was this

14   invoice form developed?

15      A    I would think it was developed initially a great

16   deal through PACA recommendations, the Picture Archive

17   Council of America, which we're a member of.  They would

18   have legal forms and documents, and they have, like, this

19   pricing guide I was telling you about that goes way back.

20   AS&P had a pricing guide, and they had some suggested

21   terminology and rights and conditions and terms and

22   conditions, and we pulled a great deal of it from there.

23      Q    And when you refer to PACA, I think it's an

24   acronym, the letters P-A-C-A?

25      A    Yes.

50

1      Q    What exactly is PACA?

2      A    Used to be Picture Agency Council of America.  I

3   believe it's now Picture Archive Council of America.

DRK v. Wiley AAA 01196

*John Wiley & Sons, Inc. v. DRK Photo*

Case No. 11-cv-5454 (KPF)

Response Declaration of Robert Penchina

# Exhibit 11

From: "DRK Photo - Dan Krasemann" <info@drkphoto.com>
Subject: **Re: Strahler 5e ³Introducing Physical Geography², print run request**
Date: January 27, 2010 9:32:06 PM MST
To: Wilkin, Sarah - Hoboken

Hi Sarah -

One other request.

As we receive requests from publishers to re-license images in the next edition we are taking that opportunity to audit our past licensing to that title.

Our records indicate that we licensed images for the 1997/ 2nd edition, 2002/ 3rd edition, and 2005/ 4th edition of this same title.

Could you forward to me the total number of copies printed of each of the 2nd, 3rd, and 4th editions of this textbook?

Thank you,
Dan

----- Original Message -----
**From:** Wilkin, Sarah - Hoboken
**To:** DRK Photo - Dan Krasemann
**Sent:** Friday, January 22, 2010 2:45 PM
**Subject:** Re: Strahler 5e ³Introducing Physical Geography²

Feb 2010

Thanks!

Sarah

On 1/22/10 4:43 PM, "DRK Photo - Dan Krasemann" <info@drkphoto.com> wrote:

> Hi Sarah -
>
> Thanks for the P.O.; can you tell me the copyright year for this textbook?  2010? 2011?
>
> Thanks,
> Dan
> DRK PHOTO
> 100 Starlight Way
> Sedona, AZ 86351  USA
> info@drkphoto.com
> 928-284-9808



EXHIBIT NO. D53
Krasemann
6-7-12

>     ----- Original Message -----
>
>     **From:** Wilkin, Sarah - Hoboken <mailto:sawilkin@wiley.com>
>
>     **To:** info@drkphoto.com

DRK v. Wiley AAA 00650