EXHIBIT 4

```
0001
 1                AMERICAN ARBITRATION ASSOCIATION

 2

 3    DRK PHOTO,                    )

 4                                  )
         Claimant,                  )
 5                                  )
      vs.                           ) No. 76 14300193 11
 6                                  )
      JOHN WILEY & SONS,            )
 7                                  )
                                    )
 8         Respondent.              )
                                    )
 9

10

11

12           DEPOSITION OF DANIEL KRASEMANN

13                  Scottsdale, Arizona

14                   June 7, 2012
                      9:26 a.m.
15

16

17

18

19

20

21

22

23                            REPORTED BY:

24                            YVONNE L. WHITEFIELD, CSR

25    (Copy)                  Certificate No. 50611
```

0017

1   older gentleman that had threatened our children over

2   riding some dirt bikes off in the countryside.

3       Q.   So it was not involving photography?

4       A.   Nothing to do with photography.

5       Q.   At the time the Harmon & Seidman firm asked if

6   you would give a deposition in the Ted Wood case, were you

7   then currently represented by Harmon & Seidman in any

8   matters?

9       A.   I don't recall if at the time I was represented

10  by them in any other matters because I don't remember the

11  exact time the deposition occurred.

12      Q.   When was the first time you retained Harmon &

13  Seidman?

14      A.   When was the first time?  You mean a date that I

15  first -- or occasion to need their services?

16      Q.   Let's start with an occasion to need their

17  services.  What was the first instance in which Harmon &

18  Seidman first represented you?

19      A.   Harmon & Seidman first and only represented us in

20  a case against Houghton Mifflin -- Houghton Mifflin, HMH.

21      Q.   Do you know when Harmon & Seidman represented you

22  in connection with a case against HMH?

23      A.   I don't know exactly.  If I had to make a guess

24  at it, I would say it was around 2009.  Between 2008,

25  2010.  I'm not exactly sure.

0023

1    Q.    Sure.  You've testified so far about the case and

2  the arbitration involving HMH, correct?

3    A.    Correct.

4    Q.    We know because we're all here today that DRK has

5  litigation with John Wiley, correct?

6    A.    Correct.  We have litigation currently ongoing.

7    Q.    Correct.  So my question is:  Other than those

8  litigations that we've just identified, has DRK ever

9  brought copyright claims against anyone else?

10    A.    If the question is have we filed suits against

11  other publishers other than HMH and John Wiley, it would

12  be yes, we have, I believe.

13    Q.    Who are the other publishers who you filed suits

14  against?

15    A.    I'm not exactly sure of the status of this or

16  that, but there's Pearson Education -- my difficulty in

17  answering is I'm not exactly sure what's been filed.

18  We've approached several publishers to request information

19  and when they don't willingly provide audit information,

20  when they refuse to provide it, we have to turn to some

21  sort of legal system to try to induce them to compel them

22  to produce the information.

23         So we've handed over several publishers to Harmon

24  & Seidman because we have failed -- DRK Photo failed in

25  its effort to obtain information from them.

0024

1              So then we've given them to Harmon & Seidman.

2    And I don't know the standings with each one of them as to

3    whether or not litigation or suits have been filed against

4    them as of yet, or not on all of them, or if the law

5    office is just working with them on an amicable basis

6    trying to get this information from them.  I don't know.

7              I don't know the line that you cross if there's

8    other litigation is in place, but I believe we filed

9    against Pearson Education.  And I believe we have things

10   in the works with others, but I'm not exactly sure where

11   those stand.

12       Q.   Do you know when you filed against Pearson?

13       A.   I don't recall exactly.  Again, I handed it over

14   to the lawyers.

15       Q.   Who are the other publishers who you believe have

16   infringed your photos?

17       A.   I can tell you -- I can name a couple of

18   publishers that we've approached regarding possible

19   infringements and asked them to provide information to us.

20       Q.   Okay.  Who are those publishers?

21       A.   Pearson Education, McGraw Hill companies,

22   Scholastic, Incorporated.

23       Q.   Any others?

24       A.   DRK photos has its efforts with a couple of

25   people who are working with -- between the two companies,

0035

1    ever submitted to DRK ever unintentionally understated the

2    ultimate print run?

3              MS. BRUSS:  Objection; calls for speculation.

4              MR. PENCHINA:  No, it's asking him is that the

5    case.

6              THE WITNESS:  Could you repeat the question?

7              (Requested portion read by the reporter.)

8              THE WITNESS:  You're asking me if I ever received

9    a license request that unintentionally had the wrong

10   number on it by a human error or something like this?

