UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                       :

  JOHN WILEY & SONS, INC.,         :

                       :

       Plaintiff/Counter-Defendant,    :        11 Civ. 5454 (KPF)

                       :

           v.             :        <u>OPINION AND ORDER</u>

                       :

  DRK PHOTO,                 :

                       :

       Defendant/Counter-Plaintiff.    :

                       :

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: <u>February 21, 2014</u>

KATHERINE POLK FAILLA, District Judge:

On August 5, 2011, Plaintiff/Counter-Defendant John Wiley & Sons, Inc. ("Plaintiff" or "Wiley"), commenced this action against Defendant/Counter-Plaintiff DRK Photo ("Defendant" or "DRK") under the Declaratory Judgment Act, 28 U.S.C. § 2201, seeking a declaration that Wiley had not infringed the copyrights on certain stock photographs that DRK had previously licensed to Wiley. In response, on May 31, 2012, DRK counterclaimed against Wiley for infringement under the Copyright Act of 1976, 17 U.S.C. §§ 101-810, as to a subset of these photographs.

The parties have filed cross-motions for summary judgment. For the reasons set forth in the remainder of this Opinion, Wiley's motion for summary judgment is granted in part and denied in part; DRK's motion for partial summary judgment is also granted in part and denied in part.

**BACKGROUND**[1]

A.    **DRK's Stock Photography Business**

DRK is a stock photography agency that licenses photographic images to publishers.  (DRK 56.1 Statement ¶ 1).  Daniel Krasemann has owned DRK as a sole proprietorship since 1981.  (D. Krasemann Decl. ¶ 1).  Rather than employ photographers, DRK executes agreements with photographers pursuant to which the photographers grant DRK the right to include certain of the photographers' works in DRK's collection of stock photographs.  (DRK's Counterstatement ¶¶ 3-4).  Once the photographers' images are included in

---

[1]    Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York (the "Local Rules") requires a party moving for summary judgment to submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Rule 56.1(a).  The movant's asserted facts are deemed to be admitted unless specifically controverted by the statement served by the opposing party.  Local Rule 56.1(c).

The parties have submitted a considerable record in support of their cross-motions. The facts in this Opinion are drawn from Wiley's Statement of Undisputed Material Facts ("Wiley's 56.1 Statement") (Dkt. #55), DRK's Response to Wiley's Statement of Allegedly Undisputed Material Facts ("DRK's 56.1 Counterstatement") (Dkt. #70), Wiley's Reply Statement of Undisputed Material Facts ("Wiley's 56.1 Reply Statement") (Dkt. #82), DRK's Separate Statement of Facts in Support of Its Motion for Partial Summary Judgment ("DRK's 56.1 Statement") (Dkt. #77), Wiley's Response to DRK's Separate Statement of Facts in Support of Its Motion for Partial Summary Judgment ("Wiley's 56.1 Counterstatement") (Dkt. #90), DRK's Reply on Separate Statement of Facts in Support of Its Motion for Partial Summary Judgment ("DRK's 56.1 Reply Statement") (Dkt. #94), and various declarations, which are identified using the convention "[Name] Decl.," as well as exhibits thereto (Dkt. #54, 67-69, 75, 76, 84, 91, 92, 95, 96).

The Court will refer to the parties' memoranda of law as follows:  Wiley's Memorandum of Law in Support of Its Motion for Summary Judgment as "Pl. Br." (Dkt. #53); DRK's Opposition to Plaintiff John Wiley & Sons, Inc.'s Motion for Summary Judgment as "Def. Opp." (Dkt. #66); Wiley's Reply Memorandum of Law in Support of Its Motion for Summary Judgment as "Pl. Reply" (Dkt. #83); DRK's Memorandum of Law in Support of Its Motion for Partial Summary Judgment as "Counter-Pl. Br." (Dkt. #74); Wiley's Memorandum of Law in Opposition to DRK's Motion for Partial Summary Judgment as "Counter-Def. Opp." (Dkt. #89); and DRK's Reply Brief in Support of Its Motion for Partial Summary Judgment as "Counter-Pl. Reply" (Dkt. #99).

DRK's collection, DRK offers to license those images to publishers, like Wiley, and other users of photographs.  (*Id.* at 4).

DRK employs an internal numbering system to track the images that DRK includes in its collection.  (D. Krasemann Decl. ¶ 7).  Using this system, DRK assigns each image an internal number when that image is received from a photographer and added into DRK's collection.  (*Id.*).  The images are numbered sequentially from the date on which the image was received.  (*Id.*).  This number allows DRK to identify when the image was first released into its collection, and consequently, when the image is deemed published under copyright law.  (*Id.*; Penchina Decl., Exh. 31 at 66).

This procedure was applied to all images at issue in this case, except for certain images received from Stephen Krasemann, a photographer and Daniel Krasemann's brother.  (*See* D. Krasemann Decl. ¶ 8).  Although internal numbers were assigned to Stephen Krasemann's images at the time DRK received them, the images were often not simultaneously released into DRK's collection.  Instead, the images were released, and thus published at later dates.  (*Id.*).[2]  Consequently, according to DRK, the internal numbers assigned to Stephen Krasemann's photographs may not reliably indicate the date on which the image was released for publication.  (*Id.* at ¶ 9).

---

[2]    DRK followed a different procedure for these images for various reasons, including the facts that (i) Stephen Krasemann would sometimes send images to DRK for storage purposes while traveling, which images he would then review and approve for publication upon his return; (ii) he may have requested first publication rights in certain images; and (iii) he may have previously promised the rights to the image to another publisher.  (D. Krasemann Decl. ¶ 8).

**B.      DRK's Agreements with Photographers**

DRK entered into a form representation agreement (the "Representation Agreement") with each photographer for whom DRK maintained images in its collection.  (D. Krasemann Decl. ¶ 3, Exh. 1).  Pursuant to the Representation Agreements for all images at issue, except those by photographers Tom Bean ("Bean") and Peter French ("French"), DRK would serve as the photographers' "agent with [] respect to the sale or leasing of the photographs or transparencies which [the photographer had] delivered to [DRK] and shall deliver to [DRK] in the future."  (*Id.*).  In contrast, under the Bean and French Representation Agreements, DRK agreed to act as Bean's and French's "*sole and exclusive* agent with respect to the sale or leasing of the photographs or transparencies which [Bean or French had] delivered to [DRK] and shall deliver to [DRK] in the future."  (*Id.* (emphasis added)).

The Representation Agreements also provided, in relevant part:

> I understand that the best possible care will be taken of my material and agree that you assume no liability for any loss or damage to the items so delivered to you.  In the event that any transparency is lost, destroyed or damaged by others, then I give you full and complete authority to make claim or bring suit for redress or compromise said claim without my permission.

> I understand that there will be a 50/50 split between DRK PHOTO and myself regarding all sales made and received. Payment is to be made within ninety (90) days of receipt.  DRK PHOTO shall notify me on a regular monthly basis if any sales activity occurred during that time.

> I understand that the terms and compensation of the sales or leasing of my photographs or transparencies shall be solely in your discretion.

4

> In the event of termination of this agreement DRK PHOTO retains the right to its normal commission on all sales which might arise from a user who has made duplicates of those transparencies, photographs, or other materials submitted to it during the terms of this agreement and then, after term hereof, the user wishes to utilize such duplicate materials.  DRK PHOTO shall have the right to grant such usage and collect 50% of the net sale from usage.  DRK PHOTO shall also retain the right to collect 50% of the net sale from all subsequent pick-ups or reprints on photos that were originally placed with the client during the term of this agreement, and then reprinted or picked-up after expiration of this agreement.

(*Id*.).  Although DRK contends otherwise, the record before the Court conclusively establishes that all Representation Agreements, except those with Bean and French, granted DRK nonexclusive rights for the photographers' images in DRK's collection.  (*See, e.g.*, Penchina Decl., Exh. 3, 30 at 166-67, 33 at 21).[3]

The Representation Agreement is not the only operative agreement between DRK and the photographers whose images are at issue here.  In 2008,

---

[3]   Wiley has submitted testimonial and documentary evidence to support its statement that "[a]ll of the photographers whose works are identified in Exhibit 1 to DRK's Counterclaims, with the exception of Tom Bean and Peter French, granted only non-exclusive rights to DRK."  (Wiley 56.1 Statement ¶ 6).  DRK has offered no conflicting testimonial or documentary evidence, but rather offers (i) a conclusory statement that the Representation Agreements and other assignment agreements that it had with photographers granted DRK "exclusive rights as recognized by the Copyright Act," coupled with (ii) an argument (ultimately unpersuasive, *see infra*) that "Wiley is confusing 'exclusive ownership' with 'exclusive rights.'"  (DRK 56.1 Counterstatement ¶ 6).  Because Wiley has supported its statement with testimonial and documentary evidence, and DRK has not submitted conflicting evidence, the Court accepts Wiley's statement as true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent … controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

DRK initiated a program to register copyrights for the photographs in its

collection.  (Wiley 56.1 Statement ¶ 20).  To that end, beginning in June 2008,

DRK asked photographers to sign a form agreement, pursuant to which the

photographers would grant DRK the right to assert copyright infringement

claims for those photographs in its collection (the "Assignment Agreement").

(*Id.* at ¶¶ 21, 24).  The Assignment Agreement, entitled "Copyright Assignment,

Registration, and Accrued Causes of Action Agreement," provided:

> The undersigned photographer, the sole owner of the copyrights in this undersigned's images, (the "Images") selected by DRK PHOTO ("DRK") and included in DRK's collection, hereby grants to DRK all copyrights and complete legal title in the Images.  DRK agrees to reassign all copyrights and complete legal title back to the undersigned immediately upon completion of the registration of the Images, as evidenced by DRK's receipt of a Certificate of Registration from the United States Copyright Office for such Images, and resolution of infringement claims brought by DRK relating to the Images.
>
> The undersigned agrees and fully transfers all right, title and interest in any accrued or later accrued claims, causes of action, choses in action — which is the personal right to bring a case — or lawsuits, brought to enforce copyrights in the Images, appointing and permitting DRK to prosecute said accrued or later accrued claims, causes of action, choses in action or lawsuits, as if it were the undersigned.
>
> Any proceeds obtained by settlement or judgment for said claims shall, after deducting all costs, expenses and attorney's fees, be divided and paid 50% for the undersigned and 50% for DRK.