11   BY MR. PENCHINA:

12      Q.  Yes.  Do publishers know precisely how well a

13   book is going to sell before they offer it to the market?

14             MS. BRUSS:  Same objection.

15   BY MR. PENCHINA:

16      Q.  You can answer.

17      A.  I don't know how publishers determine how well a

18   book is going to do, how many copies to print because it

19   is hundreds of thousands of dollars, perhaps, to produce

20   these books.  So, obviously, they have some accurate

21   information gathered by sales teams or previous editions.

22   I'm not sure what.

23             But I assume that what they are doing is figuring

24   out what they believe the sales should be and requesting a

25   license sufficient enough to cover that sales projection.

0036

1      Q.   And don't your publishers sometimes ask you for

2  permission for more copies than they ultimately actually

3  produce?

4      A.   We have had publishers return to us for

5  additional rights.

6      Q.   Do publishers sometimes ask for more than they

7  needed?

8      A.   I don't really know.  I have no idea.  I'm not

9  the publisher.

10     Q.   So when a publisher gives you a number, you have

11 no basis for knowing whether that number meets their

12 ultimate needs or not?

13     A.   DRK Photo has no idea where they got that number

14 from.  I don't know.  I can only assume it meets their

15 needs or why would they be using it?

16     Q.   And you have no evidence that any of these

17 numbers provided to you were done so in bad faith?

18     A.   I don't know in what faith they were provided to

19 me.  I can only assume it was honest and good faith.

20     Q.    Is it your view that Wiley knew its use was going

21 to exceed what it was requesting?

22     A.   At the time we were issuing licenses over all

23 these years, I would say no.  I assume this was what they

24 wanted.

25     Q.   Did your view ever change?

0037

1        A.    My view did change.

2        Q.    When?

3        A.    My view changed early 2010, perhaps.   Around

4    there.   I began to become suspicious.

5        Q.    Why did you begin to become suspicious?

6        A.    Because we had some photos suddenly dropped from

7    a textbook, which is very unusual.

8        Q.    What was it about having photos dropped from a

9    textbook that made you suspicious?

10       A.    We received a photo request for re-permissioning

11   of some photos in the fifth edition of a textbook.   I

12   believe it was Strahler Physical Geography, fifth edition,

13   2010 fifth edition.

14            And I took that opportunity to ask about the

15   adequacy of our licensing for the second, third and fourth

16   editions of the same title because these pictures have

17   been used pretty consistently throughout each edition.

18            And I got this request in for the fifth edition

19   with a rush to license, we got to do this quick.   And I

20   said prior to moving forward with this, can you answer

21   these questions:   I would like to know some details on the

22   second, third and fourth just to find out if we're good.

23   And within a couple of days, we got an e-mail saying due

24   to deadlines, we have dropped all your pictures.

25            I had even offered, because of the deadline, I

0038

1    had offered a proviso licensing saying if this would help

2    your deadline, why don't we issue proviso licensing which

3    could be converted to permanent licensing conditional upon

4    things being in order on the second, third and fourth

5    editions.

6           Once they got that, they pulled the chair out

7    from under everything and dropped all our pictures.

8       Q.   Why did you ask at that point about the second,

9    third and fourth editions?

10      A.   I asked at that point because we were starting to

11   do a little more auditing on previous licensing.

12      Q.   Why were you starting to do more auditing on

13   previous licensing?

14      A.   We had some time to do it.  By that time, I had

15   gone -- was involved with and perhaps closed up stuff with

16   HMH.

17      Q.   When you got involved with the HMH dispute, did

18   you form a view about the textbook industry as a whole?

19      A.   I wouldn't say the textbook industry as a whole,

20   no.

21      Q.   What would you say?

22      A.   When I got involved with HMH, we had an issue at

23   HMH.  I have no other qualms with anyone else.

24      Q.   Well, you have disputes with others as well?

25      A.   There's disputes.  We were asking questions of

0039

1    some other companies right now.

2        Q.   Why did you start asking questions of other

3    companies?

4        A.   Just began to do some audits on some of our

5    licensing.

6        Q.   Why did you begin to do some audits on some of

7    your licensing?

8        A.   Well, why not?

9        Q.   Why then?

10       A.   Why then?

11       Q.   Why didn't you do audits on your licensing ten

12   years earlier?

13       A.   We've always asked questions, need clarifications

14   on licensing.  We have for years.  We clarified things

15   with people, print runs, definitions of this and that so

16   we would get licensing correct.