(*Id.* at ¶ 22).[4]

---

[4]    All Assignment Agreements at issue in this case contain this language except for the second assignment agreement executed between DRK and Stephen Krasemann (the "Stephen Krasemann Second Assignment Agreement"), which was executed to cover certain images that Stephen Krasemann had already registered with the Copyright Office.  (DRK 56.1 Counterstatement ¶ 22; D. Krasemann Decl., Exh. 2).  The Court,

The purpose of the Assignment Agreement was to allow DRK to register photographs with the United States Copyright Office "as the copyright holder by assignment" so that DRK would have — at least as DRK understood it — "legal standing with the courts to pursue would be infringers." (Wiley 56.1 Statement ¶ 27). Indeed, when transmitting the Assignment Agreement to photographers, DRK informed them that the purpose of the agreement was for DRK to register the photographers' images in its collection with the United States Copyright Office so that DRK would be "in a much stronger position with much more leverage for settling copyright infringement claims." (Penchina Decl., Exh. 4). In those e-mails to photographers, DRK confirmed that the Assignment Agreement was "not a permanent assignment." (*Id.*). Rather, and as provided for in the Assignment Agreement, DRK "agree[d] to reassign all copyrights and complete legal title back" to the photographers "immediately upon completion of the registration of the images, as evidenced by DRK's receipt of a Certificate of Registration from the United Stated Copyright Office

---

however, may not consider the Stephen Krasemann Second Assignment Agreement because it was not produced by DRK during discovery. Instead, it was produced to Wiley for the first time in response to Wiley's motion for summary judgment. *See Melie* v. *EVCI/TCI Coll. Admin.*, No. 08 Civ. 5226 (HB), 2009 WL 1404325, at *1 n.4 (S.D.N.Y. May 20, 2009) ("Plaintiff may not rely on this document [in] his opposition to summary judgment, as he did not provide a copy of it to Defendants in discovery."), *aff'd*, 374 F. App'x 150 (2d Cir. 2010) (summary order); *see also Stengel* v. *Black*, No. 03 Civ. 0495 (GEL), 2004 WL 1933612, at *4 (S.D.N.Y. Aug. 30, 2004) ("These documents, however, are not part of the evidentiary record, and may not be considered by the Court."); Fed. R. Civ. P. 37(c) ("If a party fails to provide information … as required by Rule 26(a) or (e), the party is not allowed to use that information … to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."). The Court notes that consideration of the Stephen Krasemann Second Assignment Agreement would not alter the outcome reached herein.

7

for such images, and resolution of infringement claims brought by DRK relating to the images." (*Id.*).  When one photographer expressed his concern in signing the agreement, based on his unwillingness to allow the copyright registration to his image to be in DRK's name, DRK "assure[d]" the photographer that there was "no rights grab going on here.  We simply want to register our website/database of images so the images are protected under copyright law, and so we can pursue infringers." (*Id.* at Exh. 9).  In another e-mail exchange, one photographer, upon realizing how many images that DRK had registered with the Copyright Office, e-mailed DRK to clarify: "I have not assigned copyright to any of these images other than temporarily to DRK Photo in order for you to pursue your infringement lawsuit.  I have however sold non-exclusive rights to some of these pictures.  I expect re-assignment of full copyright in the very near future when your lawsuit is concluded." (*Id.* at Exh. 12).

## C.    DRK's Relationship with Wiley

Wiley is a publisher of textbooks and other educational materials.  (Wiley 56.1 Statement ¶ 1).  Beginning around 1992, DRK began licensing photographs to Wiley for inclusion in textbooks and related products published by Wiley.  (*Id.* at ¶ 9).  In general, Wiley would submit a letter to DRK for each transaction that would identify which particular stock photographs from DRK's collection Wiley desired to use.  (*Id.* at ¶ 10).  Wiley would also inform DRK which textbook or publication the photographs would be included in, and the number of print runs that Wiley intended to complete.  (*Id.*).

8

Once Wiley's request was approved, DRK would issue an invoice to Wiley that set forth the terms applicable to Wiley's use of the licensed photographs. (Wiley 56.1 Statement ¶ 11).  For example, the invoices specified the terms of the "Media Usage and Type Allowed" as follows:

> One-time, non-exclusive, North American, English language reproduction and distribution rights for publication inside the print version of the copyright 1997 John Wiley's & Sons, Inc. COLLEGE LEVEL TEXTBOOK publication titled THE SCIENCE, 2ND EDITION, by Trefil; the total number of copies to be printed is not to exceed 20,000.  No other rights granted or implied.  No electronic publishing rights granted.

(Second D. Krasemann Decl., Exh. 2-A, 2-B).  The invoices also contained standard form language under the heading "Rights Granted" that stated:

> One-time, non exclusive reproduction rights to the photographs listed below, solely for the uses and specifications indicated and limited to the individual edition, volume series, show event or the like contemplated for this specific transaction (unless otherwise indicated in writing).

(*Id.*).[5]  Invoices that used a revised standardized form also included additional restrictions on the use of the images beyond the terms of the agreement:

> If [Wiley] desires to reuse an image or extend previous usage, then Recipient must request and pay for additional rights prior to publication.  [Wiley] agrees not to make, authorize or permit any use of an image or its derivative ... except as authorized by the invoice.  In the event [Wiley] use[s] an image for any use other than

---

[5]     Two invoices do not include this language, but those documents appear to be anomalies.  This is purportedly because when they were produced during discovery, they were not produced on DRK's standardized form that included the "Rights Granted" language.  (Second Krasemann Decl. ¶ 12, Exh. 2-A).  This variance in language is immaterial to the Court's analysis.

that indicated on the invoice, including but not limited to the number of uses, the publication using, or the size of reproduction, DRK PHOTO agrees to forego its rights to sue for copyright infringement and breach of contract if [Wiley] pay[s], as liquidated damages, a sum equal to ten (10) times the maximum price [DRK] would have charged for such use, within 10 (ten) days of [DRK] billing such fee.

(Second Krasemann Decl., Exh. 2-B, Invoices 8795 and 9243).

In addition to the aforementioned agreements, for the period 2000 through 2001, DRK and Wiley entered into a separate pricing agreement that set forth the prices that DRK would charge Wiley for use of photos licensed by DRK (the "Pricing Agreement"). (*See* Wiley 56.1 Statement ¶¶ 13-14). Pursuant to the Pricing Agreement, "DRK charged Wiley $170 for the right to print and distribute in North America (with up to 10% of the distribution permitted to be sent abroad) up to 40,000 copies of a book (printed in the English language) in which DRK's photos comprised up to half a page; and DRK charged an additional 10% [(i.e., $17)] to increase the permitted print run up to 80,000 copies." (*Id.* at ¶ 14).

**D.    The Alleged Instances of Copyright Infringement**

**1.    Background and Nomenclature**

At issue in this case are a number of photographs, and an even greater number of alleged instances of copyright infringement with respect to those photographs.  Certain photographs are the subject of multiple instances of alleged infringement.  Consequently, when referring to "instances" of alleged infringement, the Court is not necessarily referring to different photographs.

10

Rather, the Court is identifying particular uses of a photograph by Wiley as to which DRK has claimed copyright infringement.

To capture the instances of alleged infringement, the parties have submitted three summary charts, included as exhibits to the parties' submissions; these charts detail information about each instance, such as the photograph used by Wiley and the publication in which it appeared. When referring to an instance of alleged infringement, the Court has adopted the parties' convention of referring to a line on one of the summary charts where the instance is identified. There are a total of 316 instances of alleged copyright infringement for which Wiley seeks a declaration of non-infringement (the "Wiley Non-Infringement Instances"). These Instances are set forth in Exhibit A to Wiley's amended complaint ("Wiley's Chart"). (Dkt. #23).[6]

In its counterclaims against Wiley for copyright infringement, DRK isolated 295 of the 316 Wiley Non-Infringement Instances, and listed them in Exhibit 1 to DRK's counterclaims. (Dkt. #26-1).[7] For clarity, the Court will refer to these instances as the "DRK Counterclaim Instances." In DRK's pending motion, it has further narrowed the scope of instances of alleged

---

[6]     Exhibit A does not include the alleged instances of infringement related to certain Stephen Krasemann's photographs listed at lines 230 and 253 of Exhibit 1 to DRK's Counterclaim. (Dkt. #26-1). It is clear from Wiley's complaint, however, that these instances of alleged infringement were inadvertently excluded from Wiley's Chart because Wiley moves for a declaratory judgment as to all "316 instances of infringement alleged by DRK" (Compl. ¶¶ 21-22), which necessarily includes these instances of alleged infringement. For this reason, the Court incorporates by reference lines 230 and 253 of Exhibit 1 to DRK's counterclaims into Wiley's Chart.

[7]     DRK's Counterclaim Instances are also identified at lines 1-292, 295, 297, and 298 of Wiley's Chart.

infringement as to which DRK seeks summary judgment in its favor, identifying only 88 instances (the "DRK Summary Judgment Instances"). The DRK Summary Judgment Instances are identified in Exhibit A to the Second Declaration of Autumn Witt Boyd ("DRK's Chart"). (Dkt. #76-1).

### 2.    The Stephen Krasemann Photographs

There are six photographs by Stephen Krasemann as to which the parties raise specific issues. The images are covered by two registrations that Stephen Krasemann personally obtained. (Wiley 56.1 Statement ¶ 35). The first registration, Registration No. VAu 175-200, has an effective date of February 1, 1990. (*Id.* at ¶ 56). The second registration, Registration No. VAu 516-002, has an effective registration date of March 13, 2001. (*Id.* at ¶ 44). The specific images at issue include the following: (i) Masai Livestock Tanzania, image number 902499; (ii) Wind Generators and Mountains Gorgonio Pass, California, image number 905268; (iii) Red Fox in winter leaping after mouse, image number 902839; (iv) Aerial view Cape Cod and surf, image number 904674; (v) Lunch Creek Waterfall, Montana, image number 905367; (vi) Aerial Permafrost Polygons, image number 901854 (collectively, the "Krasemann Images"); as well as (v) image numbers 127141 to 134177; and (vi) image numbers 100001 to 112610. (*See id.* at ¶¶ 45-57).[8]

---

[8]     The parties dispute the exact date of publication for most of Stephen Krasemann's photographs. The Court need not address this dispute in order to resolve the pending motions.

### 3.     The Tom Bean and Peter French Photographs

Separately, there are 43 instances of alleged infringement related to photographs by Tom Bean (the "Bean Instances"), and one instance related to a photograph by Peter French (the "French Instance").  DRK seeks summary judgment as to only 16 of the Bean Instances, and thus only those 16 are listed among the DRK Summary Judgment Instances.[9]  The parties do not dispute that, unlike the other photographs at issue in this case, DRK held an exclusive license to the photographs by Bean and French.  (*See* Wiley 56.1 Statement ¶ 6).  The parties agree that all 16 Bean Instances were published, sold, or distributed prior to August 5, 2008, except for those instances at lines 6, 7, and 75 of DRK's Chart.  (Counter-Def. Opp. 8-9; Counter-Pl. Reply 12).

### E.     The Instant Litigation

On August 5, 2011, Wiley filed suit against DRK seeking a declaratory judgment of non-infringement for any use by Wiley of any image that DRK had licensed to Wiley; these potential instances of infringement are referred to herein as the Wiley Non-Infringement Instances.  (Dkt. #1).  Wiley alleged that (i) it was entitled to a declaration of non-infringement because DRK lacked copyright ownership or a valid copyright registration; (ii) many of Wiley's Non-Infringement Instances occurred outside of the applicable statute of limitations;

---

[9]     The 16 Bean Instances on which DRK moves for partial summary judgment are identified at lines 29, 30, 39, 41, 43, 45, 46, 53, 54, 57, 73, 76, 85, 86, 111, and 278 of Wiley's Chart.  The other instances of infringement related to Bean and French photographs are identified at lines 3, 10, 12, 13, 17, 38, 117, 120, 137, 140, 149, 150, 160, 163, 192, 210, 213, 224, 225, 233, 236, 247, 248, 265, 278, 287, 290, 298, 313, and 314 of Wiley's Chart.