17       Q.   Have you always asked your customers about their

18   past usage of photos?

19       A.   We have not always asked our customers about past

20   uses because once the license is issued, we assume that we

21   met their needs and it's issued and they honored it and we

22   move on to the next calendar that they're doing.

23       Q.   At some point, you started asking customers about

24   their past uses?

25       A.   Uh-huh.  At some point, we've done lots of

0116

1    like them reassigned at this point.  We probably let them

2    know as far as we know they're settled, although it's an

3    ongoing process and I suspect they're going to say why

4    don't you hang on to that in case more come along.

5        Q.   Have you had such a conversation with any

6    photographer?

7        A.   Conversation about what?

8        Q.   About whether you should hang on to the

9    copyright?

10       A.   No, because we've got infringement -- active

11   infringement claims so it's not an issue at this point.

12       Q.   But you've resolved infringements claims as well,

13   haven't you?

14       A.   I have resolved a case with HMH, one of many that

15   are ongoing.

16       Q.   Were there any others ongoing at the time the HMH

17   case started?

18       A.   I don't know the dates, but I don't even know

19   that the HMH case had begun when they signed these.

20       Q.   Were there any other ongoing cases at the time

21   the HMH case started?

22       A.   At the time the HMH case started?  No, because

23   HMH is the first time in my life we had to take legal

24   action against a publisher.

25       Q.   Were there any cases in mind when you sent this

0117

1    form out to the photographers?

2         A.   There were no specific cases in mind.

3         Q.   Were there any claims in mind, short of

4    litigation?

5         A.   I don't believe there were.  I don't know.  I

6    don't recall if we had any suspicions at that point.  I

7    don't believe there were.  I believe we just thought it

8    was long overdo that we protect our images.

9              And with the web and things going digital -- it's

10   easy to steal things -- we felt they should be better

11   protected.

12              (Deposition Exhibit Number D9 was marked for

13              identification.)

14   BY MR. PENCHINA:

15        Q.   Would you please take a look at a document marked

16   Exhibit D9 and tell me whether D9 is familiar to you?

17        A.   Yes.  It looks familiar.

18        Q.   What is Exhibit D9?

19        A.   It appears to be the, more or less, form e-mail

20   we sent to everyone at the time with this Copyright

21   Assignment, Registration and Accrued Causes of Action

22   Agreement attached to it explaining what we were doing;

23   what we were wanting to do.

24        Q.   When you say more or less form, were there other

25   e-mails that went to other photographers?

0204

1              It would have been 30 years ago.  I don't know if

2    he was there and I said hi and made small talk or not.

3        Q.    Do you belong to any photography or photographer

4    organizations?

5        A.    As of today, no.

6        Q.    In the last five years, have you belonged to any

7    photographer or photography organizations?

8        A.    Yes, we have.

9        Q.    Which ones?

10       A.    PACA and NAMPA.

11       Q.    When did you cease belonging to PACA?

12       A.    We did not renew for 2012 with either of them.  I

13   believe we were a current member through 2011.

14       Q.    When did you begin your membership in PACA?

15       A.    Couldn't give you the date, but it's 20 years

16   ago.

17       Q.    What about NAMPA?

18       A.    Whenever they formed.  We were -- whatever year

19   they formed, we joined them.  I don't recall when it was.

20       Q.    More than ten years ago?

21       A.    I can't say for certain.

22       Q.    Did you ever attend any conferences, meetings, or

23   the like run by PACA?

24       A.    I would say no.  I don't recall any.

25       Q.    What about NAMPA?

0205

1      A.   I went to one or two NAMPA, like, conventions.   I

2   think it's -- I remember one for sure.   Two.

3      Q.   Which was the most recent one that you attended?

4      A.   I don't recall.   I think it was Fort Meyers,

5   Florida.

6      Q.   Do you know when that was?

7      A.   No.   Again, it's been many, many, many years.

8      Q.   And that was the more recent of them?

9      A.   Yes.   The previous one was in California, if I

10   recall right.

11      Q.   When you were a member of these organizations,

12   did you receive literature or newsletters or anything of

13   the like?

14      A.   We do get e-mails newsletters nowadays from them.

15      Q.   Did you ever get an e-mailed newsletter from PACA

16   or NAMPA relating to copyright infringement claims?

17      A.   I know copyright is an issue for the organization

18   for PACA.   I don't know about NAMPA so much.   They have

19   articles and updates on copyright things and events.

20      Q.   Were any of the articles from PACA that you

21   recall seeing ever dealing with the subject of copyright

22   claims against textbook publishers?