13

and (iii) the Wiley Non-Infringement Instances involved the re-use of the same images that DRK had licensed to Wiley to use in a later edition or revised version of the work.  (*Id.*).  Wiley also sought a declaration that it was not liable to DRK for any claim sounding in fraud.  (*Id.*).

A few weeks after Wiley commenced suit in this District, DRK filed a mirror-image action against Wiley in the United States District Court for the District of Arizona (the "Arizona Action").  (Dkt. #22).  The Wiley Non-Infringement Instances were first identified by DRK in its complaint in the Arizona Action.  (Dkt. #23 at ¶ 21).  On August 26, 2011, DRK moved to dismiss the complaint in this action, citing both alleged deficiencies in pleading and the existence of the Arizona Action.  (Dkt. #4, 5).

By order dated October 13, 2011, the Honorable George B. Daniels, the District Judge then presiding over this case, dismissed Wiley's request for declaratory relief as to any fraud claim, and any copyright infringement claims prior to June 18, 1997, because those claims were subject to arbitration; he also dismissed Wiley's claims for declaratory relief as to alleged instances of infringement occurring after June 18, 1997, because Wiley had failed to put DRK on notice of the photographs at issue.  (Dkt. #16, 22).  Judge Daniels then denied DRK's cross-motion to dismiss the complaint in favor of the Arizona Action pursuant to the "first filed" rule, under which a district court may dismiss an action in favor of a previously filed lawsuit "concerning the same

parties and issues." (Dkt. #22).[10]  At the same time, the Court granted Wiley

leave to amend its complaint.  (Dkt. #16).

On May 14, 2012, Wiley filed an amended complaint in which it sought a

declaratory judgment as to the Wiley Non-Infringement Instances that were

implicated by the Arizona Action.  (Dkt. #23).  Specifically, Wiley sought an

order declaring that:

> (i) for each of the instances in which Wiley's alleged infringement
> occurred more than three years prior to August 2011, declarations
> that DRK's claim is barred by the statute of limitations and Wiley
> is not liable to DRK for copyright infringement;

> (ii) for each of the instances in which DRK lacks copyright
> ownership or a valid copyright registration for the photograph at
> issue in DRK's claim, declarations that DRK lacks standing and
> Wiley is not liable to DRK for copyright infringement; and

> (iii) for each of the instances in which Wiley simply included the
> same photograph in a later edition or revised version of a work for
> which DRK originally licensed Wiley to use the photograph,
> declarations that such inclusion was permissible under Section
> 201(c) of the Copyright Act and Wiley is not liable to DRK for
> copyright infringement.

(*Id.*).  Attached to the amended complaint was Wiley's Chart, a summary chart

that identified the 316 instances of alleged copyright infringement.  (*Id.*).

On May 31, 2012, DRK filed an answer and asserted counterclaims for

copyright infringement, contributory infringement, and vicarious infringement

as to the DRK Counterclaim Instances that DRK had identified in Exhibit 1 to

its Answer and Counterclaim.  (Dkt. #26, 26-1).  DRK further sought an order

---

[10]    On June 11, 2012, the Arizona Action was transferred to the Southern District of New
York, and remains pending before the Court as a related case.  *See DRK Photo, a sole
proprietorship* v. *John Wiley & Sons, Inc. and John Doe Printers 1-10*, No. 12 Civ. 4538
(KPF).

declaring that any use of DRK's photographs by Wiley beyond the limits of the parties' applicable license agreement constituted copyright infringement.  (*Id*.).

Having concluded with discovery, the parties have filed the pending cross-motions for summary judgment.  Wiley filed its motion for summary judgment on May 23, 2013, requesting that the Court (i) dismiss all of DRK's counterclaims for copyright infringement (except for those claims relating to photographs by Bean and French); and (ii) issue a declaration of non-infringement for the Wiley Non-Infringement Instances.  (Dkt. #52).[11]  DRK filed its opposition on June 24, 2013 (Dkt. #66), and on July 11, 2013, the motion was fully submitted when Wiley filed its reply (Dkt. #83).

On June 28, 2013, DRK moved for partial summary judgment, requesting that the Court enter judgment of liability for copyright infringement against Wiley as to the DRK Summary Judgment Instances.  (Dkt. #73).  Wiley filed its opposition on July 26, 2013 (Dkt. #89), and on August 9, 2013, the motion was fully submitted when DRK filed its reply (Dkt. #93-2).  Between August 18, 2013, and January 28, 2014, the parties submitted supplemental authority in support of their respective motions.  (*See* Dkt. #98, 100-02, 105).

---

[11]    Although Wiley styles its motion as one for "summary judgment," it seeks less than full relief from the Court.

## DISCUSSION

### A.     Applicable Law

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985).

The standard used to decide cross-motions for summary judgment, such as the motions pending before the Court, "is the same as that for individual summary judgment motions[,] and a court must consider each motion independent of the other." *Worldwide Home Products, Inc.* v. *Time Inc.*, No. 11 Civ. 3633 (LTS) (MHD), 2013 WL 5477480, at *6 (S.D.N.Y. Sept. 30, 2013) (internal quotation marks omitted); *Auscape Intern.* v. *Nat'l Geographic Soc.*, 409 F. Supp. 2d 235, 238 (S.D.N.Y. 2004) ("A court faced with cross-motions for summary judgment need not 'grant judgment as a matter of law for one side or the other,' but 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose

motion is under consideration.'" (quoting *Heublein, Inc.* v. *United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

**B.    Analysis**

**1.    DRK's Motion for Partial Summary Judgment and the Issue of Standing**

DRK moves the Court to enter a judgment of liability for copyright infringement against Wiley on Count I of its Counterclaims — which, as noted, pertain to the 88 DRK Summary Judgment Instances listed in DRK's Chart. Included within the DRK Summary Judgment Instances are 16 Bean Instances for which, as discussed above, DRK was granted an exclusive license.  DRK does not move with respect to the remaining 207 instances of alleged copyright infringement that it alleges in its counterclaims.  Accordingly, the Court need not address those instances at the present time.

Wiley contends that DRK's motion should be denied for three reasons: (i) the record presents a genuine issue of material fact as to whether Wiley exceeded the scope of its licenses relating to the DRK Summary Judgment Instances; (ii) DRK lacks standing to assert any copyright infringement claims; and (iii) DRK's claims are barred by the statute of limitations.  (Counter-Def. Br. 4-9).  Because resolution of whether DRK has standing is dispositive of nearly all instances of infringement, except the Bean Instances, and because "federal courts are under an independent obligation to examine their own jurisdiction," including whether standing is established, the Court will first focus on whether DRK has standing to bring its claims against Wiley.  *Cf.*

19

*United States* v. *Hayes*, 515 U.S. 737, 742 (1995) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of the jurisdictional doctrines.'" (quoting *FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 230-31 (1990)).[12]

> **a.    DRK Does Not Have Standing to Assert Copyright Infringement Claims for the Non-Bean Instances**[13]

"Copyright … is a creature of statute, and the only rights that exit under copyright law are those granted by statute." *Silvers* v. *Sony Picture Entm't, Inc.*, 402 F.3d 881, 883-84 (9th Cir. 2005); *accord Stone* v. *Williams*, 970 F.2d 1043, 1051 (2d Cir. 1992). This general tenet was acknowledged by the Supreme Court over 180 years ago, and remains true today. *Wheaten* v. *Peters*, 33 U.S. 591, 663-64 (1834) ("This right [in copyright] … does not exist at common law — it originated, if at all, under the acts of congress. No one can deny that

---

[12]    In this regard, while using the term "standing" throughout this Opinion, the Court agrees with the following standing analysis offered by the Seventh Circuit:

> The Copyright Act restricts the set of people who are entitled to bring a civil action for infringement to those who qualify as "[t]he legal or beneficial owner of an exclusive right under a copyright...." 17 U.S.C. § 501(b). Some courts (including this one in years past) have seen this as a limitation derived from Article III's standing requirement . . . , but we believe that it is preferable to be more precise in our language. . . . [O]ne could keep it simple and say that the Copyright Act spells out who has enforceable rights under the statute; someone who does may sue, and someone who does not has failed to state a claim upon which relief may be granted. Our understanding of the law as it now stands, particularly in light of the Supreme Court's decision in *Reed Elsevier, Inc.* v. *Muchnick*, [559 U.S. 154] (2010), is that [this approach] is the correct one.

*HyperQuest, Inc.* v. *N'Site Solutions, Inc.*, 632 F.3d 377, 381 (7th Cir. 2011) (internal citations omitted).

[13]    The Court's discussion excludes reference to the French Instance because DRK did not move for summary judgment with respect to that instance of alleged infringement.

when the legislature are about to vest an exclusive right in an author or an inventor, they have the power to prescribe the conditions on which such right shall be enjoyed."); *Stewart* v. *Abend*, 495 U.S. 207, 251 (1990) ("Since copyright is a creature of statute and since the statute gives the author only a contingent estate, with the widow, widower, or children as remaindermen, the author has only an expectancy to assign for the second term." (internal quotation marks omitted)).

Section 501(b) of the Copyright Act establishes who may sue for infringement of a copyright, authorizing:

> The *legal or beneficial owner* of an exclusive right under a copyright ... to institute an action for any infringement of that particular right committed while he or she is the owner of it.

17 U.S.C. § 501(b) (emphasis added); *see also Russian Entm't Wholesale, Inc.* v. *Close-Up Intern., Inc.*, 482 F. App'x 602, 604 (2d Cir. 2012) ("[T]he legal or beneficial owner of an exclusive right under a copyright is entitled ... to institute an action for any infringement of *that particular right* committed while he or she is the owner of it." (emphasis in original)) (summary order).

As it must, the Second Circuit enforces Section 501(b) by holding that "[t]he Copyright Act authorizes only two types of claimants to sue for copyright infringement: [i] owners of copyrights, and [ii] persons who have been granted exclusive licenses by owners of copyrights." *Eden Toys, Inc.* v. *Florelee Undergarment Co., Inc.*, 697 F.2d 27, 32 (2d Cir. 1982), *superseded on other grounds by* Fed. R. Civ. P. 52(a). The "exclusive rights" referenced in Section

21

501(b) are set out in Section 106 of the Copyright Act, and include, as

pertinent to the pending claims:

> the exclusive rights to do and to authorize any of the following:
> (1) to reproduce the copyrighted work in copies or phonorecords;
> (2) to prepare derivative works based upon the copyrighted work;
> (3) to distribute copies of phonorecords of the copyrighted work to
> the public by sale or other transfer of ownership, or by rental,
> lease, or lending … [and] (5) in the case of … pictorial … works …
> to display the copyrighted work publicly.