23      A.   I don't recall any specifics.   Nancy Wolfe has a

24   little column in there.   Every time it's usually about

25   copyright.   There's lots of them.   I don't know if one was

0206

1   about textbook and one was about some magazine or one was

2   about a sculptor.

3           It's updates on all kinds of things and I don't

4   know how they choose what they talk about.

5       Q.   Do you remember reading any article by Nancy

6   Wolfe or anyone else about textbook publishers exceeding

7   license restrictions?

8       A.   I don't remember anything from NAMPA -- from PACA

9   specifically about textbook copies exceeding print runs.

10      Q.   What about from anywhere besides PACA?

11      A.   Well, I was involved with HMH.  So I saw things

12  and learned things that might have indicated one thing or

13  another.  I haven't necessarily looked at every PACA

14  newsletter that comes my way.

15          I'm aware of some abuses by some companies.

16      Q.   How did you become aware of those abuses?

17      A.   Well, through my own experiences mostly with

18  them.

19      Q.   In addition to your own experiences, how have you

20  become aware?

21      A.   Well, it's my own experiences, which I guess

22  includes information that may be provided to me by my

23  legal staff, a legal group.  You don't talk about this

24  stuff.  Other photographers aren't generally out there

25  throwing names around either.

0209

1      Q.   Other than what might have been noted on a letter

2  that you received by Wiley, from Wiley or on an invoice

3  form, what notes would you have?

4      A.   The notes I have, you have copies of.

5      Q.   Well, that wasn't precisely the question.

6           The question is, other than notes on letters that

7  you received from Wiley or on the invoice forms, what

8  other notes do you have of conversations with Wiley?

9      A.   I don't think there would be any others because

10  the notes are typically attached to the paperwork they

11  pertain to, are part of a package.

12          So I don't have random notes that we just -- we

13  didn't talk about anyone's birthday that I recall.  It

14  just was pertinent information was noted and is part of

15  the license because it was needed to clarify things,

16  usually.

17          It was business related.  Sometimes it could have

18  been phone calls on a want list that came through.  We

19  might have called up and said we can't make it by Friday,

20  is Monday going to be okay?  As simple as that.  I didn't

21  take notes to that effect.

22          I might have put the note on a want list, Monday

23  okay or something like that.  That would be the extent of

24  it.

25      Q.   That same document indicates that you would

0210

1    testify about the discovery of Wiley's infringements.

2    Tell me everything you know about how you discovered

3    Wiley's alleged infringements.

4         A.   Well, it began -- I think we talked about it

5    earlier -- it began and my suspicions really started to

6    happen in early 2010 with that Strahler book where they

7    suddenly dropped our photos.  And I had offered proviso

8    licensing.

9              They said they dropped our photos; said we had to

10   drop your photos.  Then I asked -- I tried for probably a

11   year, another year.  I wanted -- she said that the

12   information on the second, third and fourth edition, she

13   said it would be provided when available.  So I waited and

14   I waited and I waited.

15             I e-mailed a couple, three, four more times.  A

16   year later, it's like when is this going to be provided; I

17   still don't have it.  And I said I would also like to send

18   you a spreadsheet listing all the licenses I can find for

19   Wiley so you could provide the information on those

20   projects' titles as well.

21             She said yes, please do send that spreadsheet.

22   Then nothing happened on my request that they promised on

23   the second, third and fourth edition.  Nothing happened on

24   the spreadsheet I sent her of additional titles.

25             All along, they're leading me on like it's in the

0211

1    works, we're working on it.  Then it got down to a point

2    where they said they wanted me to sign an NDA,

3    nondisclosure agreement before providing that to me.

4            I signed that nondisclosure agreement and still

5    nothing.  And then she tells me in there somewhere that

6    there's a lawsuit filed against Wiley by -- she said your

7    lawyers involving that title, the Strahler title, so I

8    can't release information to you on it.

9            I e-mailed her back and I said I know nothing

10   about a lawsuit against Wiley; it certainty wasn't filed

11   by DRK Photo; we have no intention of filing anything

12   against John Wiley; if you and I can settle this amiably

13   between our two companies, and still nothing.

14           That's what put us here.

15       Q.   That's how you discovered alleged infringements

16   by Wiley?

17       A.   That's when -- I guess I would say I first became

18   suspect of problems with John Wiley licensing and perhaps

19   they weren't honoring the licenses granted to them.

20       Q.   You had no such suspicions prior to that?

21       A.   I didn't.  I don't have suspicions really against

22   anybody.  I don't know why I would suspect someone until I

23   have reason to suspect them.