17 U.S.C. § 106; *Davis* v. *Blige*, 505 F.3d 90, 98 (2d Cir. 2007) ("These rights

include 'reproducing,' 'preparing derivative works,' 'distributing,' 'performing,'

or 'displaying' a creative work." (quoting 17 U.S.C. § 106)).  Although "[t]he

right to prosecute an accrued cause of action for infringement is also an

incident of copyright ownership," *Davis*, 505 F.3d at 99, it is "not an exclusive

right under § 106," *Silvers*, 402 F.3d at 884.

As discussed below, the record conclusively demonstrates that DRK is

neither an owner of the copyrights at issue nor an entity that has been granted

an exclusive license by the owners.  For that reason, DRK does not have

standing to sue for copyright infringement for the DRK Summary Judgment

Instances, except for the Bean Instances.  Accordingly, DRK's motion for

summary judgment as to the Non-Bean Instances is denied.

### i.   The Representation Agreements Do Not Confer Standing on DRK

DRK contends that the Representation Agreements between it and the

photographers transferred co-ownership to DRK of three Section 106 exclusive

rights, namely the rights to authorize others to reproduce, distribute, and

22

display photographs.  (Def. Opp. 10).  From this premise, DRK argues that
because it is the owner of those exclusive rights (even though it is not the
exclusive owner of any one of those rights), it is entitled to sue Wiley for
copyright infringement.  (*Id.* at 10-11).  DRK further argues that it qualifies as
a beneficial owner because, under the Representation Agreement, it receives
one-half of the proceeds from the licenses it issues.  (*Id.* at 12).  Wiley takes the
opposite position, contending that the Representation Agreements establish
that DRK is neither an "owner" nor a "beneficial owner" under the Copyright
Act.  (Pl. Br. 7).

Owners may grant a license to others to exercise Section 106 rights or
assign those rights to others.  *Davis*, 505 F.3d at 98.  Two general categories of
licenses are granted: nonexclusive licenses and exclusive licenses.  *Id.* at 99.  A
nonexclusive license "permit[s] licensees to use the copyrighted material and
may be granted to multiple licensees."  *Id.*  In contrast, an exclusive license
"grant[s] to the licensee the exclusive right — superior even to the copyright
owners' rights — to use the copyrighted material in a manner as specified by
the license agreement."  *Id.*  "A valid license of either sort immunizes the
licensee from a charge of copyright infringement, provided that the licensee
uses the copyright as agreed with the licensor."  *Id.* at 100; *see also Graham* v.
*James*, 144 F.3d 229, 236 (2d Cir. 1998) ("A copyright owner who grants a
nonexclusive license to use his copyrighted material waives his right to sue the
licensee for copyright infringement.").

A key distinction between the rights granted by nonexclusive and exclusive licenses — and one that is critical to the claims pending before this Court — is that "[a nonexclusive] license conveys no ownership interest, and the holder of a nonexclusive license may not sue others for infringement." *Davis*, 505 F.3d at 100; *see Broadcast Music, Inc.* v. *CBS Inc.*, No. 83 Civ. 5004-CSH, 1983 WL 1136, at *5 (S.D.N.Y. July 20, 1983) (holding that plaintiff, as a nonexclusive licensee of the works at issue, lacked standing to bring claims against defendant for copyright infringement); *see also Sybersound Records, Inc.* v. *UAV Corp.*, 517 F.3d 1137, 1146 (9th Cir. 2008) ("We hold that because [Plaintiff] is neither an exclusive licensee nor a co-owner in the nine copyrights, it lacks standing to bring the copyright infringement claims alleged in the FAC, and, thus, its copyright infringement claims fail."); *I.A.E., Inc.* v. *Shaver*, 74 F.3d 768, 775 (7th Cir. 1996) ("[A] person holding a nonexclusive license has no standing to sue for copyright infringement."); *Eden Toys*, 697 F.2d at 32 ("The Copyright Act authorizes only two types of claimants to sue for copyright infringement: [i] owners of copyrights, and [ii] persons who have been granted exclusive licenses by owners of copyrights."). On the other hand, an exclusive license "conveys an ownership interest." *Davis*, 505 F.3d at 100.

The record provides uncontroverted proof that the Representation Agreements are nonexclusive licenses. (*See, e.g.*, Penchina Decl., Exhs 3, 30 at 166, 33 at 21). For starters, DRK admitted that the Representation Agreements were nonexclusive licenses. (*Id.*, Exh. 30 at 135 ("It is a

24

nonexclusive arrangement.")).  This is in addition to the fact that the Representation Agreement itself does not indicate that it grants DRK any exclusive rights.  Considering the preeminence of exclusive rights in copyright cases, it is axiomatic that if the Representation Agreement did not specify that exclusive rights were being transferred, no such rights were in fact transferred. To further underscore this point, one need only look to the Representation Agreements with Bean and French, which were the only ones that authorized DRK to "act as [Bean's or French's] *sole and exclusive* agent."  (D. Krasemann Decl., Exh. 1 (emphasis added)).

DRK's contention that the Representation Agreements transferred exclusive rights to it fails not only as a factual matter, but also as a legal matter.  Section 101 of the Copyright Act makes clear that transfer of ownership of an exclusive right cannot be accomplished by a nonexclusive license.  This section defines "transfer of copyright ownership" as an "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, *but not including a nonexclusive license.*"  17 U.S.C. § 101 (emphasis added).  Moreover, as Wiley notes, "DRK has not cited, and there is not, a single case finding standing based on a non-exclusive representation agreement."  (Pl. Reply 1).  Not surprisingly, when presented with a similar representation agreement between Wiley and another stock photography agency, a district court in the Northern

District of California rejected the agency's argument that the nonexclusive representation agreement in that case conferred standing on the plaintiff. *Minden Pictures, Inc.* v. *John Wiley & Sons*, *Inc. ("Minden I")*, No. C-12-4601 EMC, 2014 WL 295854, at *5 (N.D. Cal. Jan. 27, 2014) ("Because the agency agreements do not make Minden a legal or beneficial owner of any exclusive right under the Copyright Act, Minden lacks standing to pursue this action."). The Representation Agreements here granted DRK a nonexclusive license to engage in certain exclusive rights granted to the photographers under the Copyright Act; they did not — indeed, they could not have, by dint of their nonexclusivity — grant DRK ownership of exclusive rights under Section 106, as DRK contends, or the copyrights at issue. *Sybersound Records*, 517 F.3d at 1146 ("Although the [Copyright Act] permits *exclusive* rights to be chopped up and owned separately, to be effective, the assignment or other type of alienation permitted … must be *exclusive*." (emphases in original)).[14]  Execution of the Assignment Agreements is itself further indication that the parties did not consider the Representation Agreements to be a conveyance of any ownership interest in the copyrights at issue.  *See Minden I*, 2014 WL 295854, at *9 (recognizing that the execution of analogous assignment agreements underscored the conclusion that the agency agreements did not convey an

---

[14]     DRK acknowledged as much when it relied exclusively on the Assignment Agreements to argue that it had standing in a related arbitration (Supplemental Penchina Decl., Exh. A), while maintaining that the Representation Agreements were not "relevant to the issues in [that arbitration]" (*id.* at Exh. M).

ownership interest in the photographs at issue so as to confer standing on the plaintiff).

DRK argues that even if it is not the legal owner of the copyrights at issue, it is the "beneficial owner" because, under the Representation Agreements, it is entitled to one-half of the proceeds under the licenses.  (Def. Br. 12).  This argument is equally unavailing, and the cases on which DRK relies in support do not prove otherwise.  *See, e.g.*, *Hearn* v. *Meyer*, 664 F. Supp. 832, 844 (S.D.N.Y. 1987) (recognizing that a beneficial owner could be an author, i.e., a current or former owner of the copyright, and "one who retained a present financial interest in exploitation of [the author's] work"). *Cortner* v. *Israel*, on which DRK also relies, is distinguishable on its facts. There, the court held that "[a] beneficial owner … would include, for example, an author who had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees."  732 F.2d 267, 271 (2d Cir. 1984).  In stark contrast, DRK never "possessed legal title in the first place," and therefore, does not qualify as a beneficial owner entitled to sue. *Poindexter* v. *EMI Record Grp., Inc.*, No. 11 Civ. 559 (LTS) (JLC), 2012 WL 1027639, at *3 (S.D.N.Y. Mar. 27, 2012) ("Plaintiff advances three arguments in support of his claim that he has standing to sue based on the infringement of the *Thin Line* sound recording: [i] he has ownership rights in the master by virtue of his role as co-producer; [ii] his continued entitlement to royalties makes him a beneficial owner; and [iii] the 2011 Agreement grants him the right to sue for

copyright infringements of the musical composition and the master.  None of these arguments is availing.").

The Representation Agreements make clear that DRK is a nonexclusive licensing agent for the photographers.  In that capacity, and having never owned the copyrights, DRK does not have standing to maintain a copyright infringement action for the DRK Summary Judgment Instances, except the Bean Instances.  *See Bourne Co.* v. *Hunter Country Club, Inc.*, 990 F.2d 934, 937 (7th Cir. 1993) ("A licensing agent is neither the legal nor beneficial owner of the copyright and has no interest in the copyright."); *Ctr. City Music* v. *Kisner*, 23 F.3d 400, 1994 WL 159769, at *4 (4th Cir. 1994) (same) (per curiam table decision); *Minden I*, 2014 WL 295854, at *8 ("[A] number of courts have found that licensing agents are neither legal nor beneficial owners of a copyright." (collecting cases)); *id.* at 11 (holding that plaintiff "is not a 'beneficial owner' in the images since it is not nor has it been a legal owner of the copyrighted works"); *cf. Psihoyos* v. *Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 114 (S.D.N.Y. 2012) (acknowledging that a plaintiff may be a beneficial owner where it retained exclusive rights and was entitled to receive a majority of the license fees and any awards or judgments for infringements); *Silberman* v. *Innovation Luggage, Inc.*, No. 01 Civ. 7109 (GEL), 2003 WL 1787123, at *7 n.5 (S.D.N.Y. Apr. 3, 2003) (noting that plaintiff could sue as a beneficial owner where plaintiff had transferred ownership of the exclusive right at issue "based on royalties received or other indicia of control").

### ii.   The Assignment Agreements Do Not Confer Standing on DRK

DRK alternatively argues that the Assignment Agreements convey both ownership interest in the copyright and the sole right to bring and resolve accrued, and later-accruing, claims relating to the photographs at issue.  (Def. Opp. 13).  Wiley responds that the Assignment Agreements are "sham" agreements that cannot confer standing because those agreements do not convey ownership, but rather only the bare right to sue.  (Pl. Br. 7-8).