24           (Deposition Exhibit Number D53 was marked for

25           identification.)

0215

1      Q.   Prior to around the time that you sent this

2   e-mail, had you requested audit information of your

3   publishers?

4      A.   Of any publisher?

5      Q.   Yes.

6      A.   If an audit means to double-check on some things,

7   yes.

8      Q.   So you, prior to the point that you sent this

9   e-mail to Wiley, had asked other publishers to

10   double-check on the past licensing to that publisher?

11      A.   Yes.

12      Q.   How often would you do something like that?

13      A.   Typically, we -- when a request comes in to

14   re-permission the picture -- and it's pretty unique to the

15   textbook industry because they have the different

16   editions -- typically when a request comes in to

17   re-permission images, mostly say for the next edition, is

18   when we ask them about previous editions just to make sure

19   that our licensing is in adequacy of previous licensing.

20      Q.   So it was something that you frequently did with

21   other publishers?

22      A.   As requests to re-permission came in, we would

23   follow back, sometimes to the effect, you know -- prior to

24   dealing with this current request, we would like to check

25   on previous uses of these same images we're showing that

0216

1    they appeared in these books; can you give us information

2    on this to make sure we're good?

3        Q.   Is that a standard practice of yours?

4        A.   It is.  Not standard practice.  Again, we're a

5    little mom and pop.  Pop, pretty much.  So when these

6    requests come in, again, mostly protected by publishers

7    because it's dealing with additional editions, we take

8    that opportunity to check on the adequacy of the previous

9    license.

10       Q.   Was that a recurring practice of yours?

11       A.   We've done it several times.  We have sent out

12   e-mails to that effect many times.  Not necessarily this

13   exact wording.

14       Q.   Was Exhibit D53 the first instance of where you

15   sent an e-mail of this type to Wiley, particularly with

16   reference to the word "audit"?

17       A.   I have no idea if I used "audit" in any previous

18   e-mails to them, but I don't recall having any auditing

19   with Wiley in the past.  It just struck me as very unusual

20   because we had a great relationship, that out of the blue,

21   they just dropped our pictures when I asked a question.

22       Q.   Did they drop your pictures after you sent this

23   e-mail or before?  It's not your testimony that this

24   e-mail was in response to their dropping your pictures, is

25   it?

0217

1    A.   I'm dealing with Sara here.  Sara is the one that

2    initially sent the photo request to me and I had to get

3    back to her to clarify the copyright year, the book.  She

4    told me it was 2010.

5         I believe it happened within days after this

6    e-mail that Wiley dropped a dozen or more of our pictures

7    that they had been using in edition, after edition, after

8    edition.  And that was a big white elephant, oh, my God,

9    what did we do?

10   Q.   So this e-mail Exhibit D53 was not a response to

11   Wiley dropping your pictures, correct?

12   A.   No.  I was just querying them on previous

13   editions after getting the initial re-permissioning

14   request from Sara.

15   Q.   So it wasn't in response to a problem with Wiley,

16   as you testified to a minute or two ago?

17   A.   I testified that this was sent to someone in

18   regards to a problem?  I sent this to her in regards to a

19   re-permissioning request we received asking her for the

20   copyright year, number one, and then additional

21   information on the second, third, fourth edition in that

22   same title.

23   Q.   As you sit here today, can you recall any other

24   e-mail requesting the same information from Wiley, the

25   same type of information?

0222

1    our imagery.

2        Q.    In connection with that incident, did you have a

3    letter that you sent to National Geographic publicly

4    distributed and invite other photographers or stock

5    agencies to weigh in with you about their thoughts on this

6    issue?

7        A.    I don't recall doing anything like that.   I

8    broadcast something to someone looking for broader

9    support?   That's how I understood you asking me if I sent

10   something out trying to form a union against something.

11   That was the question.   I don't remember doing anything

12   like that.

13       Q.    Did you provide a copy of your letter to National

14   Geographic to Jim Pickrell?

15       A.    I don't recall specifically requesting a copy of

16   any letter to Jim Pickrell.   I'm never met Jim Pickrell

17   that I recall.

18       Q.    Did you supply background information about this

19   dispute to Mr. Pickrell?