The Second Circuit rejected the exact argument DRK advances here in *Eden Toys*.  The Court in *Eden Toys* indicated that the Copyright Act does not permit "holders of rights under copyrights to choose third parties to bring suits on their behalf."  697 F.2d at 32 n.3.  This principle has been followed in numerous subsequent decisions in the Second Circuit and courts throughout this Circuit.  *See, e.g., ABKCO Music, Inc.* v. *Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991) ("[T]he Copyright Act does not permit copyright holders to choose third parties to bring suits on their behalf."); *Plunket* v. *Doyle*, No. 99 Civ. 11066 (KMW), 2001 WL 175252, at *5 (S.D.N.Y. Feb. 22, 2001) ("The *Eden* Court noted that it did not believe that the Copyright Act permits holders of rights under copyrights to choose third parties to bring suits on their behalf." (internal quotation marks omitted)); *Yong Ki Hong* v. *KBS Am., Inc.*, 951 F. Supp. 2d 402, 430 (E.D.N.Y. 2013) ("*Eden Toys* makes clear that a copyright owner cannot, by contract or otherwise, grant a non-exclusive licensee the right to sue for copyright infringement.").  Consequently, DRK's claim that it has

29

standing because the photographers, by execution of the Assignment
Agreements, authorized DRK to bring suit on their behalf, fails as a matter of
law. *See Eden Toys,* 697 F.2d at 32 n.3 (rejecting plaintiff's argument that a
"third basis for standing under the Copyright Act existed, namely authorization
by the copyright holder of suit by a person *other* than an exclusive licensee"
(emphasis in original)); *see also ABKCO Music, Inc.*, 944 F.2d at 980; *Fed.
Treasury Enter. Sojuzplodoimport* v. *SPI Spirits Ltd.*, 726 F.3d 62, 84 (2d Cir.
2013) ("While Federal Rule of Civil Procedure 17(a) ordinarily permits the real
party in interest to ratify a suit brought by another party, the Copyright Law is
quite specific in stating that only the owner or an exclusive right under a
copyright may bring suit." (internal quotation marks omitted)); *Wu* v. *Pearson
Educ., Inc.*, 377 F.R.D. 255, 266 (S.D.N.Y. 2011) ("To the extent that the
licensing agreements or the contracts between the photo bureaus and the
photographers specifies that only the photo bureaus may bring suit, they are
likely unenforceable.").

DRK's parallel argument that the Assignment Agreements confer
standing on DRK because they transfer to it ownership in the copyrights, albeit
temporary, is also meritless. Although there is no case in this Circuit directly
on point, courts in other Circuits have held in analogous circumstances that
similar — indeed, nearly identical — agreements did not confer standing. The
Court finds these decisions analytically sound, and adopts their reasoning
here.

When determining whether an agreement confers standing, courts look to "the substance of the agreement, not the labels it uses." *HyperQuest*, 632 F.3d at 383; *Righthaven LLC* v. *Hoehn*, 716 F.3d 1166, 1169 (9th Cir. 2013) ("When determining whether a contract has transferred exclusive rights, we look not just at the labels parties use but also at the substance and effect of the contract."). Where, as here, an agreement transfers "nothing more than a bare right to sue … [it] cannot be the basis for standing under the Copyright Act." *Minden Pictures, Inc.* v. *John Wiley & Sons, Inc. ("Minden II")*, No. C-12-4601 EMC, 2013 WL 1995208, at *7 (N.D. Cal. May 13, 2013); *see Silvers*, 402 F.3d at 890 ("The bare assignment of an accrued cause of action is impermissible under 17 U.S.C. § 501(b)."); *see also Righthaven*, 716 F.3d at 1169 (holding that plaintiff did not have standing to sue where the substance of the parties' agreement transferred only the right to sue); *Russian Entm't Wholesale, Inc.* v. *Close-Up Intern.*, 767 F. Supp. 2d 392, 401 n.13 (E.D.N.Y. 2011) (noting that a license between the parties that purported to give one party the right to sue, but did not provide the party with the right to reproduce or distribute copies of the work, was "not a valid licensing agreement because a party cannot assign exclusive rights solely for the purpose of having the licensee bring suit"), *aff'd*, 482 F. App'x 602 (2d Cir. 2012) (summary order). DRK's argument that the Assignment Agreement transfers the copyrights at issue is obviated by the rationale of these decisions and the factual record before this Court.

31

*Minden Pictures, Inc.* v. *Pearson Educ., Inc.* ("*Pearson*"), is particularly instructive.  929 F. Supp. 2d 962 (N.D. Cal. 2013).  In that case, the plaintiff, a stock photography agency, alleged that the defendant had breached its license agreement, thereby engaging in copyright infringement.  *Id.* at 963.  Like DRK, the plaintiff in *Pearson* argued that its assignment agreements, containing nearly identical language as the Assignment Agreement before the Court, conferred standing.  *Id.* at 968.  The court held that "[w]hen the contract is viewed as a whole, the clear and unambiguous intent of the parties was to assign to [plaintiff] the bare right to sue.  'Co-ownership' was merely a label intended to disguise the assignment of the cause of action as something else." *Id.*

Support for this holding was found in the agreement itself, which (i) granted a license to "bring suit and divvy up any return," and (ii) did not include any duration of the license, but rather specified that it would terminate automatically upon conclusion of any litigation.  *Id.* at 969.  The court reasoned that if transfer of ownership had truly been contemplated by the agreement, plaintiff would have been granted "co-ownership in perpetuity [even] if it failed to bring suit."  *Id.*  In short, the court recognized that "the contracting parties intended for [plaintiff] to bring the instant suit and not for it to be a genuine, potentially-permanent owner of any exclusive rights under Section 501(b)."  *Id.*  The court also relied on e-mails submitted by the parties

32

in which the plaintiff stated to photographers, in regard to the assignment agreement:

> What this amendment does is assign [plaintiff] co-ownership of copyrights of images we represent solely for actions or lawsuits brought by [plaintiff] to address unauthorized image use by our clients. *My understanding is this is the sole purpose this assignment of co-ownership may be used for.*

929 F. Supp. 2d at 970 (emphasis in original). All of this led the court to conclude that the agreements were nothing "more than disguised assignments of the bare right to sue" that did not provide the plaintiff with standing to sue on behalf of the individual photographers. *Id.*[15]

The present case is substantively indistinct from *Pearson*. Except for the reference to "co-owners," the agreements in both cases contain identical text and, just like the plaintiff in *Pearson*, DRK assured its photographers that the sole basis for entering into the Assignment Agreements was to allow DRK to bring suit on the photographers' behalf. DRK's e-mails to the photographers confirm that the Assignment Agreements transferred nothing more than a blanket right for DRK to pursue copyright infringement claims. Indeed, Dan Krasemann, the sole proprietor of DRK, assured one photographer that there

---

[15]    In a related case, where plaintiff sought to rely on the same assignment agreements, the court agreed with the earlier court's decision in *Pearson*, stating:

> In the alternative, even if collateral estoppel does not apply as to these four photographers, this Court finds Judge Alsup's reasoning [in *Pearson*] on the effect of these agreements persuasive, and follows *Pearson* in finding that these agreements convey nothing more than a bare right to sue, and thus cannot be the basis for standing under the Copyright Act.

*Minden II*, 2013 WL 1995208, at *7.

was "no rights grab going on here.  We simply want to register our website/database of images so the images are protected under copyright law, and so we can pursue infringers."  (Penchina Decl., Exh. 9).[16]

The Ninth Circuit's decision in *Righthaven* provides still further support for the Court's conclusion that the Assignment Agreement does not confer standing.  716 F.3d at 1166.  The assignment agreement at issue in *Righthaven* stated that Plaintiff received "all copyrights requisite to have [Plaintiff] recognized as the copyright owner of the Work for purposes of [Plaintiff] being able to claim ownership as well as the right to seek redress for past, present, and future infringements of the copyright … in and to the Work."  *Id.* at 1168. The Court held that describing plaintiff as the "owner" of the copyright did not prove that plaintiff actually owned any exclusive rights, as required to bring a lawsuit.  *Id.* at 1170.  A substantive review of the arrangement between the parties showed that the assignment agreement granted only the "bare right to sue" because, under the terms of the agreement, the transferor retained all exclusive rights as to the copyright.  *Id.*[17]

---

[16]    It is for this reason that the district court's decision in *Alaska Stock, LLC* v. *Pearson Educ., Inc.*, No. 12-cv-01927-WHO, 2013 WL 5496788, at *5-7 (D. Alaska Sept. 11, 2013), offered by DRK, does not alter the Court's decision.  In that case, the court recognized that standing would *not* be established "where the assignor labels an assignment a transfer of ownership, but expressly reserves the exclusive rights in the copyright to itself."  This is exactly what DRK sought to achieve, as evidenced by the terms of the proffered agreements and its correspondence with photographers.

[17]    Courts in cases related to *Righthaven* interpreting the same assignment agreement have similarly held that such agreements did not confer standing.  *See, e.g.*, *Righthaven LLC* v. *Eiser*, No. 2:10-cv-3075-RMG-JDA, 2012 WL 527571, at *6 (D.S.C. Jan. 13, 2012) (holding that plaintiff did not have standing to bring a claim for copyright infringement where the substance of the agreement only granted plaintiff a bare right to sue); *Righthaven LLC* v. *Hush-Hush Entm't, Inc.*, No. 2:10-cv-01404-LRH, 2012 WL 688429, at

The same is unquestionably true here.  DRK embarked on a campaign to
register its photographers' copyrights for the simple reason that copyrights
need to be registered to bring suit.  Section 411(a) of the Copyright Act makes
this clear: "no civil action for infringement of the copyright in any United States
work shall be instituted until preregistration or registration of the copyright
claim has been made in accordance with this title."  17 U.S.C. § 411(a).
Indeed, "[t]he absence of a valid copyright registration ... would bar a plaintiff
from bringing a viable copyright infringement action."  *L.A. Printex Indus., Inc.*
v. *Le Chateau, Inc.*, No. 11 Civ. 4248 (LTS), 2012 WL 987590, at *3 (S.D.N.Y.
Mar. 23, 2012); *see also Reed Elsevier, Inc.* v. *Muchnick*, 559 U.S. 154, 157
(2010) ("[Section 411(a)] establishes a condition — copyright registration — that
plaintiff ordinarily must satisfy before filing an infringement claim and invoking
the Act's remedial provisions.").  DRK proceeded under the belief, albeit a
misguided one, that if it registered the photographers' copyrights, it would have
standing to sue.  The record before the Court is clear: the sole purpose of the
Assignment Agreement was to grant DRK the right to bring suit.  This
conclusion is further solidified by e-mails between DRK and the photographers,
such as the e-mail from one photographer who made clear that:

---

*2-3 (D. Nev. Mar. 1, 2012) ("This court concurs with these well-reasoned decisions"
that hold that the agreement "does not confer [plaintiff] standing to sue for copyright
infringement because the [agreement] deprives [plaintiff] of any of the rights normally
associated with ownership of an exclusive right and grants [plaintiff] only the bare right
to sue."); *Righthaven LLC* v. *Computer Servs. One LLC*, No. 2:11-cv-00721-LRH-PAL,
2012 WL 694468, at *2 (D. Nev. Mar. 1, 2012) (same).

> I have not assigned copyright to any of these images other than temporarily to DRK Photo in order for you to pursue your infringement lawsuit. I have however sold non-exclusive rights to some of these pictures. I expect re-assignment of full copyright in the very near future when your lawsuit is concluded.

(*Id.* at Exh. 12).