20       A.    I don't remember ever e-mailing or writing Jim

21   Pickrell about an issue we had with National Geographic.

22   He could have been aware of it through other sources, but

23   I don't remember doing anything with Mr. Pickrell.

24       Q.    Did you sign off on any submission to a

25   photography community with a welcome comment in the

Depo Corrections, DRK v. WILEY, # 76 143 00193 11

| Page No. | Line No. | Correction | Reason | |
|---|---|---|---|---|
| 7 | 21 | we license | I believe "re-license" to be incorrect. | |
| 9 | 10 | we're small | I believe "We were small" to be incorrect. | |
| 10 | 4 | lightboxes | I believe "white boxes with lights" to be incorrect. | |
| 15 | 24 | questioning me about licensing | I believe "questioned me about licenses" to be incorrect. | |
| 18 | 17 | at another | I believe "in another" to be incorrect. | |
| 19 | 5 | Galen | I believe "Gail" to be incorrect. | |
| 20 | 11 | Galen | I believe "Gail" to be incorrect. | |
| 21 | 6 | not been involved | I believe "has been involved" to be incorrect. | |
| 24 | 24 | PHOTO | I believe "photos" to be incorrect. | |
| 24 | 25 | who we are | I believe "who are" to be incorrect. | |
| 25 | 8 | licensed | I believe "license" to be incorrect. | |
| 26 | 9 | didn't | I believe "don't" to be incorrect. | |
| 27 | 7 | questions | I believe "answers" to be incorrect. | |
| 31 | 19 | failed in it's efforts to | I believe "failed to" to be incorrect. | |
| 37 | 19 | we've | I believe "we" to be incorrect. | |
| 37 | 22 | fourth editions just | I believe "fourth just" to be incorrect. | |
| 38 | 23 | had | I believe "have" to be incorrect. | |
| 39 | 13 | needed | I believe "need" to be incorrect. | |
| 39 | 16 | get the licensing | I believe "get licensing" to be incorrect. | |
| 43 | 5 | they were | I believe "there was" to be incorrect. | |
| 43 | 20 | of | I believe "to" to be incorrect. | |
| 44 | 5 | was | I believe "went" to be incorrect. | |
| 45 | 14 | print edition only | I believe "print only" to be incorrect. | |
| 46 | 3 | we've got | I believe "we got" to be incorrect. | |
| 50 | 11 | PHOTO | I believe "photos" to be incorrect. | |
| 50 | 16 | see it | I believe "say" to be incorrect. | |
| 52 | 10 | delete "those" | I believe "those" to be incorrect. | |
| 52 | 13 | checked | I believe "looked" to be incorrect. | |
| 53 | 5 | company | I believe "copy" to be incorrect. | |
| 55 | 7 | offer (?) | I believe "forward" to be incorrect. It doesn't make sense. | |
| 55 | 9 | me as a | I believe "me as" to be incorrect. | |
| 61 | 12 | no | I believe the question was "There's no print run number on here, is there?". | |
| 64 | 5 | delete "duly" | Not sure I said "duly".  Not a word I typically use. | |

*[handwritten signature]*  7-13-2012

*1 of 5.*

Depo Corrections, DRK v. WILEY, # 76 143 00193 11

| | | | | |
|---|---|---|---|---|
| 65 | 8 | a | I believe "to" to be incorrect. | |
| 68 | 16 | images | I believe "imagery" to be incorrect. | |
| 71 | 4 | A | I believe "8" to be incorrect | |
| 74 | 2 | delete "there's" | I believe it should read "I've" | |
| 74 | 3 | of certain | I believe "on certain" to be incorrect | |
| 76 | 21 | insert "it" between the words "has" and "or" | Clarification | |
| 77 | 23 | I've | I believe "I" to be incorrect | |
| 82 | 9 | they're | I believe "we're" to be incorrect | |
| 82 | 12 | insert "a" in front of beautiful | Clarification | |
| 82 | 13 | Then | I believe "Them" to be incorrect | |
| 82 | 24 | insert "a" in front of "licensing" | Clarification | |
| 83 | 21 | replace "most" with "moose" | I believe "most" to be incorrect | |
| 84 | 16 | lists | I believe both instances of "list" to be incorrect | |
| 85 | 22 | delete "the" | I believe "the" to be incorrect | |
| 87 | 8 | delete "arrived of" and replace with "defined as" | I believe "arrive at" to be incorrect | |
| 89 | 17 | delete "get" | I believe "get" to be incorrect | |
| 89 | 17 | change "distributed" to "distribute" | I believe "distributed" to be incorrect | |
| 90 | 13 | delete "US", replace with "English" | I believe "US" to be incorrect | |
| 90 | 15 | replace "them" with "the" | I believe "them" to be incorrect | |
| 90 | 24 | delete "progression of" | I believe "progression of" to be incorrect | |
| 91 | 3 | delete "I heard people saying" and replace with "I've asked people" | I believe "I heard people saying" to be incorrect | |
| 93 | 4 | change "charge" to "charged", and change "corporate" to "appropriate" | I believe "charge" and "coporate' to be incorrect | |
| 93 | 9 | change "The two ways you're looking at it" to "There's two ways of looking at it" | I believe "The two ways you're looking at it" to be incorrect | |
| 99 | 11 | registered | I believe "register" to be incorrect | |
| 104 | 20 | replace "that Ekol" with "the eCO" | I believe "that Ekol" to be incorrect | |
| 105 | 7 | we're going to do | I believe "we weren't doing" to be incorrect | |
| 105 | 9 | delete "just" | I believe "just" to be incorrect | |
| 106 | 9 | Wu | I believe "Woo" to be incorrect | |
| 106 | 15 | insert "my" in front of "brain" | Clarification | |
| 106 | 16 | who | I believe "what" to be incorrect | |
| 106 | 16 | insert "you" between "who" and "can" at end of line. | Clarification | |
| 106 | 24 | Wu | I believe "Woo" to be incorrect | |
| 107 | 3 | don't | I believe "didn't" to be incorrect | |