DRK directs the Court to the decision in the parallel arbitration proceeding, in which the arbitrator held that DRK had standing to sue because the Assignment Agreements did not only confer the bare right to sue. (Boyd Decl., Exh. 1). As an initial matter, the arbitrator's decision is not binding authority on the Court. Yet even if it were, the arbitrator expressly left open the potential for the Court to come to the opposite conclusion:

> Nevertheless, nothing in this Final Award should be construed to bar Wiley from attempting to develop a more complete factual record in the copyright infringement litigation between the parties currently pending in the Southern District of New York and to argue there that the assignments are a sham under *Righthaven.* I conclude only that the assignments are not rendered a sham under *Righthaven* given the record presented here, particularly in view of my hesitancy as an arbitrator to extend existing copyright law, a task which more appropriately should be within the domain of the federal courts with full appellate review.

(*Id.* at 3).

The arbitrator's determination that *Righthaven* was inapplicable was premised on the view that critical to the decision in *Righthaven* was "the fact that the assignee had no real ability to monetize the copyrights except through copyright infringement actions." (Boyd Decl., Exh. 1 at 2). The arbitrator reasoned that the same was not true with respect to DRK, because DRK had the right to license the copyrighted images to publishers without seeking the

photographers' permission.  (*Id.*).  The Court does not read *Righthaven* so narrowly, but rather heeds the Ninth Circuit's admonition that courts should "consider the substance of the transaction" to determine if any exclusive rights were granted to the licensee.  *Righthaven*, 716 F.3d at 1170.  As the Court has already held, no exclusive rights could have been granted to DRK because the photographers, except for Bean and French, had only granted DRK a nonexclusive license.  The arbitrator did not explore whether DRK had been granted exclusive rights, but rather left this, and the standing issue, to the Court to adjudicate more fully.[18]  Just like the plaintiff in *Righthaven*, DRK, equipped with nothing more than a nonexclusive license, cannot obtain standing to sue under the Assignment Agreements that, in substance, convey nothing more than a bare right to sue.

In short, DRK's Assignment Agreements are "no more than disguised assignments of the bare right to sue" that cannot confer standing.  A contrary holding would be inconsistent with the standing limitation first recognized in *Eden Toys* and subsequently adopted throughout this Circuit, because such a decision would enable parties to circumvent the prohibition against allowing "holders of rights under copyrights to choose third parties to bring suits on

---

[18]     An arbitrator in a similar case against Wiley, *Visuals Unlimited, Inc.* v. *John Wiley and Sons, Inc.*, Case No. 11 143 Y 00658 13, came to the opposite conclusion, holding that the claimant in that case did not have standing pursuant to an assignment agreement that contained nearly identical language to the Assignment Agreement before the Court. (Dkt. #98).  The arbitrator, relying on *Pearson*, held that the agreement was "insufficient, alone or in combination with non-exclusive Representation Agreements, to establish that [the claimant] is a co-owner of an exclusive right for purposes of standing under Section 501(b) of the Copyright Act."  (*Id.*).

their behalf." *Eden Toys*, 697 F.2d at 32 n.3.  Put somewhat differently, authorizing DRK to use the Assignment Agreement to establish standing in this case would endorse a practice incongruous with Second Circuit precedent — something this Court cannot condone.  Accordingly, DRK's summary judgment motion as to the DRK Summary Judgment Instances, except the Bean Instances, is denied, and its counterclaims as to those instances are dismissed.

> **b.    Claims Involving the Instances Contained at Lines 8 to 56, 87, and 88 of DRK's Chart Are Barred by the Statute of Limitations**

An additional basis for denying DRK's partial summary judgment motion (at least as to a majority of the DRK Summary Judgment Instances) is that claims involving those Instances are barred by the statute of limitations.  Wiley makes just this argument with respect to the instances at lines 8 to 56, 87, and 88 of DRK's Chart.  (Counter-Def. Br. 8).  This subset of the DRK Summary Judgment Instances includes instances that the Court has already dismissed on standing grounds, as well as additional Bean Instances.

A civil action under the Copyright Act must be "commenced within three years after the claim accrued."  17 U.S.C. § 507(b) ("No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued.").  The parties dispute whether the Court should apply an "injury rule," under which "a claim accrued at the time of each act of infringement, regardless of the copyright holder's knowledge of the infringement," *Urbont* v. *Sony Music Entm't*, 863 F. Supp. 2d 279, 281 (S.D.N.Y.

38

2012), or the "discovery rule," under which "a claim for copyright infringement does not accrue until the aggrieved party knows or has reason to know of the injury that forms the basis of the claim," *id.*  Wiley argues that the injury rule applies, and that because each work identified at lines 8 to 56, 87, and 88 of DRK's Chart was published prior to August 3, 2008 (i.e., three years before DRK instituted the present action), those claims are barred by the statute of limitations.  (Counter-Def. Br. 8-9).  In the alternative, Wiley maintains that even if the discovery rule applied, the claims are either barred, or at minimum, an issue of fact is raised so as to foreclose summary judgment.  (*Id.* at 9).  Conversely, DRK contends that the discovery rule applies, and that under this rule, its claims were timely filed.  (Counter-Pl. Reply 7).

"Neither the Supreme Court nor the Second Circuit has ruled on the appropriate accrual rule for federal copyright infringement claims."  *Urbont*, 863 F. Supp. 2d at 282; *see also TufAmerica, Inc.* v. *Diamond*, No. 12 Civ. 3529 (AJN), 2013 WL 4830954, at *17 (S.D.N.Y. Sept. 10, 2013) (same).  The majority of the courts in this Circuit had initially applied the discovery rule in infringement cases based on their interpretation of the Second Circuit's holdings in *Stone* v. *Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992), and *Merchant* v. *Levy*, 92 F.3d 51, 56 (2d Cir. 1996).  *See Muench Photography, Inc.* v. *Houghton Mifflin Hardcourt Pub. Co.*, No. 09 Civ. 2669 (LAP), 2013 WL 4464002, at *5 (S.D.N.Y. Aug. 21, 2013) (recounting history).  But, beginning with the Supreme Court's decision in *TRW Inc.* v. *Andrews*, 534 U.S. 19 (2001),

and particularly after Judge Lewis A. Kaplan's decision in *Auscape Int'l* v. *Nat'l Geographic Soc'y*, 409 F. Supp. 2d 235 (S.D.N.Y. 2004), the pendulum has swung in the other direction.  A "majority of courts" in this District now apply the injury rule to infringement claims.  *TuftAmerica, Inc.*, 2013 WL 4830954, at *17 ("Since *Auscape*, a growing majority of the courts in the Southern District of New York to address this question have followed Judge Kaplan's lead and applied the injury rule to infringement claims." (collecting cases)).

In *TRW*, the Supreme Court, in determining the accrual of claims under the Fair Credit Reporting Act ("FCRA"), made clear that the discovery rule had limited application.  It did so by identifying that it had recognized the discovery rule only in "two contexts, latent disease and medical malpractice cases 'where the cry for such a rule is loudest.'"  *TRW*, 534 U.S. at 27 (quoting *Rotella* v. *Wood*, 528 U.S. 549, 555 (2000)).  In *Auscape*, Judge Kaplan began by observing that

> In light of these considerations, two things are clear in the aftermath of *TRW*. First, it is uncertain whether *Stone* and *Merchant* remain good law even in the co-ownership context, as both were premised upon the automatic application of the discovery rule that the Supreme Court rejected in *TRW*. Second, regardless of whether *Stone* and *Merchant* continue to govern in the co-ownership context, *TRW* demonstrates that uncritical extension of those cases to the infringement context would be unwarranted. Instead, *TRW* requires examination of the statutory structure and legislative history in determining whether a discovery or injury rule should apply where, as here, the statute itself is silent on the issue.

409 F. Supp. 2d at 244.  He then proceeded to elucidate how subsequent courts had neglected to account for two critical distinctions present in *Stone*

40

and *Merchant*.  First, Judge Kaplan noted, those two cases had "rest[ed] entirely on then prevalent views regarding the accrual of federal claims generally," pursuant to which "federal courts long applied a discovery rule, in absence of any authority to the contrary, in determining when claims under a plethora of federal statutes accrued."  *Id.* at 243-44.  Second, he observed, *Stone* and *Merchant* had involved copyright *ownership* rather than *infringement* claims.  *Id.*  After (i) considering the limitations of *Stone* and *Merchant*, and how *TRW* had "altered [the] landscape"; (ii) holding that the discovery rule was not the default accrual rule; and (iii) conducting a comprehensive examination of the limitations period under the Copyright Act, Judge Kaplan held that infringement claims under the Copyright Act should be governed by the injury rule.  *Id.* at 244-48.

The Supreme Court's subsequent decision in *Merck & Co.* v. *Reynolds*, 559 U.S. 633 (2010), would appear to confirm the correctness of Judge Kaplan's decision.  In *Merck*, the Court stated that the discovery rule is "an exception to the general limitations rule that a cause of action accrues once a plaintiff has a complete and present cause of action."  *Id.* at 644 (internal quotation marks omitted).  The Court went on to explain that the genesis of the discovery rule was found in fraud cases, acknowledging that the "Court long ago recognized that something different was needed in the case of fraud, where a defendant's deceptive conduct may prevent a plaintiff from even *knowing* that he or she has been defrauded."  *Id.* (emphasis in original).  The Second Circuit,

in turn, has recognized that "[a]s a general matter, [the discovery rule] does not govern the accrual of most claims because most claims do not involve conduct that is inherently self-concealing." *SEC* v. *Gabelli*, 653 F.3d 49, 59 (2d Cir. 2011), *rev'd on other grounds*, 133 S. Ct. 1216 (2013).

In sum, *Auscape* and other decisions following *TRW* make clear that the Court should follow the majority rule in this District, and apply the injury rule to DRK's infringement claims. Doing so requires that DRK's claims as to the instances of alleged infringement at lines 8 to 56, 87, and 88 of DRK's Chart be dismissed as untimely filed.[19] Indeed, DRK concedes that application of the injury rule bars these instances of alleged infringement. (Counter-Pl. Reply 12). As for DRK's argument that *Stone* and *Merchant* are binding precedent (Counter-Pl. Reply 8), the succeeding decisions outlined earlier in this section thoroughly undercut DRK's position. Similarly, DRK's argument that this case necessitates application of the discovery rule because Wiley's alleged infringements were concealed is unavailing. (Counter-Pl. Reply 11). DRK has not established that it could not uncover, or that it would be very difficult for it to uncover, the alleged instances of infringement, such that this Court should recognize an exception to the principle, articulated by the Supreme Court and endorsed by the Second Circuit, that the discovery rule is applied to limited cases sounding in fraud. As the legislative history of the Copyright Act confirms, "Congress was well aware that the statute of

---

[19]    Because the Court holds that the injury rule applies, it need not assess whether DRK's claims would likewise be barred under the discovery rule.

limitations it was enacting would not necessarily allow a remedy for every wrong.  It at least implicitly acknowledged 'that the passage of time must leave some wrongs without a remedy.'" *Auscape*, 409 F. Supp. 2d at 246 (quoting *Pearl* v. *City of Long Beach*, 296 F.3d 76, 77 (2d Cir. 2002)).