7-13-2012

2 of 5,

Depo Corrections, DRK v. WILEY, # 76 143 00193 11

| | | | | |
|---|---|---|---|---|
| 109 | 13 | insert "office" after copyright | I believe it should read "copyright office" | |
| 109 | 16 | deductions | I believe "deduction" to be incorrect | |
| 109 | 16 | delete "on this" | I don't believe "on this" should be there. | |
| 111 | 13 | from | I believe "for" to be incorrect | |
| 111 | 16 | could | I believe "can" to be incorrect | |
| 115 | 2 | insert "are" in between "and: and "up" | I believe "and up" to be incorrect | |
| 120 | 12 | The | "It's" doesn't make sense.  "The" makes sense. | |
| 121 | 15 | say | I believe "save" to be incorrect | |
| 121 | 16 | Wu | I believe "Woo" to be incorrect | |
| 121 | 17 | was | I believe "were" to be incorrect | |
| 123 | 7 | insert "an" between "be" and "assignment". Delete the word "on". | Clarification of my response. | |
| 124 | 20 | it's | I believe "his" to be incorrect | |
| 125 | 22 | PHOTO | I believe "photos" to be incorrect | |
| 127 | 14 | photo editors | I believe "photographers" to be incorrect | |
| 127 | 15 | additions | I believe "editions" to be incorrect | |
| 137 | 9 | registered | I believe "registered" makes more sense than "registration". | |
| 137 | 17 | replace "these" with "this", and delete "but" | I believe "these, but" to be incorrect | |
| 138 | 3 | insert "the" between "to" and "public' | the word "the" was missing. | |
| 140 | 16 | replace "an Ekol" with "the eCO" | I believe "an Ekol" to be incorrect | |
| 141 | 18 | "was" should be "were" | I believe "were" to be incorrect | |
| 141 | 22 | "original" should be "originals" | I believe "original" to be incorrect | |
| 142 | 8 | replace "base" with "being" | I believe "base" to be incorrect | |
| 142 | 18 | replace "you" with "we" | I believe "you" to be incorrect | |
| 146 | 22 | delete "a big" | I believe "a big" to be incorrect | |
| 148 | 8 | The agreement does mention sole and exclusive in regards to the photos delivered to DRK but we did not enforce exclusivity with Johnny Johnson. | Upon further review of the agreement I noticed it did mention sole and exclusive so the response "This is a nonexclusive agreement" needs to be corrected. | |
| 153 | 15 | delete "the" and replace with "from a" | Clarification | |
| 153 | 20 | delete "how" | Clarification | |
| 153 | 21 | delete "to make" | Clarification | |
| 155 | 25 | representation | I believe "registration" to be incorrect | |

*[signature]*  7-13-2012

3 of 5.