Accordingly, DRK's motion for partial summary judgment as to the instances of alleged infringement at lines 8 to 56, 87, and 88 in DRK's Chart is denied, and those claims are dismissed, with the non-Bean Instances already dismissed on standing grounds dismissed on this alternate basis.

### c.    Wiley Infringed on the Bean Instances at Lines 6, 7, and 75 of DRK's Chart

Having dismissed claims for the majority of the DRK Summary Judgment Instances on standing or timeliness grounds, the Court is left to determine whether DRK is entitled to summary judgment on the Bean Instances identified at lines 6, 7, and 75 of DRK's Chart (the "Three Bean Instances").  DRK contends that its licenses with Wiley for the images at issue in these instances were limited in scope in terms of the print run, media, and/or geographic distribution, and that Wiley violated the license terms by printing more units than authorized, selling the photographs beyond the licensed geographic distribution areas, and/or using the photographs electronically without permission.  (Counter-Pl. Br. 12-14).[20]  Wiley responds that summary

---

[20]    DRK advances these arguments as to all of the DRK Summary Judgment Instances. Having dismissed all other DRK Summary Judgment Instances, however, the Court need only address whether DRK has established that there is no genuine issue of material fact as to whether Wiley engaged in copyright infringement with respect to the Three Bean Instances.

judgment cannot be granted in DRK's favor because there are material issues of fact as to whether Wiley exceeded the scope of its licenses as to the Three Bean Instances.  (Counter-Def. Br. 4-5).  Here, Wiley raises only one potential issue of material of fact: Wiley argues that it did not exceed the print run for the alleged instance of infringement at line 75 of DRK's Chart because pursuant to the Pricing Agreement, Wiley had the right to print up to 40,000 copies at the price paid, and it printed fewer than this amount.  (*Id.* at 6).

"To establish an infringement of a copyright, a plaintiff must show both ownership of a copyright and that defendant copied the protected material without authorization."  *Rogers* v. *Koons*, 960 F.2d 301, 306 (2d Cir. 1992); *Hamil Am. Inc.* v. *GFI*, 193 F.3d 92, 98 (2d Cir. 1999); *TechnoMarine SA* v. *Jacob Time, Inc.*, No. 12 Civ. 790 (KBF), 2013 WL 5231471, at *7 (S.D.N.Y. July 16, 2013).  The Court need not address the first element for proving copyright infringement because Wiley does not dispute that DRK owns a valid copyright as to the Bean photographs pursuant to the exclusive license granted to DRK. Turning to the second element, the Court finds that no issue of material fact exists.

"It is black-letter law that a claim for copyright infringement lies when a party's use of copyrighted material exceeds the scope of its license."  *Harrell* v. *Van der Plas*, No. 08 Civ. 8252 (GEL), 2009 WL 3756327, at *2 (S.D.N.Y. Nov. 9, 2009); *see Bean* v. *John Wiley & Sons, Inc.*, No. CV 11-08028-PCT-FJM, 2012 WL 1078662, at *2 (D. Ariz. Mar. 30, 2012) ("A licensee can infringe a

44

copyright by exceeding the scope of a license."); *see also E. Broadcasting Am. Corp.* v. *Universal Video, Inc.*, No. 04 Civ. 5654 (DGT), 2006 WL 767871, at *2 (E.D.N.Y. Mar. 24, 2006) (finding that where a party uses copyrighted material in a way that exceeds the duration or scope of a previously-granted license, the resulting claim is for copyright infringement, not breach of contract); *Marshall* v. *New Kids on the Block P'ship*, 780 F. Supp. 1005, 1008 (S.D.N.Y. 1991) (finding that existence of a prior license is no bar to copyright claim because a copyright licensee can make itself a "stranger" to the licensor by exceeding the duration or scope of the license).

The license for the Bean Instances at lines 6 and 7 is dated January 6, 1999; it limits Wiley's use of the Bean photographs to use in "one (1) print version of the copyright 1999 John Wiley & Sons, Inc. TEXTBOOK publication titled BLUE PLANET, 2ND EDITION, by Skinner; the total number of copies to be printed is not to exceed 30,000 copies," and specifies that "[n]o other rights known or unknown to mankind are granted or implied," and that "[n]o electronic publishing rights [are] granted." (Second Krasemann Decl., Exh. 2-A). The invoice for the Bean Instance at line 75, dated March 27, 2003, contains the same language with respect to Wiley's use of the image in a different textbook publication. (*Id.* at Exh. 2-B). Wiley does not dispute that it exceeded the scope of the licenses governing the Three Bean Instances. (Counter-Def. Br. 5-6). Instead, Wiley takes issue with only the Bean Instance

at line 75, arguing that under the Pricing Agreement it was allowed to print up to 40,000 copies, which Wiley did not exceed.  (*Id.* at 6 n.6).

"[D]etermining whether a defendant's activities fall within the scope of an existing license essentially involves a question of contract interpretation." *Reinhardt* v. *Wal-Mart Stores, Inc.*, 547 F. Supp. 2d 346, 352 (S.D.N.Y. 2008); *see also Bourne* v. *Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995).  "If the contract language is unambiguous and conveys a definite meaning, its interpretation is a question of law for the court." *Reinhardt*, 547 F. Supp. 2d at 352.  The language of the relevant licenses is clear and unambiguous.  As DRK argues, and the record supports, the Pricing Agreement was in place from July 1, 2000, to July 1, 2001, and consequently could not govern the Bean Instance at line 75.  Wiley has not submitted evidence to refute the limited temporal application of the Pricing Agreement.  Indeed, Wiley conceded this much when it submitted that "[p]ursuant to the pricing agreement *in place during 2000 and 2001*, DRK charged Wiley $170 for the right to print and distribute in North America ... up to 40,000 copies."  (Wiley 56.1 Statement ¶ 14 (emphasis added)).

The record establishes that Wiley infringed on DRK's copyrights for the Three Bean Instances.  *See Gilliam* v. *Am. Broadcasting Co., Inc.*, 538 F.2d 14, 21 (2d Cir. 1976) ("We find, therefore, that unauthorized editing of the underlying work, if proven, would constitute an infringement of the copyright in that work similar to any other use of a work that exceeded the license

46

granted by the proprietor of the copyright."); *J.S. Nicol, Inc.* v. *Peking Handicraft, Inc.*, No. 03 Civ. 1548 (GBD) (AJP), 2008 WL 4613752, at *7 n.25 (S.D.N.Y. Oct. 17, 2008) ("Neither party contests the basic tenet that use of J.S. Nicol's copyrighted works would constitute copyright infringement if used in violation of the License Agreement."); *Leutwyler* v. *Royal Hashemite Court of Jordan*, 184 F. Supp. 2d 303, 306 (S.D.N.Y. 2001) ("[A] copyright owner may bring a claim for infringement against a licensee whose actions exceed the scope of the license.... The question thus reduces to an interpretation of the license that [plaintiff] concedes was granted." (internal citation omitted)); *Wood* v. *Houghton Mifflin Harcourt Publ'g Co.*, 589 F. Supp. 2d 1230, 1241 (D. Colo. 2008) (granting partial summary judgment where licensee used copyright beyond the scope of the license); *Bean*, 2012 WL 1078662, at *2 (same).

Because Wiley has failed to raise any issue of material fact as to whether it exceeded the scope of its license for the Three Bean Instances, summary judgment is granted in DRK's favor for these instances.

## 2.    Wiley's Motion for Summary Judgment

Turning now to Wiley's motion for summary judgment, the company advances three principal grounds for relief.  First, Wiley seeks an order dismissing with prejudice all the DRK Counterclaim Instances, except the Bean and French Instances, on the ground that DRK lacks standing.  Wiley also requests that DRK's claims as to the Krasemann Images be dismissed because DRK lacks valid copyright registrations for these images.  Second, Wiley seeks

a declaratory judgment of non-infringement as to the Wiley Non-Infringement Instances (other than the Bean and French Instances) on the ground that DRK lacks standing.  With respect to the 21 Wiley Non-Infringement Instances as to which DRK did not assert counterclaims, Wiley argues in the alternative that a declaration of non-infringement should issue precisely because DRK did not counterclaim.  Finally, Wiley also requests declaratory relief as to the Krasemann Images on the same ground that it requests dismissal, *viz.*, that DRK lacks a valid copyright registration.

> ### a.   DRK Does Not Have Standing to Maintain Its Counterclaims as to the Non-Bean and Non-French Instances

As an initial matter, DRK seeks to voluntarily dismiss its claims for the instances of alleged infringement that were previously resolved in arbitration, as well as claims related to photographs by Michael Collier that are included in the DRK Counterclaim Instances.  (Counter-Pl. Reply 1).  These instances are identified at lines 1, 32, 33, 48, 49, 73, and 79 of DRK's Chart.  Voluntary dismissal of these claims, however, "is improper at this stage of the proceedings."  *Muench Photography, Inc.*, 2013 WL 4464002, at *4; Fed. R. Civ. Proc. 41.  Accordingly, Wiley's motion for summary judgment as to these instances is granted.  *See Muench Photography, Inc.*, 2013 WL 4464002, at *4 (granting summary judgment in the defendant's favor where plaintiff sought to

voluntarily withdraw claims after defendant served its summary judgment motion).[21]

Putting the Bean and French Instances aside, as discussed at length above, DRK lacks standing to maintain its counterclaims against Wiley as to the DRK Summary Judgment Instances. The parties do not dispute that the same Representation Agreements and Assignment Agreements govern the photographs at issue. Just as those two agreements could not confer standing as to the DRK Summary Judgment Instances, they similarly cannot confer standing as to the broader category of the DRK Counterclaim Instances. For that reason, Wiley's motion for summary judgment as to the DRK Counterclaim Instances (less the French and Bean Instances) is granted.

### b. Wiley's Declaratory Judgment Claims as to the Non-Bean and Non-French Instances Must Be Dismissed

Wiley seeks a declaratory judgment under the Declaratory Judgment Act for non-infringement as to the more comprehensive group of Wiley Non-Infringement Instances, except the Bean and French Instances, arguing that DRK lacks standing as to these instances. (*See* Pl. Br. 6-12). Wiley also argues that it is entitled to declaratory relief for the additional reasons that DRK failed to file counterclaims as to 22 instances included in Wiley's complaint, and that the Krasemann Images' copyright registrations are invalid. (*Id.* at 12-18). In response, DRK relies on the same Representation Agreements and Assignment Agreements to argue that it has standing to sue (Def. Opp. 13-18); it claims

---

[21]   Even if DRK had not sought to voluntarily dismiss these claims, summary judgment would still have been granted in Wiley's favor for the reasons set forth herein.

that not opposing the 21 instances does not equate to a declaration of non-infringement in Wiley's favor (*id.* at 27); and it contends that the copyright registrations for the Krasemann Images are valid (*id.* at 19-26).[22]

The Court has held that neither the Representation Agreements nor the Assignment Agreements confer standing on DRK to sue for copyright infringement.  Accordingly, because the same agreements govern the Wiley Non-Infringement Instances (except, as noted, the Bean and French Instances), the Court agrees with Wiley that DRK lacks standing to sue as to these instances.  DRK's lack of standing, however, does not equate to Wiley's entitlement to a declaration of non-infringement.  Quite the opposite: DRK's lack of standing to sue Wiley requires dismissal of Wiley's claims as to the non-Bean and non-French Wiley Non-Infringement Instances.