| | | | | |
|---|---|---|---|---|
| | | I should have proof of which photos are covered by this registration, but not the other | | |
| 164 | | 12 items. | Clarification | |
| 168 | | 6 insert "with" in front of "These" | Clarification | |
| 172 | | 2 replace "one" with "ones' | I believe "one" to be incorrect | |
| 175 | | 23 the | I believe "these" to be incorrect | |
| 181 | | 20 previously | I believe "previous" to be incorrect | |
| 181 | | 21 delete "just track" and replace with "tracking' | I believe "just track" to be incorrect | |
| 184 | | 23 replace "he" with "I' | I believe "he" to be incorrect | |
| 185 | | 17 delete "accrued" | I believe "accrued" to be incorrect | |
| 186 | 15 & 16 | I do not understand this response, it is incomplete. | I do not understand this response, it is incomplete | |
| 187 | | 10 them | I believe "that" to be incorrect | |
| 187 | | 13 you've | I believe "you" to be incorrect | |
| 188 | | 12 certain | I believe "certainty" to be incorrect | |
| 190 | | 4 certain | I believe "certainty" to be incorrect | |
| 191 | | 3 delete "to" | I believe "to" to be incorrect | |
| 192 | | 6 certain | I believe "certainty" to be incorrect | |
| 192 | | 12 likely | I believe "unlikely" to be incorrect | |
| 193 | | 14 insert "our" between "that" and "Val" | Clarification | |
| 194 | | 9 replace "letterhead" with "logo" | Clarification | |
| 194 | | 12 insert "portion" after "text" | Clarification | |
| 194 | 13 | in | I believe "into" to be incorrect | |
| 194 | | 17 insert "text" after "this" | Clarification | |
| 195 | | 6 sheets | I believe "sheet" to be incorrect | |
| 195 | | 9 delete "right to" | Clarification. "right to" makes no sense in this sentence. | |
| 196 | | 25 insert "a" between "for" and "book" | Clarification | |
| 200 | | 8 point | I believe "pointed" to be incorrect | |
| 201 | | 25 I've | I believe "I" to be incorrect | |
| 203 | | 3 it | I believe "there" to be incorrect | |
| 203 | | 8 I've | I believe "I" to be incorrect | |
| 204 | | 10 NANPA | I believe "NAMPA" to be incorrect | |
| 204 | | 17 NANPA | I believe "NAMPA" to be incorrect | |
| 204 | | 25 NANPA | I believe "NAMPA" to be incorrect | |
| 205 | | 1 NANPA | I believe "NAMPA" to be incorrect | |

*[signature]* 7-13-2012
4 of 5,

Depo Corrections, DRK v. WILEY, # 76 143 00193 11

| | | | | |
|---|---|---|---|---|
| 205 | 14 | e-mail | I believe "e-mails" to be incorrect | |
| 205 | 16 | NANPA | I believe "NAMPA" to be incorrect | |
| 205 | 18 | NANPA | I believe "NAMPA" to be incorrect | |
| 206 | 8 | NANPA | I believe "NAMPA" to be incorrect | |
| 207 | 23 | what | I believe "where" to be incorrect | |
| 210 | 11 | replace "another year" with "at least a year" | Clarification | |
| 214 | 13 | use | I believe "mean" to be incorrect | |
| 215 | 19 | this line makes no sense to me as I read it.  I may have said something like "that our previous licensing is adequate" or "of the adequacy of our previous licensing" | Clarification | |
| 216 | 6 | from textbook publishers | I believe "protected by publishers" to be incorrect | |
| 217 | 2 | replace "photo" with "re-permission" | Clarification | |
| 217 | 21 | of | I believe "in" to be incorrect | |
| 220 | 23 | spider | I believe "expired" to be incorrect | |
| 221 | 1 | delete "it" | Clarification | |
| 221 | 23 | replace "agreement" with "use" | I believe "agreement" to be incorrect | |
| 221 | 24 | were | I believe "was" to be incorrect | |
| 222 | 15 | sending | I believe "requesting" to be incorrect | |
| 222 | 16 | I've | I believe "I'm" to be incorrect | |
| 226 | 12 | they | I believe "we" to be incorrect | |
| 226 | 21 | replace "edition" with "editions" | Clarification | |
| 229 | 22 | certain | I believe "certainty" to be incorrect | |
| 230 | 18 | of | I believe "on" to be incorrect | |
| 230 | 18 | insert "rights" after "reproduction" | Clarification | |
| 230 | 23 | there's | I believe "they're" to be incorrect | |
| 231 | 11 | higher | I believe "hiring" to be incorrect | |
| 232 | 5 | photo | I believe "photocopy" to be incorrect | |
| | | | | |

*[signature]*   7-13-2012

5 OF 5.

DRK PHOTO v. WILEY & SONS                    DANIEL KRASEMANN

Page 242

1    accomplish this in the same day.  I appreciate you staying

2    here.

3              MR. PENCHINA:  Thank you.  Same to the court

4    reporter.

07:02  5              (Whereupon, the deposition concluded at

6              7:00 p.m.)

7                                          7-13-2012

8                        DANIEL KRASEMANN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25