The Declaratory Judgment Act provides:

> In a case of actual controversy within its jurisdiction, … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a).  "[T]he phrase 'case of actual controversy' in the [Declaratory Judgment] Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III."  *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S.

---

[22]  Because the Court resolves the issue on standing grounds, it need not determine whether the copyright registrations for the Krasemann Images are valid.  Similarly, as to the Non-Bean Instances within the 21 instances, those too are resolved on standing grounds and need not be separately addressed.  The 21 instances not related to photographs by Bean include instances at lines 293, 294, 296, 299 to 312, and 315 to 316 of Wiley's Chart.

118, 127 (2007) (quoting *Aetna Life Ins. Co.* v. *Haworth*, 300 U.S. 227, 240 (1937)). "It is a basic principle of Article III that a justiciable case or controversy must remain 'extant at all stages of review, not merely at the time the complaint is filed.'" *United States* v. *Juvenile Male*, 131 S. Ct. 2860, 2864 (2011) (quoting *Arizonans for Official English* v. *Arizona*, 520 U.S. 43, 67 (1997)); *see also Alvarez* v. *Smith*, 558 U.S. 87, 92 (2009) ("The Constitution permits this Court to decide legal questions only in the context of actual 'Cases' or 'Controversies.' An 'actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" (quoting *Preiser* v. *Newkirk*, 422 U.S. 395, 401 (1975) (internal citation omitted)). "[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc.*, 549 U.S. at 127.

"Throughout the litigation, the party seeking relief must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Juvenile Male*, 131 S. Ct. at 2864. "As with any federal action, courts may not entertain actions for declaratory judgment 'when the parties are asking for an advisory opinion, when the question sought to be adjudicated has been mooted by subsequent developments, and when there is not standing to maintain the action.'" *Velvet*

*Underground* v. *Andy Warhol Found. for the Visual Arts, Inc.*, 890 F. Supp. 2d

398, 403 (S.D.N.Y. 2012) (quoting *Flast* v. *Cohen*, 392 U.S. 83, 95 (1968)).

"To have standing to pursue a declaratory relief action regarding

copyright infringement, a plaintiff must show that 'under all the circumstances

of the case, there is a substantial controversy between parties having adverse

legal interests, and that the controversy is of sufficient immediacy and reality

to warrant declaratory relief.'" *Amaretto Ranch Breedables* v. *Ozimals Inc.*, 907

F. Supp. 2d 1080, 1084-85 (N.D. Cal. 2012) (quoting *Hal Roach Studios, Inc.* v.

*Richard Feiner & Co.*, 896 F.2d 1542, 1555-56 (9th Cir. 1989)).  The party must

have "a real and reasonable apprehension that he will be subject to liability if

he continues the allegedly infringing conduct."  *Id.*; *see also Velvet*

*Underground*, 890 F. Supp. 2d at 403-04 ("Under the Declaratory Judgment

Act, a party who wishes to engage in conduct that may infringe another's

intellectual property rights may seek a declaration that those rights are invalid

without first exposing itself to liability.  But the dispute must be presented in

the context of a specific live grievance that justifies invoking the protection of

the courts to shield the plaintiff against the defendant's actual interference

with its legal interests." (internal citations and quotation marks omitted)).

The Court's determination that DRK lacks standing effectively moots the

controversy between the parties.  In light of the Court's holding, Wiley is no

longer confronted with a reasonable apprehension that it will be subject to

liability *to DRK* for the alleged infringement, if it continues to engage in the

allegedly infringing conduct.  Although Wiley argues that a determination that

DRK lacks standing under the copyright law equates to a declaration of non-

infringement in its favor (Pl. Reply 11), such a result is not tenable under

Article III.  DRK's inability to sue Wiley for copyright infringement for the non-

Bean and non-French Instances strips this Court of subject matter jurisdiction.

*Amaretto Ranch Breedables*, 907 F. Supp. 2d at 1086 (holding that plaintiff

lacked standing for declaratory relief where the defendants lacked standing to

sue for copyright infringement; finding that the court would not exercise its

discretion to grant declaratory relief even if standing was established; and

denying plaintiff's motion for summary judgment as to the declaratory

judgment claims and dismissing those claims for lack of subject matter

jurisdiction); *see also Fina Research S.A.* v. *Baroid Drilling Fluids, Inc.*, 98 F.3d

1357 (Table), 1996 WL 521465, at *2-3 (Fed. Cir. 1996) (upholding district

court's dismissal of plaintiff's declaratory judgment complaint for lack of "case

of actual controversy," where defendant, an alleged patentee, did not have

standing to sue); *cf. Velvet Underground*, 890 F. Supp. 2d at 404 ("Accordingly,

in intellectual property cases, when a declaratory judgment plaintiff seeks a

declaration that an asserted right is invalid or otherwise unenforceable and the

declaratory defendant provides the plaintiff with a covenant not to sue for

infringement of that right, that covenant can 'extinguish any current or future

case or controversy between the parties, and divest the district court of subject

matter jurisdiction.'" (quoting *Dow Jones & Co.* v. *Ablaise Ltd.*, 606 F.3d 1338,

1348 (Fed. Cir. 2010))); *Orion Elec. Co., Ltd.* v. *Funai Elec. Co., Ltd.*, No. 01 Civ. 3510 (AGS) (JCF), 2001 WL 1506009, at *3 (S.D.N.Y. Nov. 26, 2001) (recognizing that if defendant did not have standing to bring a claim against the plaintiff, it would not be a proper defendant in a declaratory judgment action).[23]

Wiley's motion for summary judgment for a declaration of non-infringement for the non-Bean and non-French Wiley Non-Infringement Instances is denied, and its claims as to those instances are likewise dismissed for lack of subject matter jurisdiction.[24]

### c. Wiley Is Not Entitled to a Declaration of Non-Infringement as to the Remaining Bean Instances

Remaining before the Court are the Bean Instances not included in DRK's Counterclaim Instances, and identified at lines 313 and 314 of Wiley's Chart (the "Remaining Bean Instances"). Wiley argues that a declaration of non-infringement should issue as to these Instances because DRK has "presented no evidence of infringement for [these] instances." (Pl. Br. 18).

---

[23]    The Court's reliance on cases concerning patent law is entirely appropriate here. *See Sony Corp. of Am.* v. *Universal City Studios, Inc.*, 464 U.S. 417, 439 (1984) ("There is no precedent in the law of copyright for imposition of vicarious liability on such a theory. The closest analogy is provided by the patent law cases to which it is appropriate to refer because of the historic kinship between patent law and copyright law."); *Davis*, 505 F.3d at 104 ("We find support for this holding in the law of patents. Although patents and copyright law function somewhat differently, courts considering one have historically looked to the other for guidance where precedent is lacking.").

[24]    The Court's conclusion here does not conflict with its prior Opinion rejecting Defendant's argument that Plaintiff lacked standing to bring a declaratory judgment action. (Dkt. #36). That decision was predicated on Defendant's argument that Plaintiff needed to plead ownership and, more importantly, was decided without the record now before the Court, from which it can assess whether Plaintiff lacked standing to assert a claim for copyright infringement.

Wiley offers neither citation to case law nor evidentiary support to establish its entitlement to a declaratory judgment. Yet it is Wiley who carries "at a minimum the risk of non-persuasion, if not the actual burden of proof" on its motion for summary judgment. *See Thompson* v. *Cnty. of Franklin*, 314 F.3d 79, 80 (2d Cir. 2002) ("Nevertheless, [Plaintiff] commenced this action for a declaratory judgment in an effort to establish her claim and sought summary judgment toward that end. In so doing, she carried 'at a minimum the risk of non-persuasion, if not the actual burden of proof.'" (quoting *NRT Metals, Inc.* v. *Manhattan Metals (Non-Ferrous), Ltd.*, 576 F. Supp. 1046, 1052 n.17 (S.D.N.Y. 1983))); *Cont'l Assur. Co.* v. *Sanasee*, No. 04 Civ. 412 (ILG), 2006 WL 335419, at *2 (E.D.N.Y. Feb. 13, 2006) ("[T]he burden of proof rests upon the plaintiff, as it generally would in a declaratory judgment action, to establish its entitlement to judgment as a matter of law.").

"A party seeking summary judgment on a claim of non-infringement of copyright must establish that at least one element of the alleged infringement cannot be proven as a matter of law." *Bill Diodata Photography, LLC* v. *Kate Spade, LLC.*, 388 F. Supp. 2d 382, 394 (S.D.N.Y. 2005); *Jean* v. *Bug Music, Inc.*, No. 00 Civ. 4022 (DC), 2002 WL 287786, at *4 (S.D.N.Y. Feb. 27, 2002). Wiley admits that DRK's Representation Agreements with Bean were exclusive licenses that accorded to DRK the right to assert a claim for copyright infringement. (Pl. Br. 7 n.5). In doing so, Wiley implicitly concedes that DRK has established the first element necessary to prove copyright infringement.

*See Davis*, 505 F.3d at 101 ("An exclusive license … conveys an ownership interest."); *see also U.S. Naval Inst.* v. *Charter Commc'n, Inc.*, 936 F.2d 692, 695 (2d Cir. 1991) ("An exclusive license granted by the copyright owner constitutes a transfer of ownership of the copyright rights conveyed in the license.").

As for the second element, "copy[ing] the protected material without authorization," *Rogers*, 960 F.2d at 306, Wiley has not submitted evidence to establish that it used the Remaining Bean Instances within the scope of its license agreement.  Thus, Wiley has not demonstrated that at least one element of the alleged infringement cannot be proven as a matter of law.  Accordingly, Wiley's motion for summary judgment for a declaration of non-infringement as to the Remaining Bean Instances is denied.

56

## CONCLUSION

For the foregoing reasons, DRK's motion for partial summary judgment is denied as to the DRK Summary Judgment Instances except the Three Bean Instances, and DRK's claims as to those instances are dismissed; DRK's motion for partial summary judgment as to the Three Bean Instances is granted; Wiley's motion for summary judgment dismissing the non-Bean and non-French DRK Counterclaim Instances is granted, and DRK's claims as to those instances are dismissed; Wiley's motion for summary judgment for declaratory relief of non-infringement is denied; and its claims for declaratory relief as to the Wiley Non-Infringement Instances are dismissed except for the French and Bean instances at lines 3, 117, 120, 137, 140, 149, 150, 160, 163, 192, 210, 213, 224, 225, 233, 236, 247, 248, 265, 287, 290, 313, and 314 of Wiley's Chart.

The Clerk of Court is directed to terminate Docket Entries 52 and 73.

A pretrial conference will be held on March 21, 2014, at 2:30 p.m. to discuss scheduling trial in this matter.

SO ORDERED.

Dated:  February 21, 2014
           New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge

57